HUNG G. TA, ESQ. PLLC
Hung G. Ta (*pro hac vice* forthcoming)
JooYun Kim
Natalia D. Williams (*pro hac vice* forthcoming)
250 Park Avenue, Seventh Floor
New York, NY 10177
Tel:  (646) 453-7288

SAFIRSTEIN METCALF LLP
Peter Safirstein
Elizabeth Metcalf (*pro hac vice* forthcoming)
1250 Broadway, 27th Floor
New York, NY 10001
Tel:  (212) 201-2845

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BHARAT AHUJA; VALIANT INVESTMENT FUND, L.P.; JAMES OLIVER EMERSON; MICHAEL FERWEDA; RON FRANKLIN; JODY GRONOWETTER; ADAM PALANCE; ALLAN HAKKO; LANCE HEITZ; BADARINATH KIDAMBI; HUAXIN LI; ROBERT LIEBERMAN; SKY LUCAS; DAVIS C. HEMINGWAY MEMORIAL SCHOLARSHIP FOUNDATION, INC.; MATTHEW MASIELLO; JENISH PATEL; FRANK ROSSI; HARRY SILVERGLIDE; WILLIAM J. SPEDDING JR.; BENJAMIN STROH; A-LINE, EDS, INC.; JOSEPH SUSSMAN AS ADMINISTATOR OF SUSSMAN SALES CO. INC. PROFIT SHARING PLAN; STEVEN SUSSMAN; GEOFFREY VLACH; JIAKAI WANG and AMY WHITED, <br><br> Plaintiffs, <br><br> v. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, INC.; J. MICHAEL PEARSON; HOWARD B. SCHILLER; ROBERT L. ROSIELLO; DEBORAH JORN; ARI S. KELLEN and TANYA CARRO, <br><br> Defendants. | Civil Case No. 18-cv-846 <br><br> COMPLAINT <br><br> DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page No.**

TABLE OF ABBREVIATIONS ................................................................................. iv

I.      INTRODUCTION ..................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................... 7

III.    PARTIES .................................................................................................. 7

        A.      Plaintiffs ........................................................................................ 7

        B.      Defendants .................................................................................... 9

                1.      Valeant ............................................................................. 9

                2.      Executive Defendants ..................................................... 9

        C.      Relevant Third Parties ................................................................ 11

IV.     VALEANT'S FRAUDULENT SCHEME ............................................. 12

        A.      Valeant's Growth By Acquisition Strategy ............................... 12

        B.      Valeant's Price Gouging ............................................................ 15

        C.      Valeant's Secret Pharmacy Network ......................................... 19

                1.      Valeant Creates Philidor, Which Was Devoted To Dispensing Valeant Brand Drugs ............................ 20

                2.      Valeant's Close Ties To Philidor ................................... 20

                3.      Valeant's Control Over Philidor ..................................... 21

                4.      Valeant Creates Shell Companies Tied To Philidor To Secretly Expand The Captive Pharmacy Network ...... 23

        D.      Valeant's Use Of Its Secret Pharmacy Network To Insulate Its Branded Drugs From Generic Competition, Inflate Prices, And Book Fictitious Sales ........................................................... 25

                1.      Altering Prescriptions .................................................... 28

                2.      Valeant's Submission Of Fraudulent Claims ................ 29

                3.      Valeant's Submission Of Fraudulent Prescription Renewals ......................................................................... 31

i

4.    Valeant's Misrepresentations To Patients ................................................... 32

E.    Valeant's Deceptive Use Of "Patient Assistance Programs" .............................. 33

F.    The R&O Lawsuit ................................................................................ 37

V.    DEFENDANTS ISSUED FALSE AND MISLEADING MATERIAL STATEMENTS DURING THE RELEVANT PERIOD ................................... 40

A.    Defendants' Material Misstatements From January To June 2013 ..................... 44

B.    Defendants' Material Misstatements From July 2013 To January 2014 ............. 50

C.    Defendants' Material Misstatements February To June 2014 ........................... 53

D.    Defendants' Material Misstatements From July 2014 To January 2015 ............. 61

E.    Defendants' Material Misstatements From February To April 2015 .................. 67

F.    Defendants' Material Misstatements From May to July 2015 ........................... 73

G.    Defendants' Material Misstatements From September to December 2015 ................................................................................................ 78

VI.    THE TRUTH ABOUT DEFENDANTS' FALSE AND MISLEADING STATEMENTS EMERGES ................................................................. 91

A.    Valeant's Extraordinary Price Gouging Is Revealed ............................................ 91

B.    Valeant's Secret Relationship With Philidor ........................................................ 94

C.    Valeant's Closure Of Philidor ............................................................................. 100

D.    The Financial Impact Of The Fraud ................................................................... 105

E.    Valeant's Fraudulent Accounting ...................................................................... 108

F.    Additional Revelations Regarding The Fraud And Its Impact ........................... 113

VII.    VALEANT'S FINANCIAL STATEMENTS VIOLATED GAAP AND SEC RULES ................................................................................................ 117

A.    Valeant Improperly Recognized Philidor Revenue ........................................... 119

B.    Valeant Concealed Philidor As A VIE .............................................................. 121

C.    Defendants' False Statements Regarding Internal Controls .............................. 122

D.  Defendants Concealed Valeant's Reliance on Philidor and Price Gouging ........................................................................................................... 125

E.  Defendants' False And Misleading Statements Were Quantitatively And Qualitatively Material ...................................................................... 128

VIII. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ......................... 130

A.  The Executive Defendants' Role In Valeant's Business Strategy ..................... 130

B.  The Executive Defendants Closely Monitored and Ultimately Closed, Philidor ........................................................................................................... 135

C.  Evidence Of Scienter From the U.S. Attorney's Complaint Against Tanner ........................................................................................................... 139

D.  Valeant's Refusal To Pursue Remedies Against Wrongdoers ............................ 142

E.  Valeant's Admissions Of Wrongdoing ............................................................. 143

F.  The Congressional Hearings ........................................................................... 144

1.  February 4, 2016 House Oversight Committee Hearing ....................... 144

2.  Senate Aging Committee Hearing ......................................................... 147

G.  Executive Departures ...................................................................................... 150

H.  Pearson's Misrepresentations To Ackman ........................................................ 151

I.  Valeant's Executive Compensation Structure Provided A Motive To Engage In Fraud ........................................................................................... 155

J.  Defendants Were Motivated To Inflate Valeant's Stock Price To Facilitate Acquisitions ................................................................................. 158

IX.  LOSS CAUSATION ...................................................................................... 159

X.  PLAINTIFFS' RELIANCE ............................................................................ 172

XI.  NO SAFE HARBOR ...................................................................................... 174

XII.  COUNTS ........................................................................................................ 175

XIII.  PRAYER FOR RELIEF ................................................................................. 178

XIV.  JURY DEMAND ............................................................................................ 178

iii

## TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| "Ackman" | Bill Ackman, CEO of Pershing Square and a Director of Valeant |
| "AF" | Alternative Fulfillment initiative at Valeant |
| "ASC 810" | ASB Accounting Standards Codification Topic 810, Consolidation |
| "Back Rank" | Back Rank, LLC, a Philidor-controlled shell company |
| "BMO" | BMO Capital Markets Corp. |
| "Board" or "Board of Directors" | Valeant's Board of Directors |
| "Carro" | Defendant Tanya Carro |
| "CEO" | Chief Executive Officer |
| "CFO" | Chief Financial Officer |
| "Citron" | Citron Research |
| "Company" | Defendant Valeant Pharmaceuticals International, Inc. |
| "Cummings" | U.S. Representative Elijah Cummings |
| "Davenport" | Andrew Davenport |
| "Davis" | Andrew Davis, Valeant's Senior VP for Business Development |
| "Defendants" | Executive Defendants and Valeant |
| "Deutsche Bank" | Deutsche Bank Securities Inc. |
| "DOJ" | U.S. Department of Justice |
| "EPS" | Earnings per share |
| "EVP" | Executive Vice President |
| "Exchange Act" | Securities and Exchange Act of 1934 |
| "Executive Defendants" | Defendants Pearson, Schiller, Rosiello, Jorn, Kellen and Carro |

iv

| Abbreviation | Description |
|---|---|
| "FASB" | Financial Accounting Standards Board |
| "Fleming" | James R. Fleming, managing member of Back Rank and Controller of Philidor |
| "GAAP" | Generally Accepted Accounting Practices |
| "House Oversight Committee" | U.S. House of Representatives Committee on Oversight and Government Reform |
| "Internal Controls Statement" | The statement in Valeant's 1Q13 10-Q that Valeant's management evaluated its disclosure controls and procedure, and concluded that they were effective |
| "Isolani" | Isolani, LLC |
| "Jorn" | Defendant Deborah Jorn |
| "Katz" | Drew Katz, CEO of Interstate Outdoor Advertising |
| "Kellen" | Defendant Dr. Ari S. Kellen |
| "KGA" | A subsidiary of Valeant |
| "Kornwasser" | Laizer Kornwasser, Valeant's EVP/Company Group Chairman |
| "Lucena" | Lucena Holdings |
| "Marathon" | Marathon Pharmaceuticals |
| "March 2015 Stock Offering" | Valeant's $1.45 billion public offering of 7.3 million shares of common stock at a price of $199 per share, announced on March 16, 2015 |
| "Maris" | David Maris, analyst at Wells Fargo |
| "McCaskill" | U.S. Senator Claire McCaskill |
| "McKinsey" | McKinsey & Company |
| "MD&A" | Management's Discussion and Analysis section of Valeant's quarterly and annual reports |
| "Medicis" | Medicis Pharmaceutical Corporation |

| Abbreviation | Description |
|---|---|
| "Merritt | Mark Perritt, President and CEO at the PCMA |
| "Mizuho" | Mizuho Securities USA |
| "MME" | Marketing Medical Economics |
| "Morfit" | Mason Morfit, President of ValueAct Capital, one of Valeant's largest shareholders |
| "NPI" | A pharmacy's National Provider Identification Number |
| "NYSE" | New York Stock Exchange |
| "Orbit" | Orbit Pharmacy, Inc, based in Houston |
| "PAPs" | Patient Assistance Programs |
| "Papa" | Joseph C. Papa, Valeant's CEO and Chairman |
| "PBMs" | Pharmacy benefit managers |
| "PCMA" | Pharmaceutical Care Management Association |
| "Pearson" | Defendant J. Michael Pearson |
| "Philidor" | Philidor Rx Services |
| "Plaintiffs" | Bharat Ahuja, Valiant Investment Fund, L.P., James Oliver Emerson, Michael Ferweda, Ron Franklin, Jody Gronowetter, Adam Palance, Allan Hakko, Lance Heitz, Badarinath Kidambi, Huaxin Li, Robert Lieberman, Sky Lucas, Davis C. Hemingway Memorial Scholarship Foundation, Inc., Matthew Masiello, Jenish Patel, Frank Rossi, Harry Silverglide, William J. Spedding Jr., Benjamin Stroh, A-Line, EDS, Inc., Joseph Sussman as Administrator of Sussman Sales Co. Inc. Profit Sharing Plan, Steven Sussman, Geoffrey Vlach, Jiakai Wang and Amy Whited |
| "Purchase Option Agreement" | December 15, 2014 agreement under which Valeant Paid Philidor's owner $100 million for the option to acquire Philidor for $0 for ten years |
| "RBC" | RBC Capital Markets, LLC |
| "RE" | Responsible entity |

| Abbreviation | Description |
| --- | --- |
| "Reitz" | Russell Reitz, a South California pharmacist who sold R&O to Philidor |
| "Relevant Period" | January 4, 2013 to March 15, 2016 |
| "R&O" | R&O Pharmacy in California |
| "Rosiello" | Defendant Robert L. Rosiello |
| "Salix" | Salix Pharmaceuticals |
| "Schiller" | Defendant Howard B. Schiller |
| "SEC" | Securities and Exchange Commission |
| "Senate Aging Committee" | U.S. Senate Committee on Aging |
| "SIRF" | Southern Investigative Reporting Foundation |
| "SOX" | Sarbanes-Oxley Act of 2002 |
| "SOX Certifications" | Certifications required under the Sarbanes Oxley Act |
| "Stolz" | Brian Stolz, former Vice President of Valeant |
| "Tanner" | Gary Tanner |
| "TPP" | Third party payors |
| "Turing" | Turing Pharmaceuticals |
| "Tyco" | Tyco International, Ltd. |
| "Valeant" | Defendant Valeant Pharmaceuticals International, Inc. |
| "VIE" | Variable Interest Entities, defined in GAAP as a legal entity subject to consolidation |
| "Warren" | U.S. Senator Elizabeth Warren |

Bharat Ahuja, Valiant Investment Fund, L.P., James Oliver Emerson, Michael Ferweda, Ron Franklin, Jody Gronowetter, Adam Palance, Allan Hakko, Lance Heitz, Badarinath Kidambi, Huaxin Li, Robert Lieberman, Sky Lucas, Davis C. Hemingway Memorial Scholarship Foundation, Inc., Matthew Masiello, Jenish Patel, Frank Rossi, Harry Silverglide, William J. Spedding Jr., Benjamin Stroh, A-Line, EDS, Inc., Joseph Sussman as Administrator of Sussman Sales Co. Inc. Profit Sharing Plan, Steven Sussman, Geoffrey Vlach, Jiakai Wang and Amy Whited (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action under the Securities and Exchange Act of 1934 ("Exchange Act") against Valeant Pharmaceuticals International, Inc. ("Valeant" or the "Company"), and certain of its former and current officers and/or directors (collectively, "Defendants") to recover damages for losses Plaintiffs have suffered on common stock and other securities of Valeant purchased or acquired by Plaintiffs between January 4, 2013 and March 15, 2016 (the "Relevant Period").

Except as to allegations specifically pertaining to Plaintiffs, all allegations herein are based upon the investigation undertaken by Plaintiffs' counsel.  Counsel's investigation included, but was not limited to, the review and analysis of:  (i) documents filed by Valeant with the U.S. Securities and Exchange Commission ("SEC"); (ii) securities analysts' reports about Valeant; (iii) transcripts of Valeant conference calls; (iv) Valeant press releases; (v) media reports concerning Valeant; (vi) Congressional hearings and documents used at these hearings; and (vii) other publicly available information.  Counsel's investigation is continuing, and many of the relevant facts are known only by Defendants, or are exclusively within their custody or control.

## I.   INTRODUCTION

1.     This case arises from a fraudulent scheme perpetrated by Valeant and its senior insiders to inflate the Company's revenues and profits.  Under this fraudulent scheme, Defendants

engaged in a number of deceptive practices through a network of secretly controlled pharmacies, in order to shield the Company's branded drugs from generic competition and, thus, to charge exorbitant prices for those products.  Valeant's fraudulent scheme also involved accounting fraud, which included the improper early recognition of revenues.

2.       As a result of this fraudulent scheme, Defendants misled investors about Valeant's business model and the sustainability of its growth, thereby artificially inflating the price of Valeant securities.

3.       Valeant is a specialty pharmaceutical and medical device company that develops, manufactures and markets a broad range of branded and generic pharmaceuticals, over-the-counter (OTC) products and medical devices.  Although Valeant is incorporated in Canada, it operates most of its business in the United States.

4.       Like most pharmaceutical companies, Valeant's business strategy for revenue growth was, historically, based on investing in research and development (R&D) to develop new or improved products and treatments.  However, Valeant was not successful with this traditional business strategy.

5.       In 2008 Valeant's business strategy changed.  In that year, Defendant J. Michael Pearson ("Pearson") became the Company's Chairman and Chief Executive Officer ("CEO").  Prior to joining Valeant, Pearson had been a management consultant at McKinsey & Company ("McKinsey") and had no background in medicine or pharmaceuticals.  Under the belief that R&D investment produced low returns and often failed to result in marketable drugs, Pearson dramatically cut R&D costs at Valeant and focused on acquiring new drugs by acquiring other companies.  Pearson claimed that the Company would then be able to market these acquired drugs

"more efficiently" – that is, by increasing the sales **volume** of the acquired drugs, and not just by increasing the prices of the acquired drugs.

6.    Throughout the Relevant Period, Valeant and its senior executives repeatedly claimed Valeant's dramatic growth in revenues and profitability was attributable to Valeant's superior marketing, sales teams, and leadership – which resulted in sales volume that was "***greater than price in terms of our growth.***"   Defendants further assured investors that the Company maintained "***extremely high ethical standard[s],***" that compliance was "***very, very, important***" to the Company, and that there were hard caps on how much Valeant could raise prices.  Defendants also informed investors that Valeant had strong internal controls and compliance, and that its accounting complied with Generally Accepted Accounting Practices ("GAAP").

7.    For example, in May 2014, Pearson represented to investors that "the highest price increase we could take under any managed care contract we have in the US is 9% a year."  Pearson emphasized that "we have a lot of constraints, just like other pharma companies do, in terms of pricing," and confirmed that "the vast majority of our growth on a global basis… is volume."  "I can assure you our operating model is both durable and sustainable," Pearson informed the market, pointing out that most of the Company's top products were "growing by volume, not just price."

8.    In response to these and other similar representations by Valeant and its top executives, Valeant's stock price soared nearly 350%, from just over $60 at the start of the Relevant Period, to a high of over $260 on August 5, 2015.

9.    In reality, Valeant's non-traditional business model was neither low risk nor sustainable.  Instead, unbeknownst to investors, the Company's business model and financial performance relied on a secret, Valeant-controlled pharmacy network and various deceptive practices that exposed the Company to enormous risks.  These deceptive and illegal practices

3

allowed the Company to exorbitantly raise the price of its products, and to ensure that the higher prices would be paid by patients and third party payors ("TPPs").  In this manner, Valeant insulated Valeant-branded products from generics and other less expensive comparable treatments.

10.   ***First***, Valeant created a concealed network of controlled pharmacies centered around Philidor Rx Services ("Philidor"), a mail order pharmacy in Pennsylvania.  Valeant then created a host of shell companies owned through Philidor, which Defendants used to acquire interests in additional retail pharmacies all over the United States.  Defendants channeled prescriptions for Valeant-branded, high-priced drugs through Philidor.  Philidor employees, as well as Valeant employees staffed at Philidor under aliases, were instructed to employ a host of deceptive practices to prevent the substitution of cheaper generic equivalents for Valeant-branded drugs.  These deceptive practices included: (i) changing prescription codes on claims to require that the prescription be filled with Valeant's brand-name drugs instead of less expensive generics; (ii) resubmitting previously denied claims to TPPs with altered prescription codes requiring Valeant brand drugs and falsely designated as "new" claims; (iii) falsely submitting reimbursement claims for prescription renewals that had not been requested by the patients; and (iv) falsely promising patients and doctors Valeant drugs at no cost if prescriptions were filled at Philidor, ensuring that the prescription would not be filled at a non-captive pharmacy, which would substitute cheaper generics for the branded drugs.

11.   ***Second***, Valeant routinely and systematically waived or reduced patient co-pays when submitting claims to insurance companies and other TPPs.  This allowed patients to fill their prescriptions with the higher-priced Valeant drugs rather than the lower-priced generic substitutes, and to obtain unnecessary refills.  Valeant waived the cost for the patient, but submitted reimbursement claims to the TPPs for the full cost of the Valeant-branded drugs.

4

12.     The success of Defendants' scheme hinged on its secrecy.   Had insurance companies and other TPPS or pharmacy benefit managers ("PBMs") known the truth about Valeant's captive pharmacy network and deceptive practices, they would have denied the claims submitted by pharmacies in the network.   To prevent discovery, Defendants deliberately misrepresented to regulators the ownership and control of these pharmacies to ensure that Valeant could charge inflated prices for Valeant-branded drugs and to sell Valeant-branded drugs that would otherwise never have been purchased.   To maintain the secrecy of the Valeant pharmacy network, Defendants also issued numerous false and misleading statements to investors, TPPs, PBMs and government regulators.

13.     Commencing in September 2015, the truth about Valeant's fraudulent scheme was gradually revealed, through a series of disclosures by the Company, as well as reports by analysts, investigations by government agencies, and private litigation.   In September 2015, *Bloomberg* announced that Congress was investigating Valeant for price gouging.   On October 19, 2015, Valeant admitted its improper relationship with Philidor.   Shortly thereafter, the three largest pharmacy benefit managers in the U.S. – CVS Health Corp., Express Scripts Holding Co., and UnitedHealth Group Inc.'s OptumRx – announced that they were dropping Philidor from their networks.   They also disclosed that audits revealed that Philidor had failed to comply with the terms of their agreements.   Almost immediately thereafter, Valeant was forced to announce the termination of its relationship with Philidor.   On March 2016, Valeant revealed it had engaged in accounting improprieties and would have to restate prior financial statements.

14.     On August 10, 2016, the full extent of Valeant's fraudulent scheme was revealed when *The Wall Street Journal* reported that federal prosecutors were investigating Valeant for criminal fraud.   On January 26, 2017, the U.S. Attorney for the Southern District of New York

indicted Gary Tanner, a senior executive at Valeant, and Andrew Davenport, Philidor's former CEO, for violations of the wire and mail fraud statutes, and money laundering.

15.     Following these revelations, most of the senior Valeant executives and directors responsible for the misconduct were forced out.  Valeant specifically attributed its fictitious accounting to the "improper conduct" of Defendant Howard B. Schiller, its former Chief Financial Officer ("CFO"), and its former Corporate Controller, as well as the unethical "tone at the top" set by senior management, including Defendant Pearson, its former CEO.  All of these individuals were terminated and replaced.  Defendant Deborah Jorn, who led the Company's dermatology division responsible for a substantial portion of Philidor's sales, was also forced out of the Company.  In addition, Valeant announced the replacement of the majority of its Audit Committee, who reviewed and approved the accounting for Philidor and conducted due diligence at Philidor.

16.     Valeant also withdrew its financial statements and acknowledged them to be false, restated its revenue for fiscal year 2014, drastically reduced its revenue and profitability guidance for 2015 and 2016, and admitted that the Company's disclosure controls and internal controls with respect to financial reporting had been inadequate.

17.     As a result of all of these revelations, investors in Valeant securities have suffered enormous losses.  As the market became aware of the truth about Valeant, Valeant's stock price fell from a Relevant Period high of over $262 per share to less than $25 on August 10, 2016, a decline of *more than 90%*.  In total, the Company's shareholders suffered over *$76 billion* in market capitalization losses.  Through this action, Plaintiffs seek to recover the damages caused by Defendants' misconduct.

## II.        JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391.  The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

20.     In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange, namely, the New York Stock Exchange ("NYSE").

21.     Plaintiffs' claims are based upon their purchases of common stock and other securities of Valeant on the NYSE.

## III.       PARTIES

### A.        Plaintiffs

22.     Plaintiff Bharat Ahuja is an individual residing in California.

23.     Plaintiff Valiant Investment Fund, L.P. is a limited partnership organized under the laws of Colorado, with its principal place of business in California.

24.     Plaintiff James Oliver Emerson is an individual residing in Iowa.

25.     Plaintiff Michael Ferweda is an individual residing in California.

26.     Plaintiff Ron Franklin is an individual residing in Illinois.

27.     Plaintiffs Jody Gronowetter and Adam Palance are individuals residing in New Jersey.

28.     Plaintiff Allan Hakko is an individual residing in Turkey.

7

29.     Plaintiff Lance Heitz is an individual residing in Michigan.

30.     Plaintiff Badarinath Kidambi is an individual residing in Texas.

31.     Plaintiff Huaxin Li is an individual residing in Michigan.

32.     Plaintiff Robert Lieberman is an individual residing in California.

33.     Plaintiff Sky Lucas is an individual residing in New Hampshire.

34.     Plaintiff Davis C. Hemingway Memorial Scholarship Foundation, Inc. is a non-profit corporation organized under the laws of New Hampshire.

35.     Plaintiff Matthew Masiello is an individual residing in South Carolina.

36.     Plaintiff Jenish Patel is an individual residing in Texas.

37.     Plaintiff Frank Rossi is an individual residing in Arizona.

38.     Plaintiff Harry Silverglide is an individual residing in Florida.

39.     Plaintiff William J. Spedding Jr. is an individual residing in Florida.

40.     Plaintiff Benjamin Stroh is an individual residing in Iowa.

41.     Plaintiff A-Line EDS, Inc. is a company incorporated under the laws of Iowa with its corporate headquarters in Iowa.

42.     Joseph Sussman is an individual residing in Florida and is a plaintiff in this action in his capacity as Administrator for the Sussman Sales Co. Inc. Profit Sharing Plan.

43.     Plaintiff Steven Sussman is an individual residing in New York.

44.     Plaintiff Geoffrey Vlach is an individual residing in Ohio.

45.     Plaintiff Jiakai Wang is an individual residing in New York.

46.     Plaintiff Amy Whited is an individual residing in Connecticut.

8

47.     Plaintiffs purchased common stock and other securities of Valeant during the Relevant Period at artificially inflated prices, and suffered damages as a result of the violations alleged in this Complaint.

### B.     Defendants

#### 1.     Valeant

48.     Defendant Valeant is a Canadian corporation, incorporated under the laws of the Province of British Columbia.  Its United States headquarters is located at 400 Somerset Corporate Boulevard, Bridgewater, New Jersey.  Valeant touts itself as a "multinational, specialty pharmaceutical and medical device company that develops, manufactures and markets a broad range of branded, generic and branded generic pharmaceuticals, over-the-counter (OTC) products, and medical devices [ ], which are marketed directly or indirectly in more than 100 countries."  Valeant is one of the largest pharmaceutical companies in the United States.  Shares of Valeant stock trade on the NYSE and the Toronto Stock Exchange under the ticker symbol "VRX."

#### 2.     Executive Defendants

49.     Defendant J. Michael Pearson served as Valeant's CEO and a member of the Company's Board of Directors from 2008 until May 3, 2016.  Pearson served as Chairman of the Board of Directors from March 2011 to January 2016.  Pearson took a medical leave in January and February 2016.  On March 21, 2016 Valeant announced that Pearson had been terminated and would be replaced.  During the Relevant Period, Pearson obtained Valeant stock valued, at one time, at over $2 billion.  Pearson's total compensation (including cash and stock awards) for 2013, 2014 and 2015 was approximately $7 million, $10.3 million and $140.3 million, respectively.

50.     Defendant Howard B. Schiller ("Schiller") served as Valeant's CFO and an Executive Vice President ("EVP") of the Company from December 2011 until June 30, 2015,

when he resigned from the position.  Additionally, Schiller was a member of Valeant's Board of Directors from September 2012 until June 2016, and served as the Company's interim CEO in January and February 2016 while Pearson was on medical leave.  On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" related to the Company's accounting restatement, and asked him to resign as a director of the Company.  Schiller refused, and was not made a candidate for re-election to the Board.  Schiller's total compensation (including cash and stock awards) for 2013 and 2014 was approximately $4 million and $27 million, respectively.

51.    Defendant Robert L. Rosiello ("Rosiello") served as Valeant's CFO and an EVP of the Company from July 2015 until his departure on December 31, 2016.  During Pearson's medical leave and before Schiller was appointed interim CEO, Rosiello served as one of the three members of the Company's "Office of the CEO."  Like Pearson, Rosiello came to Valeant from McKinsey, where he worked for over 30 years.  Rosiello's total compensation (including cash and stock awards) for 2015 was approximately $60.4 million.

52.    Defendant Deborah Jorn ("Jorn") served as a Valeant EVP and Company Group Chairman from August 2013 until her departure on March 2, 2016.  Jorn was general manager of Valeant's U.S. dermatology business, and she joined the Company in connection with its acquisition of Bausch & Lomb, where she served as Vice President of Global Marketing.  Jorn's total compensation (including cash and stock awards) for 2013, 2014, and 2015, was approximately $1.7 million, $2.3 million and $5.6 million, respectively.

53.    Defendant Dr. Ari S. Kellen ("Kellen") served as the Company's EVP and Company Group Chairman from January 1, 2014 until his departure on December 31, 2016. Kellen briefly served as one of the three members of the Office of the CEO after Pearson went on medical leave and before Schiller was named interim CEO.  Like Pearson and Rosiello, Kellen

worked at McKinsey for over 22 years.  Following Jorn's departure, Kellen became and currently serves as the head of Valeant's U.S. dermatology business.  Kellen's total compensation (including cash and stock awards) for 2014 and 2015 was approximately $50.6 million and $4.6 million, respectively.

54.     Defendant Tanya Carro ("Carro") was at all relevant times Valeant's Corporate Controller.  On March 21, 2016, Valeant announced Carro had been placed on administrative leave after committing "improper conduct" related to the Company's accounting restatement.  Shortly thereafter, Valeant announced that it had hired a new Controller.

55.     Defendants Pearson, Schiller, Rosiello, Jorn, Kellen and Carro are collectively referred to herein as the "Executive Defendants."

56.     The Executive Defendants possessed the authority to control the contents of Valeant's quarterly reports, annual reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They received copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material nonpublic information available to them but not to the public, the Executive Defendants knew that the adverse facts specified herein had not been disclosed and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Executive Defendants are liable for the false statements pleaded herein.

###     C.     Relevant Third Parties

57.     Philidor is a Delaware limited liability company.  Its headquarters were located at 400 Horsham Road, Suite 109, Horsham Pennsylvania, 19044.  It was formed in January 2013

with the assistance of Valeant employees to serve as the head of Valeant's secret network of specialty pharmacies.

58.     Gary Tanner ("Tanner") was hired by Valeant in or about December 2012 as its Executive Director of Commercial Analytics.  By April 2013, Valeant also appointed Tanner to the position of Senior Director for Valeant's "Access Solutions Team."  Tanner was largely responsible for overseeing daily operations at Philidor, including its alternative prescription fulfillment, or "AF" program.  On November 16, 2016, the U.S. Attorney charged Tanner with violations of mail and wire fraud statutes, as well as money laundering, for his role in the fraudulent scheme.  An indictment was filed on January 26, 2017.

59.     Andrew Davenport ("Davenport") created Philidor with the assistance of Tanner, Valeant and others.  During the Relevant Period, Davenport was the CEO of Philidor.  On November 16, 2016, the U.S. Attorney charged Davenport with violations of mail and wire fraud statutes, as well as money laundering, for his role in the fraudulent scheme.  An indictment was filed on January 26, 2017.

## IV.    VALEANT'S FRAUDULENT SCHEME

### A.    Valeant's Growth By Acquisition Strategy

60.     Traditional pharmaceutical companies typically spend 15-20% of their revenue on R&D to develop new or improved cures and treatments for diseases, and to provide future revenue growth.  In order to encourage investments in such research, U.S. patent law generally protects newly developed products from generic competition for a period of time.  During this period of time, pharmaceutical companies charge high prices for the new products.  This allows them to recoup their R&D investment, realize commercial success, and re-invest in R&D for new treatments.  After the patent protection expires, generic drugs enter the market.  The

pharmaceutical companies must then lower the prices of their products to compete with the generic drugs.

61.     Unlike the typical growth strategy of pharmaceutical companies, Valeant's business model involved acquiring drugs from other pharmaceutical companies and cutting R&D spending.  This unconventional strategy was directed from the very top, by Valeant's CEO Pearson.

62.     Pearson claimed that R&D spending was wasteful, R&D had a low rate of success, and a better business strategy would be to grow through acquisitions.  For example, when asked about cancer research, Pearson stated:  "I think it's a losing proposition.  I don't know any pharmaceutical company who has generated positive returns on it."  Thus, Pearson focused on acquiring companies with established products to sell, cutting R&D costs and dramatically raising prices.  Accordingly, Valeant's R&D expenditures were limited to only approximately 3% of revenue.  Executing Pearson's strategy, Valeant completed more than 100 acquisitions since 2008 at a cost of over $30 billion, which the Company financed through its positive cash flow and debt financing.

63.     Valeant's acquisitions gave the Company access to a diverse portfolio of drugs.  For example, in September of 2010, Valeant engaged in a reverse merger with Biovail Corporation, Canada's largest pharmaceutical company, for $3.3 billion, with Pearson becoming CEO of the combined company.  The merger gave Valeant access to a portfolio of dermatological drugs, drugs treating disorders of the central nervous system, and the anti-depressant drug Wellbutrin.  In 2012, Valeant purchased Medicis Pharmaceutical Corporation ("Medicis") for $2.6 billion, providing Valeant with access to drugs for the treatment of acne, as well as other aesthetic skin care products.  Also in 2012, Valeant acquired Natur Produkt International of Russia for $180 million, giving

13

Valeant control of a portfolio of cough and cold treatments.  In 2013, Valeant bought eye-care giant Bausch & Lomb from private equity firm Warburg Pincus for $8.6 billion, giving Valeant access to Bausch & Lomb's specialized ophthalmology and contact lens portfolio.  In April 2015, Valeant completed its $11 billion purchase of Salix Pharmaceuticals ("Salix"), a maker of drugs treating gastrointestinal disorders.

64.     Valeant's growth by acquisition strategy appeared to be successful.  Year after year, the Company reported consistent and steep growth, reporting $7.71 billion of revenue for the first three quarters of 2015, and revenues of $8.25 billion for 2014, $5.76 billion for 2013, and $3.48 billion for 2012.  As of July 2015, Valeant was valued at over $90 billion, making it the largest public company incorporated in Canada and the largest pharmaceutical company headquartered in the United States.

65.     During the Relevant Period, Valeant attributed the success of its non-traditional strategy to its aggressive cost-cutting strategies, its "outstanding sales teams, implementation of innovative marketing approaches, great leadership, [and] a portfolio of great products."  In a February 22, 2015 Valeant press release, Pearson attributed Valeant's explosive growth to the Company's "output-focused research and development model," which involved "focusing on innovation through our internal research and development, acquisitions, and in-licensing" and "focusing on productivity through measures such as leveraging industry overcapacity and outsourcing commodity services."  These misrepresentations concealed from Plaintiffs and the Company's other investors – as well as regulators – the true drivers of the Company's growth: price-gouging through deceitful practices based on a secret network of captive pharmacies.

14

### B.      Valeant's Price Gouging

66.      Pricing was crucial to Valeant's illusion of growth.  As demonstrated by documents that the Congressional Committee on Oversight and Government Reform obtained while investigating Valeant's misconduct, the prices Valent set for its drugs were specifically designed to reach profitability and revenue targets.  However, price gouging (facilitated by deceptive marketing and distribution practices) is an unsustainable business practice that carries increased business, reputational, compliance, and regulatory risks.  It also increases overall costs in the healthcare system and leads to push back from patients, physicians, pharmacies, and PBMs, as well as risks of nonpayment by payors.

67.      Implementing its acquisition strategy, Valeant acquired numerous "orphan drugs," which are drugs used to treat rare medical conditions.  Due to the small populations of patients that require these medications, orphan drugs face little or no competition, despite being past the point of protection from generics.  In addition, because of the small patient populations, such drugs represented smaller portions of hospital and private payor budgets and drew less scrutiny.  As a result, Valeant saw such drugs as a prime opportunity to boost revenue by increasing prices.  While the higher prices could attract competition by generics, according to the Pharmaceutical Care Management Association ("PCMA"), generic drugs face a 42-month backlog at the FDA for approval because the FDA prioritizes breakthrough therapies.  Valeant used this backlog to calculate the amount of time it could engage in price gouging to meet financial targets.  For example, on December 26, 2014, Valeant's consultant reported that "FDA Average Review Time for ANDAs [Abbreviated New Drug Application, a form used for generics] is 36-48 months."

68.      Valeant's acquisition of Isuprel and Nitropress from Marathon Pharmaceuticals ("Marathon") is an illustrative example of Valeant's strategy of acquiring products and sharply

increasing their price to exorbitant levels.  In late 2014, Valeant began exploring the acquisition of Isuprel and Nitropress, which are heart medications used in emergency situations.  The drugs were owned by Hospira and moderately priced for years.  Marathon acquired them and implemented significant price increases, but Defendants saw an opportunity to price the drugs even higher.

69.     On December 3, 2014, Andrew Davis, Valeant's Senior VP for Business Development, emailed Laizer Kornwasser ("Kornwasser"), Valeant's EVP/Company Group Chairman, that another "opportunity company is [M]arathon, value is largely derived from 2 hospital products they bought from Hospira which have no IP [intellectual property protections]." Steve Sembler, the general manager of Neurology, responded that those two drugs "make up the VAST majority of revenue" at Marathon and "[t]his would also have to be a price play (if we determine there is upside to take price)…."

70.     Defendants worked with consultants from Marketing Medical Economics ("MME") to study the pricing of Nitropress and Isuprel.  In a presentation, MME noted that Hospira had priced Nitropress at $47 in 2013.  Marathon acquired the drug and increased the price to $214.  Similarly, MME noted that Hospira had priced Isuprel at $48 in 2013.  Marathon raised the price to over $200.  MME claimed there was still "upward potential for pricing" on these drugs, adding that for Nitropress, "most patients treated are in critical condition."

71.     Defendants also worked alongside consultants from Pearson's former employer, McKinsey, as they considered the potential for dramatically increasing the prices of Isuprel and Nitropress.  On December 29, 2014, Aamir Malik, the co-leader of McKinsey's global Pharmaceuticals & Medical Products Practice, wrote an email to Pearson and Davis regarding those and other drugs stating that they "have material pricing potential."  McKinsey also noted that

"Smaller/older products (*e.g.*, Isuprel and Nitropress) are not reviewed on formulary…. Products have been in the system for so long that reviews are practically rubber stamped."

72.    Valeant's analyses showed that generic competition would likely not arrive until mid-2017 and volumes would decrease each year following generic entry.  As soon as Valeant acquired the drugs, Pearson, Schiller, Davis, and others held a meeting to discuss price.  Davis recommended a steep increase in price.  Pearson decided to raise prices even higher.

73.    Isuprel and Nitropress are examples of how dramatic price increases provide a short-term surge in profitability.  The two drugs had total revenues of approximately $150 million in 2014.  However, Valeant forecasted an increase to approximately $525 million for 2015 based on "Aggressive Pricing through consultant recommendation."  The increased revenue had nearly the same impact on bottom line profitability because, as Valeant's Senior Director of Finance stated in an email to Davis on March 24, 2015, the price assumptions "are leading to high gross margins (more than 99%)."  By the end of 2015, Valeant recorded gross revenues from the sale of Isuprel and Nitropress of approximately $540 million against a cost of approximately $2 million.

74.    These practices were wide-spread, and not limited to Isuprel and Nitropress.  According to a Deutsche Bank Securities Inc. ("Deutsche Bank") analysis, in 2015 alone, Valeant raised prices on its brand-name drugs an average of 66%, approximately five times more than its closest industry peers.

75.    In addition to Isuprel and Nitropress, Valeant also drastically increased the prices of Syprine and Cuprimine, both used to treat Wilson's disease.  In May 2010, 100 capsules of Syprine and 100 capsules of Cuprimine were priced at approximately $650 and $450, respectively.  By July 2015, Valeant had raised the prices of Syprine to over $21,000 for 100 capsules (a more than 32-fold increase) and Cuprimine to over $26,000 for 100 capsules (a more than 57-fold

increase) in the United States, even though Valeant had spent little or no money on additional R&D relating to those medications.  These products also had incredibly high margins – Valeant sold Cuprimine for approximately $240 in Brazil and $350 in Canada, roughly 1% of its price in the United States.

76.     Valeant dramatically increased the prices of numerous other drugs that it had acquired including: (i) Glumetza, a diabetes drug whose price Valeant increased from approximately $900 per 90 tablets to over $10,000 (a more than 11-fold increase); (ii) Targetin, a T-cell lymphoma drug whose price was increased from approximately $1,800 per tube to over $30,000 (a more than 16-fold increase); (iii) Carac cream, a drug for precancerous lesions whose price was increased from approximately $230 to over $2,800 per tube (a more than 12-fold increase); (iv) Wellbutrin XL, an anti-depressant, which had eleven price increases during the Relevant Period; (v) Addyi, a recently FDA approved "Female Viagra" drug, whose price was increased by 100% immediately following Valeant's acquisition of the drug from Sprout; and (vi) Mephyton, a drug that helps blood clot, which saw eight price increases since July 2014, costing $58.76 a tablet, up from $9.37.

77.     From 2014 to 2015 alone, Valeant raised prices on more than 50 other drugs.  While the Company referred to this practice as "optimization," in reality, these price increases were effectuated in conjunction with Defendants' deceptive practices, alleged in greater further below.  The chart below summarizes the price increases that Defendants implemented for certain of Valeant's drugs during the Relevant Period:

| Valeant Drug | Begin | End | Duration (in years) | Percent Increase |
|---|---|---|---|---|
| Carac Cream | Q1 2013 | Q3 2015 | 2.50 | 557% |
| Wellbutrin XL 300 MG Tablet | Q1 2013 | Q3 2015 | 2.50 | 381% |

18

| Valeant Drug | Begin | End | Duration (in years) | Percent Increase |
|---|---|---|---|---|
| Tretinoin 0.1% CRM | Q2 2014 | Q3 2015 | 1.25 | 328% |
| Vanos 0.1% CRM | Q1 2013 | Q3 2015 | 2.50 | 279% |
| Targretin 60g 1% Gel | Q1 2013 | Q3 2015 | 2.50 | 250% |
| Aldara 5% CRM | Q1 2013 | Q3 2015 | 2.50 | 223% |
| Xerese 5%-1% Cream | Q1 2013 | Q3 2015 | 2.50 | 216% |
| Noritate 1% Cream | Q1 2014 | Q3 2015 | 1.50 | 212% |
| Migranal Nasal Spray | Q1 2013 | Q3 2015 | 2.50 | 159% |
| Loprox 1% Shampoo | Q1 2013 | Q3 2015 | 2.50 | 145% |
| Atralin 0.05% Gel | Q1 2013 | Q3 2015 | 2.50 | 135% |
| Dihydroergotamine Mesylate 4MGIML Nasal Spray | Q1 2014 | Q3 2015 | 2.50 | 90% |
| Jublia (Efinaconazole topical solution 10%) | Q2 2014 | Q3 2015 | 1.25 | 20% |

C.      **Valeant's Secret Pharmacy Network**

78.      In order to insulate its brand name drugs from generic competition and boost sales, Valeant engaged in a scheme to funnel its branded drugs through a nationwide network of captive pharmacies.

79.      Traditionally, the pharmacies that dispense drugs operate independently from pharmaceutical manufacturers to avoid any conflict of interest.  Pharmacies serve as a check on prices and unnecessary refills.  As a result, TPPs and, in particular PBMs, require notification of any change in pharmacy ownership.  Any pharmacy that is owned or controlled by a manufacturer would raise increased scrutiny from the TPPs and PBMs.  To avoid the checks provided by independent pharmacies, Valeant created and controlled a secret network of pharmacies.

1.    **Valeant Creates Philidor, Which Was Devoted To Dispensing Valeant Brand Drugs**

80.    At the center of Valeant's network of captive pharmacies was Philidor.  On January 2, 2013, Philidor was incorporated as a purportedly independent specialty mail order pharmacy. During the Relevant Period, Philidor was licensed in 45 states and the District of Columbia.

81.    Philidor falsely held itself out to be a "specialty pharmacy."  Specialty pharmacies typically handle complex drugs and end-of-life situations for patients in need of unique therapies or drugs that require refrigeration.  Such specialty drugs are almost always highly differentiated brand-name drugs for patients undergoing intensive therapies for chronic, complex illnesses such as cancer and HIV.  Importantly, specialty pharmacies are exempt from reporting the drugs they sell to IMS Health, the tracking service used by companies and analysts to monitor drug sales and inventory channels.  Contrary to the typical purpose of a specialty pharmacy, Philidor was devoted to dispensing Valeant's undifferentiated traditional drugs – principally its dermatological products – most of which had low-cost generic substitutes.  Indeed, as Philidor has admitted, Valeant was Philidor's "only client."[1]

2.    **Valeant's Close Ties To Philidor**

82.    Valeant was closely tied to Philidor even before its formal incorporation.  One month before Philidor was incorporated, Valeant hired Tanner as the Company's special liaison with Philidor and to help launch the pharmacy's operations.  According to the U.S. Attorney's complaint against Tanner,[2] by April 2013, Tanner was appointed as the "Senior Director for Valeant's 'Access Solutions Team,'" and had "direct access to senior management of Valeant." Further, according to the U.S. Attorney's complaint, Tanner "interacted directly with Philidor's

_____

[1] *See Business Insider*, October 22, 2015.

[2] The U.S. Attorney's complaint against Tanner is dated November 16, 2016.

executives," including its CEO Davenport, and "supervised employees who worked partially or wholly out of Philidor's offices in Pennsylvania, including sales and managerial staff employed by Valeant and certain staff employed by Philidor."  He also maintained an office on Philidor's premises.

83.    On the same day that Philidor was incorporated, Valeant also hired Laizer Kornwasser – a former senior executive at Medco – to oversee Valeant's relationship with Philidor. Kornwasser supervised Tanner and reported directly to Valeant CEO Pearson.  Immediately upon being hired, Kornwasser received nearly $5 million in equity awards.  Both Kornwasser's prominence in Valeant's organizational structure and his outsized compensation demonstrate that Valeant viewed its relationship with Philidor as critical to the Company's success.  Tanner and Kornwasser were key employees who remained closely involved in the details of running the pharmacy, including expanding its business.

84.    In addition to Tanner and Kornwasser, Valeant installed a cadre of its employees within Philidor to supervise operations at the pharmacy and fraudulently increase the sale of Valeant drugs.  For example, Valeant placed a 30-person team inside Philidor with instructions to show doctors how to direct patients to Valeant products.  Valeant employees were also responsible for performing a variety of key business functions for the pharmacy, including interviewing Philidor job applicants and overseeing the pharmacy's billing operations.

### 3.    Valeant's Control Over Philidor

85.    On December 15, 2014, Valeant paid Philidor's owners $100 million for the option to acquire Philidor for $0 for ten years ("Purchase Option Agreement").  Valeant's little known subsidiary, KGA, was used to obtain the option to acquire Philidor.  Notably, the Purchase Option Agreement provided that Philidor was to enter into a purchase agreement with Isolani, LLC

("Isolani") and Lucena Holdings ("Lucena") (two other pharmacies discussed below) as a condition to the acquisition and stated that Philidor's business "ha[d] been conducted in the Ordinary Course of Business" since December 31, 2013.

86.    The Purchase Option Agreement also gave Valeant, through KGA, the right to form a joint steering committee to "assess and discuss" matters relating to legal compliance and Philidor's "internal policies, manuals and processes," including amending existing policies or establishing new ones.   Significantly, it documented Valeant's right to "make the final determination" regarding all matters with respect to "the Strategic Plan of Philidor" and "the compliance of [Philidor] with applicable Legal Requirements, Contractual obligations (including agreements with Third Party Payors) and the Company's internal policies and manuals" in the event of any tie of the joint steering committee members.   The Purchase Option Agreement provided for meetings and reviews of Philidor's strategic plan and compliance matters, including Philidor's policies and manuals.   The joint steering committee also had "the right to review, prior to their submission, all applications of the Company for licenses and permits (including state pharmacy licenses)."

87.    On December 15, 2014, Valeant and Philidor entered into a distribution and services agreement, which superseded a Medicis services agreement dated January 11, 2013.   In the agreement, Philidor represented it would "operate in full compliance with all licenses and permits required by Laws and all contracts with participating insurance companies and Third Party Payors."   The agreement gave Valeant the right to inspect Philidor's policies and procedures and to visit sites to verify such compliance.   Kellen signed on behalf of Valeant.   Davenport, Philidor's CEO, signed on behalf of Philidor.   Products covered by the agreement included, among others,

Elidel (an eczema treatment), Jublia (a topical treatment for toenail fungus), and Solodyn (an acne drug).

### 4. Valeant Creates Shell Companies Tied To Philidor To Secretly Expand The Captive Pharmacy Network

88.    After Philidor was formed, Defendants created a host of shell companies tied to Philidor, which they used to acquire interests in smaller retail pharmacies all over the United States and secretly extend their captive pharmacy network.  In this manner, Defendants created a network of at least 76 "phantom" pharmacies, and concealed their control of this network.  In order to keep their captive pharmacy network a secret, Defendants caused the shell companies to make false and misleading statements in pharmacy applications filed with state regulators that failed to disclose the companies' relationship with Valeant and Philidor.

89.    For example, on or about August 15, 2013, Philidor submitted an application with the California State Board of Pharmacy that contained numerous false and misleading statements designed to hide Valeant's control over Philidor.  In that application, Philidor and its CEO Davenport, while under penalty of perjury, falsely represented that:

- Alan Gubernick was Philidor's accountant and bookkeeper, when in reality it was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor;

- there were no individuals or entities with a beneficial interest in Philidor;

- there were no owners or shareholders of Philidor, when in fact there were sixteen;

- there were no persons with a beneficial interest in Philidor, when in fact there were sixteen;

- there were no entities with 10% or more ownership interest in Philidor; and

- Davenport himself was not an owner of Philidor, when in fact he owned a 27% stake in the company.

90.     On May 16, 2014, the California State Board of Pharmacy denied Philidor's application, finding that Philidor and Davenport knowingly made false statements concerning these matters, and that they made these statements "with the intent to substantially benefit [Philidor and Davenport]," and that Philidor and Davenport, by virtue of their false statements, were "guilty of unprofessional conduct."   The California State Board of Pharmacy affirmed its denial of Philidor's pharmacy license in February 2016.  According to published reports, less than 1% of applications for this particular license are denied.

91.     Undeterred by the California State Board of Pharmacy's findings and determined to gain access to the California market, the largest insurance marketplace in the United States, Defendants caused a Valeant/Philidor-controlled shell company, Lucena, to acquire a stake in a California pharmacy called "West Wilshire Pharmacy" in an effort to circumvent the Board of Pharmacy's licensing denial.  In a "Change of Permit Request" filed with the California State Board of Pharmacy on September 24, 2014, Defendants caused Lucena to falsely represent that Lucena did not have a parent company; that the only entity or individual with an interest in Lucena was Gregory W. Blaszczynski, who, unbeknownst to state regulators, was an employee of BQ6 Media, an instrumentality of Valeant and Philidor; and that Lucena's CEO and pharmacist-in-charge, Sherri Leon, was not, and had never been, "associated in business with any person, partnership, corporation, or other entity whose pharmacy permit…was denied."  In fact, Leon was Philidor's Director of Pharmacy Operations, and California had denied Philidor's pharmacy application earlier that same year.

92.     Similarly, Philidor caused another shell company, Isolani, to purchase a California-based mail order pharmacy, R&O Pharmacy ("R&O"), under an agreement dated December 1, 2014.  After Philidor's purchase of R&O through Isolani, R&O began dispensing thousands of

24

prescriptions, dwarfing the size of its business prior to its acquisition by Philidor/Valeant.  These new prescriptions were extraordinarily expensive for simple dermatological conditions like acne or eczema – all for drugs manufactured by Valeant.  It was only when R&O began its own investigation into Philidor that it discovered the relationship between Philidor and Valeant.  *See infra* Section IV.F.  In connection with its purchase of R&O, Isolani concealed from California regulators its relationship with Philidor and Valeant.

93.     Defendants also misled state regulators in Texas.  Defendants caused Back Rank, LLC ("Back Rank"), a Philidor-controlled shell company to take ownership of Houston-based Orbit Pharmacy, Inc. ("Orbit").  Back Rank's managing member, James R. Fleming ("Fleming"), was in fact Philidor's Controller, and Back Rank's address is the same as a listed Philidor mailing address,  In a September 2015 application filed with the Texas State Board of Pharmacy, Defendants caused Orbit to falsely represent that no state had ever denied a pharmacy application filed by any of the "the pharmacy's owner[s] or partner[s]."  In reality, as detailed above, California had denied Philidor's pharmacy application the previous year.  Orbit's false and misleading representation concealed its connection with Philidor and Valeant from state regulators.

94.     The full extent of Valeant's secret pharmacy network and the identities of all the pharmacies and shell companies that comprised Valeant's secret network of pharmacies is still unknown.  However, as described above, elements of that network have become public.

> **D.     Valeant's Use Of Its Secret Pharmacy Network To Insulate Its Branded Drugs From Generic Competition, Inflate Prices, And Book Fictitious Sales**

95.     Through its secret pharmacy network, Valeant shielded its products from generic competition by, among other things, flouting statutory or contractual mandates requiring substitution of generic equivalents for Valeant-branded drugs and submitting false claims information to TPPs and PBMs.  This fraudulent scheme enabled Valeant to massively increase

the price of its drugs and inflate the number of claims paid on prescriptions for those drugs.  As a result, TPPs and PBMs overpaid for Valeant's expensive branded drugs, were prevented from obtaining cheaper generic alternatives, and paid for drugs that should never have been dispensed. Investors were unaware that Valeant's illusory success and artificially inflated stock price were due to these deceptive practices.

96.     Ordinarily, pricing a brand-name alternative to a generic drug at a huge premium would have caused that product to lose market share to the point where such a price increase would be unprofitable.  A primary purpose of Defendants' secret network of pharmacies was to ensure that Valeant's branded drugs would be insulated from generic competition at the retail outlet, where such competition plays out as a result of the incentives to pharmacies and patients.

97.     Fourteen states, including Pennsylvania (the state in which Philidor is headquartered), require pharmacists to substitute generic equivalents for branded drugs. Additionally, contracts between pharmacies and TPPs or their PBM agents typically require the pharmacy to dispense a generic substitute for a branded drug where available.  Defendants' refusal to substitute generic alternatives for expensive Valeant-branded drugs, despite their widespread availability, violated these statutory and contractual mandates.  Contrary to these requirements and unknown to patients, physicians, and payors, Philidor's internal policy mandated that Valeant-branded drugs be dispensed, even when a prescription expressly called for a generic.

98.     By minimizing generic substitution and, thus, substantially shielding Valeant-branded products from generic competition, Defendants were able to inflate the prices of Valeant's drugs far beyond the prices at which the drug had previously been marketed and sold, both within Valeant's captive pharmacy network and by pharmacies outside of Valeant's network.  Indeed, documents obtained by the Congressional Committee on Oversight and Government Reform

through its investigation into Valeant's misconduct revealed that Valeant first identified goals for revenue and then set drug prices to reach those goals.

99.     Typically, the fact that a high volume of claims for expensive branded drugs from a single manufacturer were coming from a single pharmacy that was failing to substitute generic drugs for any of that manufacturer's drugs – *i.e.*, Philidor – would have triggered heightened scrutiny and denials of claims from PBMs, and scrutiny of the pharmacy's practices.  However, by concealing Valeant's relationship with Philidor, its relationships with its network of pharmacies, and the pharmacies' relationships with each other, Defendants were able to spread claims across ostensibly unrelated pharmacies.  This caused Defendants' deceptive practices to go undetected by creating the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced branded drugs for legitimate reasons and burying fraudulent claims among the large volume of the pharmacy network's claims.

100.    Secrecy was essential to Defendants' scheme, and Defendants went to great lengths to ensure that Valeant's ownership of Philidor and its network of captive retail pharmacies remained concealed from the public, including from TPPs and PBMs.  For example, neither Philidor nor any of the other captive pharmacies in Defendants' network disclosed to the TPPs or PBMs – with whom they were negotiating contracts, reporting audits, submitting claims or otherwise transacting business – their relationship with Valeant.

101.    Secrecy was so important to Defendants' scheme that Valeant employees who worked at Philidor used aliases when sending emails from Philidor accounts.  Further, former Philidor employees were forbidden and even reprimanded if they mentioned Philidor's relationship with Valeant to customers.  In September 2015, Philidor began requiring employees to sign confidentiality agreements empowering the pharmacy to sue workers who divulged information

about its activities.  Similarly, Valeant never disclosed the existence of Philidor in any of its SEC filings during the Relevant Period prior to October 19, 2015.  Likewise, Philidor never publicly discussed the nature of its relationship to Valeant prior to October 19, 2015.

102.    In furtherance of their fraudulent scheme, Defendants made a host of false and misleading statements directly to TPPs, their PBM agents, and their members/beneficiaries in order to improperly maximize the reimbursements paid by TPPs and to boost Valeant's drug sales. Many aspects of Defendants' fraudulent schemes are catalogued in manuals distributed to Philidor employees to guide their handling of claims submitted to TPPs.  Those manuals explained to employees that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."  As explained in further detail below, those "back door approaches" included altering prescription information, making claims for refills that were never requested by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs.  Internal emails, including a July 19, 2015 email from Philidor's CEO Davenport, reveal that Valeant and Philidor senior management knew about these practices during the Relevant Period.

### 1.    Altering Prescriptions

103.    Defendants instructed Philidor employees to change codes on prescriptions – *i.e.*, to deliberately alter the prescribing doctor's instructions as set forth in the prescription – to require that the prescription be filled with Valeant's brand-name drugs, as opposed to less expensive generic alternatives.  While pharmacists who receive a prescription for a branded drug will ordinarily dispense a generic substitute if available, doctors can indicate that the prescription be "dispensed as written" and order that no substitutions be made.  As reported by *Bloomberg* on October 29, 2015, former Philidor employees confirmed that pharmacies in Valeant's network,

acting on written instructions in claims-handling manuals issued by Defendants, routinely altered

doctors' prescriptions in order to ensure that more patients received Valeant products rather than

less costly generics.  These employees explained that this fraud was frequently implemented with

respect to certain key Valeant dermatologic products that encountered repeated denials from TPPs,

such as Retin-A Micro and Vanos.

## 2.   Valeant's Submission Of Fraudulent Claims

104.   If claims were denied by a TPP, Philidor employees resubmitted the claims with

altered prescription codes, falsely representing that the prescribing doctor had ordered only

Valeant drugs be dispensed and that no generic substitutions were permitted.  In resubmitting these

denied claims, Philidor employees falsely designated them as new claims to hide the fact that these

claims had previously been denied.

105.   Defendants also used false pharmacy identification information to bill TPPs for

prescriptions in order to fraudulently bypass the TPPs' denials of claims for reimbursement.

Defendants' claims-handling manual instructed Philidor employees to submit claims to TPPs or

their PBM agents using Philidor's National Provider Identification Number, or "NPI."  However,

if a claim was rejected, employees were instructed to resubmit that claim using an NPI belonging

to a different pharmacy in Defendants' captive network – in other words, to claim that a pharmacy

had dispensed a prescription it did not in fact dispense, and, in some cases, did not even stock.

106.   Indeed, former Philidor employees indicated that they were provided with maps

and detailed instructions that set out the particular false NPI information that should be submitted

in the event of a denial relating to a particular dispensing pharmacy.  For instance, Defendants'

claims-handling manual instructed employees who received certain denials from TPPs to "submit

the NPI for our partner in California, West Wilshire Pharmacy.…  There is a good chance they are

contracted."  If a claim using West Wilshire's NPI was denied, the next step was to "add the Cambria Central Fill insurance and run that as the primary" – referring to one of Philidor's secret retail pharmacies based out of Philadelphia, Pennsylvania.  "They should then get a paid claim and then Cambria … will reimburse us."

107.   Defendants also routinely caused pharmacies in the Valeant network, including Isolani (mentioned above), to use the NPI belonging to California-based R&O, one of the constituents of Defendants' captive network discussed further below, to bill for prescriptions R&O had never filled and, in some cases, drugs R&O didn't even stock.  In a July 19, 2015 email to R&O, Philidor CEO Davenport acknowledged that he was aware this practice was ongoing.

108.   The purpose of this conduct was to fraudulently secure payment of a claim that was properly denied by a TPP or PBM.  In an interview with SIRF, Taylor Geohagen, a former Philidor claims adjudicator during the Relevant Period, confirmed that this fraudulent practice was routinely implemented: "Everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."

109.   To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also submitted false and misleading payer audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which they were secretly associated, falsely representing that the pharmacy had filled certain prescriptions, when, in fact, those prescriptions had been filled by Philidor or one of its other captive pharmacies.  Relatedly, Defendants and their agents misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies.

### 3.     Valeant's Submission Of Fraudulent Prescription Renewals

110.    Defendants Valeant and Philidor submitted for reimbursement numerous prescription renewals, falsely representing to TPPs and their PBM agents that patients had requested renewals of their prescriptions when, in fact, no such request had been made. Specifically, as Philidor customers have explained and as *New York Magazine* reported on January 13, 2016, Defendants caused Philidor and its captive pharmacies to automatically refill patients' prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, despite the fact that the patients had not requested any refills, and made it virtually impossible for patients to decline or cancel those automatic refills.

111.    Defendants' implementation of this automatic renewal practice for Valeant's dermatological products allowed them to receive additional payments from TPPs, even though such products were designed to treat non-chronic conditions with a limited course of treatment. Notably, Philidor's practice of waiving patient co-pays in connection with this scheme allowed the scheme to go undetected as patients were not incentivized to complain about unnecessary refills for which they were not charged a co-payment.

112.    As a Philidor employee explained in an online forum, Philidor "auto ship[ped] [Valeant drugs] without proper approval, most people do not need these refills. The reason they ship refills so fast is because it is free for the patient but Philidor gets anywhere from $550-$1220 from the insurance companies."

113.    This scheme was jointly developed by Brad Greenfield, Director of Sales and Marketing for Valeant, and Philidor executive Fabian Forrester-Charles. As a Philidor employee explained in an online forum:

> They took the list of customers who had been approved by [insurance] and had refills available. Instead of waiting for the customer to call they would

31

dial and leave a msg saying your refill will be shipped unless you call within 24 hrs.  They would do this on the 30th day of the rx.  Previously they had a Co pay so would have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0 allowed them to ship refills whether u wanted them or not.  Not a bad money making idea except most people did not really need refills of Solodyn so soon . . . Of course these refills were out the door ASAP sometimes within an hour of the call and the [insurance] money would come in.

What patients don't get is your [insurance] company is paying 500 plus bucks for an old medication reformulated and refills not needed.  I would bet a lot of Solodyn and Jublia bottles are just lying around still in the shipping package.

*If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor*.  Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$ and a ton of it!  Think about it.

(Cafepharma, Philidor employee post dated October 27, 2015.  Emphasis added.)

### 4.    Valeant's Misrepresentations To Patients

114.    Defendants also made misrepresentations directly to patients in order to boost Valeant's drug sales.  Specifically, Defendants disseminated brochures and coupons to doctors and patients, promising Valeant drugs at no cost if prescriptions were filled at Philidor.  This ensured that prescriptions for Valeant drugs would not be filled by a non-captive pharmacy that would substitute cheaper generics for the branded drugs, but at Philidor, where Valeant's branded drug would be dispensed.  To induce these patients to take advantage of these discounts, the coupons falsely assured patients that their TPPs would not be billed.  In fact, TPPs were billed for these drugs.

115.    To facilitate their fraudulent scheme, Defendants made it difficult for patients to contact Philidor to complain, for example, that their insurers had been billed in contravention of promises made in coupons and sales literature or that they had received unrequested refills.  Despite its massive investment in its sales force, Philidor invested very little in creating a call

center to handle customer complaints and problems.  In fact, customers and patients would routinely report that they were directed to sales staff when they tried to report these problems.

### E.     Valeant's Deceptive Use Of "Patient Assistance Programs"

116.     Traditionally, Patient Assistance Programs ("PAPs") are intended to ensure that patients without the financial means to purchase high priced drugs are not deprived of critical medications.  However, Valeant manipulated its PAPs so that they became a deceptive sales tactic to conceal Valeant's price gouging from private payors.

117.     A patient's co-payment serves as a check on prescription drug prices and frequency of distribution (*i.e.*, refills).  The collection of co-pays from insureds discourages "overutilization," or wasteful consumption of pharmacy benefits beyond those medically necessary, and incentivizes insureds to select generics when available and only refill medications when needed.  Conversely, waiving co-pays discourages patients from actively avoiding low-value or medically unnecessary medicines.  Accordingly, PBM contracts with pharmacies mandate that pharmacies make every attempt to collect the co-payment and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied.

118.     To circumvent this check in pricing and distribution, Valent routinely and systematically waived or reduced patient co-pays when submitting claims to insurance companies and other TPPs.  As a result, Valeant was able to sell medically unnecessary and low-value drugs at artificially inflated prices.  The undisclosed waiver and reduction of co-pays led patients to obtain higher-priced Valeant drugs rather than lower-priced generic substitutes, and to obtain unnecessary refills, whose costs were reimbursed by the insurance companies and other TPPs. When submitting claims to TPPs, Defendants also misrepresented the dispensing pharmacy's "actual charges" for Valeant drugs by failing to account for Defendants' practice of routinely

33

waiving patient co-pays.  Defendants falsely represented to TPPs that the patient had been charged the full price of the drug.

119.    Had Defendants charged co-pays, patients would have chosen lower cost generic drugs and avoided unnecessary prescriptions, thereby reducing unneeded costs that were ultimately born by the insurance companies and other TPPs.  Further, had Defendants properly disclosed their routine waiver of patient co-pays, PBMs and TPPs would not have paid the prices they did for the relevant Valeant-branded drugs, or paid for them at all.

120.    Valeant's total expenditure on PAPs increased by more than eleven times from 2012 to 2015, from $53 million to $600 million, respectively, with expectations for PAPs spending to reach over $1 billion in 2016.  In comparison, the Company's revenues increased by less than three times in the same time period, from $3.5 billion in 2012 to $10.4 billion in 2015.  Although waiving patient co-pays cost Valeant some revenue, it more than paid off in the increased prices that Valeant was able to charge as a result.

121.    Federal anti-kickback laws prohibit such practices when the government is the TPP.  Thus, Valeant targeted its PAP practices toward patients with private insurance.  However, engaging in such activities left Valeant open to potential violations of state fraud and deceptive practice statutes and contractual terms with the TPPs.  It also increased the risk that private insurers would apply extra scrutiny to Valeant or refuse to reimburse Valeant prescriptions.

122.    Mark Merritt ("Merritt"), President and CEO at the PCMA, which represents PBMs, explained to Congress at a hearing on Valeant that PBMs "encourage the use of generics and more affordable brand medications."  He noted that PBMs restrain drug costs by "using differential co-pays and other tools to encourage patients to choose more affordable options."  Merritt explained that the pricing and marketing tactics by Valeant were designed to reduce

"resistance to higher prices."  He testified that by providing co-pay coupons to encourage patients to bypass generic and cheaper drugs "for higher cost branded drugs," Valeant forced third party payors "to pay hundreds of thousands more for the most expensive brands on the formulary." Echoing Senator Warren, Merritt stated that "such practices are considered illegal kickbacks in federal programs."

123.    As Valeant dramatically increased drug prices, it directed patients into its secret network of pharmacies (*see* Section IV.D below) and offered discounts as a means to quell any pushback on price increases.  Valeant developed a PR strategy to divert attention from any negative media regarding patient complaints over massive price increases by highlighting their purported increased PAPs.

124.    An internal Valeant analysis outlining the Company's "Orphan Drug Model" for Syprine, Cuprimine, and Demser reflected this strategy.  The analysis stated: "Take initial 25% price increase to drive patients into the restricted distribution model," and noted that "[h]igh deductible co-pay requires increased foundation support."  The analysis "assume[d] target price increases of 100% for Demser and Cuprimine" and "price target increases of 500% for Syprine."

125.    Another internal Valeant presentation detailed the proposed launch of a new PAP called "Valeant Coverage Plus Program."  The presentation plainly stated that "[t]he program will be funded through planned price increases [*i.e.*, funded by higher prices to payors rather than by Valeant]."  The analysis directed adjudicators to "[u]tilize all of patient resources prior to co-pay mitigation or foundation assistance" when adjudicating claims and to use a "[p]atient assistance program or free goods as last resort."  The presentation noted that Valeant had an opportunity to expand utilization "for niche brands" that "[i]nvolves a combination of alternative/restricted

distribution model, advocacy support and patient assistance programs" along with "planned pricing actions expected to maximize overall returns."

126.    The presentation also identified the risks of such tactics (which were concealed from investors), including that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's, payors, and/or government agencies" and "Managed Care plan actions against products could limit/restrict re-imbursement."   To address the risks, the presentation included a "PR Mitigation" plan to "Privately address concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment" and "[m]inimize media coverage of the pricing increase."

127.    The presentation included a June 4, 2013 "PR Draft Communications Plan: Orphan Drug Rate Increases," which noted that orphan drugs "often command a substantial premium in the market – to offer pharmaceutical companies a greater return on investment."  It explained that "[w]hile the high cost of orphan drugs has been largely tolerated by the medical community because the overall impact of these pharmaceuticals on health budgets has been relatively small, there has recently been a renewed focus on the cost of these drugs."  The presentation warned that the "press has also picked up on these trends" and Valeant's planned price increases on drugs to treat Wilson's disease "needs to be managed carefully."

128.    As part of the PAP and PR strategy, the presentation also encouraged false and misleading responses to inquiries about price increases.  A draft Q&A directed that the response to the question of "Isn't Valeant just trying to make insurers and managed care providers pay as much as possible for these drugs?" was: "No.  These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with Wilson's disease while also remaining commercially viable."  In truth, Valeant's

36

costs of producing these drugs had not increased and the price increases (which resulted in gross margins exceeding 90%) were not necessary to keep Valeant commercially viable. Kornwasser essentially conceded the fact that Valeant was using price increases to chase outsized profit margins when he wrote a May 2014 email stating, "These patients are too valuable to lose."

### F.    The R&O Lawsuit

129.    On December 1, 2014, Russell Reitz ("Reitz"), a Southern California pharmacist, sold R&O Pharmacy, a specialized dispensary for gastroenterology patients, to Philidor. Through the sale, Reitz learned that Philidor was not licensed by the California State Board of Pharmacy.

130.    Following the sale, R&O was inundated with thousands of prescriptions from doctors using Philidor's mail-order service, numbers dwarfing the customary size of R&O's business. Philidor would send R&O bulk orders of Valeant-branded pharmaceuticals, and Reitz would dispense these drugs to patients directly or by mail. Payment later arrived in the form of paper checks from health insurers, with each check covering hundreds of patients and typically made out for over one million dollars.

131.    Not only was the volume of Philidor-channeled patients unusually large, the prescriptions that Philidor was filling were also extraordinarily expensive, even compared to the specialized prescriptions R&O usually dispensed. Yet, most of the overpriced prescriptions R&O was filling were Valeant drugs indicated for simple dermatological conditions, such as Solodyn for acne, Elidel, an eczema treatment, and Jublia, a topical treatment for toenail fungus.

132.    In March 2015, Reitz received an audit from one of his PBMs. The audit showed that R&O was being used by Philidor to fill thousands of prescriptions all across the country. These prescriptions had been filled with Reitz's name and R&O's NPI, but they were dispensed to patients of whom Reitz had never heard. Many were for medications that R&O didn't carry.

37

Some prescriptions were even backdated to before Reitz had sold R&O to Philidor.  These practices continued throughout the summer of 2015.

133.    As a result of these suspicious practices, in the summer of 2015, R&O began investigating Philidor.  Its investigation uncovered that in 2013, Philidor had filed an application with the California State Board of Pharmacy – which, as noted above, California denied because Philidor made "false statements of fact" in its pharmacy application.  Upon learning that Philidor had been denied access to the California pharmaceutical marketplace, Reitz realized that the purpose of the R&O purchase was to use R&O as a channel through which Philidor would surreptitiously conduct its own business in California and circumvent the licensing board's denial.

134.    On July 14, 2015, Reitz wrote an email to Eric Rice, Senior Director at Philidor, to address "the issue of Philidor's improper, and perhaps illegal, use of my [pharmacy] number without my knowledge or consent to bill for prescriptions that were" either filled by other pharmacies or billed before the execution of the agreement to purchase R&O.  Reitz demanded that they cease the practices immediately.  Reitz added that the agreement required Philidor/Isolani to apply for a permit and that "this process does not take 7 months" and asked for all documents relating to the application.

135.    On July 19, 2015, Davenport emailed Reitz stating that Philidor stopped using R&O's NPI number and "halted activity pending coming to some alignment with you."  The next day, Reitz wrote back asking why "Philidor is responding to my concerns instead of Eric Rice" who executed the agreement on behalf of Isolani.  Reitz further stated that he learned that Rice signed off on the "Argus-Humana audit, the same audit I refused to sign," and "Eric Rice is not the PIC [pharmacist-in-charge] (I am) and has never stepped through R&O's doors.  I am not sure how he could verify the accuracy of anything pertaining to that audit."

136.    On July 21, 2015, Rice and several Philidor executives, including Davenport, Fleming, and General Counsel Gretchen Wisehart, flew to California to meet Reitz at R&O.  The meeting did not satisfy R&O's concerns, and the next day counsel for R&O sent a letter to Rice noting that they "appear[ed] to be engaging in a widespread fraud."  On August 18, 2015, Fleming emailed Reitz suggesting responses to an audit.  One of the issues identified in the audit was the large number of prescriptions being filled by R&O that were shipped to patients from Pennsylvania, where Philidor was based.

137.    On August 31, 2015, counsel for R&O sent a notice of termination to Isolani's law firm.  R&O's counsel wrote "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to sign the [Sale, Management Services, and related] Agreements in order to allow Isolani/Philidor to engage in a massive fraud."  R&O's counsel added that "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks."  R&O's counsel noted that Philidor had been denied a California license and "targeted Mr. Reitz and R&O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts" and "Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O."  Counsel added that "Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's written assurance, Isolani/Philidor continue to use R&O's…NPI numbers to bill payors for prescriptions dispensed by Philidor."  R&O's counsel also asserted that "Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O…to certain payors."

138.    In response to Reitz's investigation of Philidor, Reitz received letters, not from Philidor, but from Valeant's General Counsel, demanding $69 million in payments from R&O. These letters made clear that Valeant was not simply a drug manufacturer supplying Philidor, but rather that Valeant was acting in concert with Philidor to perpetrate the conduct of which Reitz complained.

139.    On September 6, 2015, Isolani's counsel sent an email informing R&O's counsel that they were seeking a protective order against Reitz and for an accounting.  Counsel for R&O responded that Isolani had known for "at least six weeks that Mr. Reitz was in receipt of checks paid to his company to protect himself and his company from the massive potential / actual civil, regulatory and even potential criminal liability that your clients have exposed him to due to their malfeasance," adding that the conduct was outlined in prior correspondence "to which your clients have provided no denials."

140.    R&O claimed it never received a previous invoice from Valeant for any amount and that either Valeant and R&O are "victims of a massive fraud perpetuated by third parties," or that "Valeant is conspiring with other persons or entities to perpetuate a massive fraud against R&O and others."

141.    Ultimately, Reitz filed a lawsuit against Valeant.  The ensuing disclosures, including the facts detailed above, set off a chain of events revealing the truth about Defendants' fraud and Valeant's network of secret pharmacies.

V.    **DEFENDANTS ISSUED FALSE AND MISLEADING MATERIAL STATEMENTS DURING THE RELEVANT PERIOD**

142.    During the Relevant Period, Defendants made numerous false and misleading statements concerning Valeant's assets, liabilities, operations and financial condition.  In an effort to obscure Valeant's reliance on the price increases facilitated by its captive network of pharmacies

40

and other deceptive business practices, Valeant made critical changes to its disclosures to investors in 2013, making it difficult, if not impossible, to determine whether Valeant's growth was attributable to its acquisition strategy or organic growth.  First, Valeant refused to break-out the revenue numbers for major acquisitions, making it impossible for investors to track whether acquired drugs were experiencing any organic growth.  Second, Valeant reduced the number of operating segments from four (U.S. Neurology and Other; U.S. Dermatology; Canada & Australia; and Emerging Markets) to just two (Developed Markets and Emerging Markets) in 2013.  Because various segments were driven by just a few main products, investors could previously track how those products were performing.  But with just two operating segments, it became impossible for investors to obtain that same information.

143.    During the Relevant Period, Defendants made many untrue statements of material fact and omitted material information necessary to make their statements not misleading.  Specifically, Defendants misrepresented or failed to disclose that:   (1) Valeant's growth, profitability, and business prospects were dependent on deceptive practices designed to boost sales and prices of the Company's drugs; (2) these deceptive practices included price gouging and efforts to conceal such price gouging, including routing prescriptions through Valeant's secret network of captive pharmacies and employing PAP and public relations strategies to conceal the practices; (3) the captive specialty pharmacies were employing deceptive tactics to boost the sales prices of Valeant's drugs and obtain funds from PBMs and private payors in amounts greater than would have been obtained if the deceptive tactics were not employed; (4) the deceptive practices exposed Valeant to enormous business, reputational, legal and financial risks that included increased scrutiny from governmental agencies such as the SEC, the Department of Justice ("DOJ"), Congress, and state regulators, as well as decreased sales, refusal to pay, and reputational

harm from PBMs, payors, physicians, and patients; (5) the Company's reported financials for the third and fourth quarters and full year of 2014 and the first nine months of 2015 violated GAAP, and its financial guidance for 2016 had no reasonable basis in fact; and (6) Valeant had deficient compliance programs and ineffective financial and disclosure controls.

144.    Defendants' false and misleading statements during the Relevant Period, detailed below, were material and artificially increased, maintained or prevented a decrease in the price of Valeant stock.   But for these artificially inflated prices, Plaintiffs would not have invested in Valeant.

145.    Defendants' misstatements were material and misleading because they failed to disclose the following facts:

a)      Philidor was formed with the assistance, and for the benefit, of Valeant to increase the sales prices of Valeant-branded pharmaceutical products and to avoid substitution of Valeant drugs with competing generic products.   Valeant employees worked at Philidor, which Defendants went to great lengths to hide.   Valeant was Philidor's only client and had the ability to shutter its business.   Valeant paid Philidor's owners $100 million for the right to acquire Philidor for $0.   Valeant was consolidating Philidor's results as its own.   Valeant had obtained explicit rights to direct Philidor's activities.   All of these facts were concealed by Defendants from private payors, patients, physicians, PBMs, and investors.

b)      Valeant's business strategy relied on a host of deceptive practices.   A material source of the Company's growth, including its organic growth, in revenues and sales of its key dermatology, neurology and other products resulted from these deceptive practices, which included: (i) price increases far beyond industry norms, which Defendants knew were unsustainable; (ii) routing patients into Valeant's secret network of captive pharmacies that were

falsely made to appear independent; (iii) using patient assistance and public relations strategies to minimize patient complaints, and resorting to rebate and chargebacks to appease the most hostile complaints; (iv) altering prescriptions so that generic substitutions would not be dispensed; and (v) misusing its automatic refill program so that patients were supplied with unwanted or unnecessary drugs.  All of these facts were concealed by Defendants from private payors, patients, physicians, PBMs, and investors.

        c)      Valeant's business risks materially increased as a result of these undisclosed practices.  The increased risks included government investigations, regulatory sanctions, criminal charges, reputational harm, contractual violations, decreased sales, and increased scrutiny, as well as alienation of PBMs, private payors, and physicians if such practices became known.  Valeant was not employing a "lower risk, output-focused research and development model" but employing a strategy that subjected Valeant to enormous risk.  All of these facts were concealed by Defendants from private payors, patients, physicians, PBMs, and investors.

        d)      Valeant's reported revenues, earnings per share ("EPS"), profitability, and future business prospects were dependent on the Company's ability to continue to conceal these deceptive practices and did not accurately portray Valeant's financial performance and business prospects due to the associated risks.

        e)      The Company's growth and ability to service its debt were dependent on acquiring companies and drug portfolios in which it could dramatically increase prices and engage in deceptive practices.  Any slow-down or cessation of such acquisitions would have a material adverse effect on the Company's business, cash flows, and results of operations.

f)      Valeant materially increased its sales volume through Philidor as Philidor expanded its network of pharmacies and began selling in states where it did not have, or had been denied, a license;

g)      Even though Valeant's branded products were subject to competition with more cost-efficient generics that were preferred by PBMs and that were used as substitutes by pharmacies, deceptive practices allowed Valeant to avoid such substitution;

h)      Valeant improperly recognized Philidor's revenues as its own, in violation of GAAP.  This caused revenues, net income, and EPS to be materially misstated and inflated.

i)      Valeant lacked adequate internal controls, compliance and training programs which resulted in an "improper tone at the top."  Defendants prioritized increasing Valeant's stock price and their own compensation over ensuring that Valeant and its secret network of pharmacies complied with applicable laws, regulations and contracts.  Defendants also failed to ensure that Valeant's SEC filings and public disclosures were free of material misstatements.

j)      Valeant's Board of Directors and senior management reviewed and approved the improper accounting, which reflected a material weakness in internal controls.

A.      **Defendants' Material Misstatements From January To June 2013**

146.    On January 4, 2013, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's 2013 financial guidance.  Pearson and Schiller made several statements concerning Valeant's business model, financial prospects, and the benefits of its new Alternative Fulfillment ("AF") initiative (in which Valeant sought to have prescriptions filled with Company branded drugs).  Specifically, Pearson stated:

> 2012 was another very strong year for Valeant.  From a top line perspective we added over $1 billion in revenue in 2012….  On the bottom line, we delivered cash EPS growth of greater than 50% as compared to 2011, ***demonstrating once again the sustainability of our business model***.

44

> Our business continued to deliver strong organic growth, and we expect full year 2012 to have same-store sales, organic growth of approximately 8%, and pro forma organic growth of approximately 10%.

147.   When asked about pricing for Solodyn, a dermatological product acquired in the Medicis transaction, Pearson responded, "In terms of Solodyn, we're not assuming we're making any kind of major price increases in terms of the end consumer.  Through the AF [alternative fulfillment] programs, it will allow us our sort of average price internally to go up, because of the way that system works."  Pearson also discussed the expansion of Valeant's AF initiative, stating:

> Yes, the more we understand about it the more excited we get about it, quite frankly because it's not just a singular sort of initiative that there's a whole evolution being planned in terms of the Stage I, Stage II, Stage III.  And there's some exciting opportunities there that we're not going to give specifics of.  And also as we had hoped, we think it will apply to more than just Solodyn.  Ziana is actually also being – already Medicis has Ziana being used in the AF program, and we see application for a number of our dermatology products and potentially neurology products in the US.

148.   When asked what percentage of Solodyn revenue would go through the AF initiative, Pearson replied it would increase because there was "evidence" AF was working, stating:

> Well the last question, it's much – it will be much closer to 50% than 10%, that's for sure.  And yes, what we – *the AF, if it all works out, will both help eliminate or get rid of non-revenue producing or non-profitable scripts, but hopefully can be used to start generating truly profitable scripts through a different channel.  That's the intent, and we're seeing evidence that that will work.*

149.   Later in the call, one analyst asked Pearson "why are you so encouraged by the AF strategy when net sales have been heading in the wrong direction for the one case study we can observe, Solodyn?"  Pearson responded that the AF channel had "incentives" in place to get paid for drugs that were being rejected by retail pharmacies, stating:

> And again, Medicis is still learning and we're just still learning about what we can do with these AF scripts.  So when someone actually makes the call

45

or sends the script to the alternate channel, what can be done with that.  And a number of things can be done.  One is you can continue to try to adjudicate the claim just because the claim was or *just because the script was rejected at retail pharmacy, does not mean that eventually you can't get the payer to actually pay for it.*  If you think about the retail pharmacist, the retail pharmacist doesn't have a huge incentive to work hard to get that script reimbursed.  In fact you might argue they have the opposite incentive, because they get paid more if they convert it to a generic.

So, all of a sudden if it goes to a different channel where the incentives are in place to actually try to get that claim adjudicated, then – so there's a significant amount of that volume that gets rejected by retail that you can then adjudicate, and actually get fully paid.

* * *

So, I think through as we continue to learn about this AF program, there are some things that we can do that might actually change the direction in terms of so rather than see a decline in Solodyn, if we're really successful we can begin starting to grow that product again.  So it's things like that that sort of start giving us some real optimism in terms of what you can do, and how this program can sort of turn out to a much better case than assuming you didn't have the AF program.

150.    On February 28, 2013, the Company issued a press release and hosted a conference call regarding Valeant's 2012 financial results.  During the call, Pearson and Schiller highlighted the purported benefits of their AF strategy but did not disclose the associated improper practices and risks.  In response to a question about the AF strategy, Pearson represented that "*The program is working actually quite well.  We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call.*"  When pressed for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to the growth," Pearson emphasized that it had increased sales volumes but similarly refused to disclose the improper practices and risks, stating:  "*We have never given details.  Medicis never gave details.  And that was probably a smart practice.  We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not.  What we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing.*"

46

151.    On May 3, 2013, Valeant filed its quarterly report on Form 10-Q for the period ended March 31, 2013 ("1Q13 10-Q").  The 1Q13 10-Q identified as a risk factor "declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control," but concealed that Valeant controlled and had significant influence over Philidor.

152.    The 1Q13 10-Q was signed by Pearson and Schiller and represented that management's disclosure controls and procedures were effective: "Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), *has evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013.  Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013*" (hereafter, "Internal Controls Statement").

153.    The 1Q13 10-Q included Sarbanes Oxley Certifications signed by both Pearson and Schiller pursuant to Rules 13a-14(a) of the Exchange Act, which stated, among other things, that the 1Q13 10-Q did not contain any untrue statement of material fact or omit to state a material fact (hereafter, the "SOX Certifications").  Specifically, the SOX Certifications stated:

**Exhibit 31.1**

**CERTIFICATION OF THE CHIEF EXECUTIVE OFFICER
PURSUANT TO RULE 13a-14(a)
AS ADOPTED PURSUANT TO
SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002**

I, J. Michael Pearson, certify that:

1.  I have reviewed this quarterly report on Form 10-Q of Valeant Pharmaceuticals International, Inc. (the "Company");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

47

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of and for, the periods presented in this report;

4. The Company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the Company and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements tor external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting, and

5. The Company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's board of directors (or persons performing the equivalent functions);

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

Date: May 3, 2013

/s/J. MICHAEL PEARSON

154.    On June 11, 2013, Schiller presented at the Goldman Sachs Healthcare Conference. When asked about the Company's "alternative fulfillment program" by a Goldman Sachs analyst, Schiller responded that the program was increasing profits and that AF was a trend in "the whole pharmaceutical industry":

> Alternative fulfillment, I think a couple things.  One is, to me, ***the alternative fulfillments was an example of what the whole pharmaceutical industry – certainly what Mike and I believe is the trend, and that is the focus on the profitable scripts.***  There was a day when you could call on anybody, and almost any script was profitable.  Those days are gone.  So segmenting your customer base and really focusing on profitability has got to be the future.  And that's – alternative fulfillment was the beginning of that journey, but not the endpoint.
>
> So I probably think under Medicis, ***alternative fulfillment*** was held out a little bit too much as the holy grail.  I really think it's – it's actually the starting points, and in some ways, it was quite a clumsy starting point.  It wasn't that different, but ***it's a process where we have generation two and generation three.  But it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of copay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it…. Yes, I think – I'm hoping – we've got generation two and generation three, which I'm hoping sort of turn it into a pure defense, into more of an offensive tool to allow us to grow profits.  And that's really the focus, is growing profits***.

155.    The statements referenced above in Valeant's January 4, 2013 conference call, February 28, 2013 press release and conference call, 1Q13 10-Q, and at the June 11, 2013 Goldman Sachs Healthcare conference were false and misleading when made for the reasons provided in ¶ 145 above.  In addition, the "incentives" were in place in the AF channel to get rejected claims paid because of Valeant's secret and controlling relationship with Philidor; and the way the AF "system works" to make the "average price internally go up" and get claims "rejected by retail" pharmacies "fully paid" was through the deceptive practices described in ¶ 145 above.

### B.      Defendants' Material Misstatements From July 2013 To January 2014

156.    On July 29, 2013, the Company filed a Form 8-K with the SEC, attaching a memorandum to employees of Valeant and Bausch & Lomb and a copy of the anticipated organizational chart of the combined company upon closing of the merger.  The memorandum purported to describe Valeant's "Organizational Design and Philosophy" by stating:

> *In the end, our primary mission is to serve the patients and consumers who use our products, the physicians who prescribe / recommend them and the customers who provide retail outlets for these products. Healthcare companies are held by society to the highest possible ethical standard - and they should be.  Adhering to this extremely high ethical bar supersedes any financial or other objective.*
>
> *      *      *
>
> Consistent with our decentralized operating philosophy, our corporate center will be small, lean and focused on three things:
>
> 1.      *Ensuring adequate controls to protect our shareholders and to ensure we are in compliance with all regulatory requirements.*

157.    On August 7, 2013, Pearson and Schiller held a conference call with analysts to discuss Valeant's second quarter 2013 ("2Q13") financial results.  During the call Pearson was asked whether the Company would need to adopt "more of a mainstream strategy" to "become one of the world's largest healthcare companies."  In response, Pearson continued to defend Valeant's purportedly superior non-traditional acquisitions strategy, stating, in part:

> I don't - I think we would plan to have our same model.  *We think we can be successful by not doing what large pharma companies are doing, and that's been our strategy, that will continue to be our strategy.  And so we're not looking to get into the traditional* — we're not going to go - therapeutic areas are largely driven by R&D in terms of why people organize that way, *and we don't plan to spend — increase our R&D spend as a percent of sales to what other companies are doing.  And we'll continue to focus on both specialty segments* and attractive geographic markets.

158.    Pearson further assured investors that there were no increased compliance risks to accompany Valeant's non-traditional strategy, stating:

> *In terms of compliance, compliance is obviously very, very important for us*.  When people come back and they rate our Company on our most positive attributes and our most negative attributes, and at the very top of the list of the positive is ethical.  So our employees really do appreciate it.  *That's our most important thing that – that comes before everything*.

159.    Also on August 7, 2013, the Company filed its quarterly report on Form 10-Q for the second quarter ended June 30, 2013 ("2Q13 10-Q"), signed by Pearson and Schiller.  The 2Q13 10-Q identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.  The 2Q13 10-Q contained the same Internal Controls Statement and SOX Certifications as set forth in the 1Q13 10-Q at ¶¶ 152-153.

160.    On October 31, 2013, the Company issued a press release reporting its 2013 third quarter financial results.  The release again emphasized Valeant's incredibly rapid growth, stating that "Valeant's Developed Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012" and that *"[t]he growth in the Developed Markets was driven by continued improvement in many of our Dermatology prescription brands,* our aesthetics and oral health portfolios, *our orphan drug products* and CeraVe."

161.    On November 1, 2013, the Company filed its quarterly report on Form 10-Q for its 3Q13 ended September 30, 2013 ("3Q13 10-Q"), signed by Pearson and Schiller.  The 3Q13 10-Q identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control*" while concealing that Valeant controlled and had significant influence over Philidor.  The 3Q13 10-Q also included

51

the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones quoted above.

162. On January 7, 2014, Pearson and Schiller hosted a financial guidance conference call with investors and analysts. During the call, Pearson emphasized that the Company's growth in sales volume was the result of its business strategy, stating:

> If we compare Valeant's performance in 2013 to the company's average performance from 2009 through 2012, you can see a continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders. ***This is a result of achieving strong organic growth in a fiscally responsible manner for the products that we already own***, coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies.

163. Also on January 7, 2014, Pearson took part in the Goldman Sachs Healthcare CEOs Unscripted: A View from the Top Conference. When asked about the Company's dermatology business and Valeant's AF program Pearson continued to conceal the practices, stating:

> ***The AF program*** was I think rolled out a little bit too quickly and there were lots of bugs in it and ***we have a next generation that we're going to - which we are implementing, which we aren't going to talk about the details of***, but net-net I think Solodyn, it's a lot less important to us now than when we – than it was to Medicis obviously.

164. The statements referenced above in Valeant's July 29, 2013 Form 8-K, August 7, 2013 conference call, 2Q13 10-Q, October 31, 2013 press release, 3Q13 10-Q, Valeant's January 7, 2014 financial guidance conference call, and at the January 7, 2014 Goldman Sachs Healthcare CEO's Unscripted: A View from the Top Conference, were false and misleading when made for the reasons stated in ¶ 145 above. With respect to price gouging, Valeant doubled the price of Syprine on July 12, 2013, doubled it again on August 2, 2013, and doubled it yet again on August 30, 2013, for a sevenfold increase in total, from $1,500 to $10,500. In addition, adhering to the "extremely high ethical bar" did not "supersede any financial" objective and "compliance" did not

"come before everything," due to the reasons set forth in ¶ 145 above.  Furthermore, by "not doing what large pharma companies are doing" and focusing on the AF strategy over R&D, Valeant exposed itself to the risks described in ¶ 145 above.

### C.  Defendants' Material Misstatements February To June 2014

165.   On February 27, 2014, the Company issued a press release detailing its 2013 financial results.  The press release noted that the source of growth was increased volume of dermatology sales, stating: "The growth in the Developed Markets was driven by continued growth in certain dermatology prescription brands, our aesthetics, consumer, neurology and other and oral health portfolios, and our Canadian business unit."

166.   Also on February 27, 2014, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's fourth quarter 2013 and full year 2013 financial results. While discussing Valeant's growth in "Neurology and Other," Pearson stated, "***When we acquired Medicis, I think we mentioned that we picked up a couple of orphan drugs, which they weren't marketing optimally.  And so we have been able to take advantage of that and grow those products***."

167.   On February 28, 2014, the Company filed its annual report on Form 10-K for the year ended December 31, 2013 ("2013 10-K").  The 2013 10-K was signed by Pearson and Schiller.  The 2013 10-K stated that the Company faced significant competition from generic pharmaceutical products without disclosing the deceptive steps Valeant took to prevent substitution of its products.  It included statements that:

 a)    addressed generic competition stating, "Generic versions are generally significantly less expensive than branded versions, and, where available, may be required in preference to the branded version under third party reimbursement programs, or substituted by

pharmacies," and claiming *"[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care*";

> b)    addressed Variable Interest Entities ("VIE"), which are defined in GAAP as a legal entity that is subject to consolidation.  Although Philidor was a VIE under GAAP (*see* Section VII.B below) in its 2013 10-K, Valeant explicitly stated that the Company did not hold any interests in VIEs: "*[t]here were no material arrangements determined to be variable interest entities*"; and

> c)    included Management's Conclusion, signed by Pearson and Schiller, "that our internal control over financial reporting was effective as of December 31, 2013."  The 2013 10-K also included the Internal Controls Statement and SOX Certifications, signed by Pearson and Schiller, which in all material respects are identical to the ones previously quoted above.

168.    The 2013 10-K included several statements regarding the Company's purportedly lower-risk business strategy.  For example, the 2013 10-K stated:

> *The growth of our business is further augmented through our lower risk research and development model.  This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*. . . This is achieved primarily as follows: focusing our efforts on niche therapeutic areas . . . and acquiring dossiers and registrations for branded generic products, which require limited manufacturing start-up and development activities.

169.    The 2013 10-K identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control*," while failing to disclose that Valeant controlled and had significant influence over Philidor.

170.    On April 22, 2014, Valeant issued a press release stating that "it ha[d] submitted a merger proposal to the Board of Directors of Allergan under which each Allergan share would be exchanged for $48.30 in cash and 0.83 shares of Valeant common stock."  In total, this unsolicited offer to acquire Allergan, the maker of Botox (a popular anti-wrinkle treatment), was valued at approximately $46 billion.  The release disclosed that the proposal was made with the full support of Ackman and Pershing Square, his hedge fund, which had accumulated 9.7% of Allergan's outstanding stock leading up to the proposed acquisition, making it Allergan's largest shareholder.

171.    On May 8, 2014, the Company issued a press release announcing Valeant's first quarter 2014 financial results.  The release discussed Valeant's continued trend of extraordinary growth, including revenue growth which represented "an increase of 77% over the prior year," which "[e]xceeded our expectations," along with "[p]ositive organic growth in the U.S. . . ."  The release quoted Pearson as stating, in part, "*[o]ur first quarter results demonstrate the strong, durable nature of our diversified business model*."

172.    That same day, Pearson and Schiller hosted an earnings conference call with investors and analysts to discuss its 1Q14 results.  When asked about the Company's dermatology products and whether "you're doing [anything] differently, in terms of how you're marketing them… [o]r improving the gross to nets on those products," Pearson responded, in relevant part:

> I think the other thing is – that we've worked on is a much more sophisticated alternate fulfillment system that we've implemented the US, which is really helping.  Those scripts don't show up in IMS, in terms of what's doing, but we're very pleased that Solodyn is now growing.  And we've applied that to a number of our other products, which is also helping in terms of the growth.

173.    On May 9, 2014, Valeant filed its quarterly report on Form 10-Q for the first quarter ended March 31, 2014 ("1Q14 10-Q").  The 1Q14 10-Q was signed by Pearson and Schiller.  In

addition to confirming the financial results announced in the Company's May 8, 2014 earnings release, the 1Q14 10-Q included:

a) numerous statements regarding the Company's purportedly lower risk business strategy, for example:

> The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense; and

b) the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones previously quoted above.

174.    The 1Q14 10-Q identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control*," but concealed that Valeant controlled and had significant influence over Philidor.

175.    On May 12, 2014, Allergan issued a press release rejecting Valeant's unsolicited bid, stating its Board of Directors "believes that the Valeant business model is not sustainable." During a conference call on the same day, Allergan's Chairman and CEO referred to "the unsustainability of Valeant's business model," emphasized Valeant's lack of organic growth, and cautioned investors to "very carefully" check the results "actually achieved" by Valeant's new product launches and "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

176.    On May 20, 2014, Valeant issued a press release announcing that it would be hosting an investor meeting and webcast on May 28, 2014, "to respond to assertions Allergan has made that the Valeant model is not sustainable." The release continued: "Our goal for this meeting is to provide transparency into Valeant's historic, current, and future operating performance and to refute Allergan's allegations through a thoughtful and fact-based presentation."

177.   On May 27, 2014, Allergan filed a Form 8-K with the SEC.  Allergan attached a slide presentation entitled "Certain Potential Business Risks and Issues With Valeant Pharmaceuticals International, Inc.," which expressed concern about "Valeant's low organic sales growth (driven mostly by price increases)."  It asserted that much of Valeant's growth was attributable to "unsustainable price increases - not volume."  The presentation also noted Valeant's "depleted R&D engine" and questioned its "roll-up" business model and "Significant Management Turnover."

178.   On May 28, 2014, Valeant issued a press release announcing it had substantially increased its merger proposal for Allergan by raising the cash consideration and making the total consideration approximately $49 billion.  That same day, the Company hosted its previously announced investor meeting and conference call, which was attended by Pearson, Schiller, and Jorn.  During the conference call, they refuted Allergan's claims:

a)   Pearson said they would provide investors with "*a much deeper understanding of our operating model and why we believe it is sustainable for many years to come*" and show that "*when we buy a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth*";

b)   Jorn emphasized the launch of "additional access programs so that patients can get the medicines that their physician prescribes for them";

c)   Jorn reiterated "that in 2014 we have returned the business to growth" and highlighted the growth of dermatology products, including Solodyn and Acanya (medications used to treat acne and which were sold through Philidor) stating:

> *We have returned many of our core promoted brands to growth.*  We have new managed care capabilities, *we have launched additional access programs so that patients can get the medicines that their physician prescribes for them.*

* * *

So what type of growth are we talking about? *It is important that we recognize that we have been able in 2014 to turn around our largest brand, Solodyn*. We entered the year with 49% share, branded share of the dermatology space. We are now up at 51% and as you can see, our competitors have issues. Doryx has been declining and Monodox is flat. We are very proud of this accomplishment.

Further, *we continue to maintain greater than 80% share of the branded Clindamycin/BPO market with our brand, Acanya*. Despite loss in some major accounts in managed care, we have been able to achieve this;

d)      Pearson concluded the presentation by claiming Valeant *"has delivered strong organic growth since I have been here"* and *"[w]e are very transparent"* and *"our basic underlying growth rate is about 8%"*; and

e)      During the question and answer session, Pearson was asked to reconcile industry data showing 15% price increases with slides used during the presentation showing a 1% increase. Pearson claimed Valeant was *"limited"* to *"9%"* price increases in dermatology and denied all of Allergan's claims stating: *"We are limited.  For example in the US with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc.  So that is what limits.  It is managed care in the United States*." He continued:

I think we showed that when *we went through the 10 points that Allergan asserted* which was based on just looking at conventional sources and it is just not applicable to the way we run our business. *And I would argue it would be less and less applicable to most pharma companies because the role of specialty pharmacies, the role of managed care is changing the landscape in terms of what you can look at*.

179.   Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference on behalf of the Company. Pearson was asked several questions during the conference about price, volume, and the sufficiency of Valeant's disclosures.

a)      With respect to price and volume, Pearson stated:

58

The only country in the world that you can really sustainably increase pricing is the United States. ***And in the United States, you're governed by managed care contracts. And the managed care contract – the highest price increase we could take under any managed care contract we have in the US is 9% a year.***

***So, we have a lot of constraints, just like other pharma companies do, in terms of pricing. So, we focus on volume growth, and the vast majority of our growth on a global basis – and we went through some of that this morning - is volume.***

b)       In response to why Valeant did not provide more detailed disclosures on product sales, Pearson responded, "***We're more like a generics company in terms of the amount of revenue we get per product***," adding "[it] just makes no sense" to make such disclosures; and

c)       Pearson was also asked if others were copying Valeant's business model. He replied that they were transparent in what they were doing but it was hard to execute, claiming: "***as Howard [Schiller] always says, it's not a very easy model to replicate. It's very simple. We tell you exactly what we're doing. But it's very hard. It requires working really, really hard, sweating the details every day.***"

180.     On June 17, 2014, Pearson and Schiller hosted a conference call "to refute recent misleading assertions made by Allergan." During the call, Defendants made the following statements:

a)       During his opening remarks, Pearson emphasized that Valeant's "business is strong" and "[Valeant's] operating model is both durable and sustainable," stating, in part:

I am pleased to update all of you that our business is continuing to perform well. I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness…. ***In short, our business is strong and I can assure you our operating model is both durable and sustainable***.

In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.

First, the products listed in the presentation are not Valeant's top 15 products by revenue.  Only 6 of the products listed are in Valeant's top 15 products. ***The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price***.

b)      Pearson continued to respond to assertions regarding Valeant's organic growth and price increases later in the call: "I think the other thing we will probably start doing again is price volume. ***People – a lot of assertions are that it's all about price, but it's not***." He additionally stated:

So I think what we're talking about earlier this morning ***is probably we will report what the volume and price parts of our organic growth are.  And I suspect it will be surprising to people because I think volume is a much larger piece of our organic growth than most people would assume it is***; and

c)      Pearson further stated during the June 17, 2014 conference call that "[o]ur sales force in dermatology now has been stable for a few quarters and… ***all our promoted products in dermatology are growing***."

181.    The statements referenced above in Valeant's February 27, 2014 press release and conference call, 2013 10-K, April 22, 2014 press release, May 8, 2014 press release and conference call, 1Q14 10-Q, May 20 2014 press release, Form 8-K filed on May 27, 2014, May 28, 2014 press release, the Sanford C. Bernstein Strategic Decisions Conference held on May 28, 2014, and June 17, 2014 conference call were false and misleading when made for the reasons stated in ¶ 145 above.  With respect to price gouging, Valeant increased the price of Cuprimine on February 28, 2014, and again on May 30, 2014, for a total increase of 60%.

182.    In addition, Valeant was neither "like a generics company in terms of the amount of revenue we get per product," limited "just like other pharma companies" on pricing, nor "limited" to 9% price increases for reasons set forth in ¶ 145 above, and Valeant was not competing

by demonstrating the "cost advantages" of its products, as Defendants were engaging in the deceptive practices referenced in ¶ 145 above.  Furthermore, Valeant's "much more sophisticated alternate fulfillment system" that was implemented in the U.S. and that was "really helping" and driving sales growth, was predicated on the deceptive practices described in ¶ 145 above and carried undisclosed risks.  Also, the "additional access programs so that patients can get the medicines that their physician prescribes for them" were neither designed to make prices more affordable nor to get patients the medicines their doctors prescribed, but were used to force patients into Valeant's controlled distribution channel and reroute prescriptions away from retail pharmacies and/or alter physician orders to ensure that prescriptions for their branded products, rather than the generic alternatives, would be filled and reimbursed.  Additionally, rather than being like "most pharma companies" with respect to specialty pharmacies, Defendants had a close and effectively controlling relationship with Philidor and its network.  Finally, in violation of GAAP, the 2013 10-K and 1Q14 10-Q failed to disclose Philidor as a VIE as set forth in Section VII.B below.

### D.    Defendants' Material Misstatements From July 2014 To January 2015

183.    On July 18, 2014, Valeant issued a press release announcing it had filed an investor presentation with the SEC that would be used in meetings with Allergan's institutional investors and proxy advisors.  The presentation, entitled "Investor Presentation Regarding the Allergan Special Meeting Process," included "Valeant Operating Principles," stated as:

- ***Put patients and our customers first by maintaining the highest ethical standards in the industry***

- ***Select high-growth business segments (therapeutic areas and geographies) where the healthcare professional is still the primary decision maker***

* * *

61

- Ensure tight controls and rigorous compliance standards while avoiding overspending[.]

184.    On July 31, 2014, the Company issued a press release announcing its second quarter 2014 financial results.  The release reported "2014 Second Quarter Total Revenue [of] $2.0 billion; an increase of 86% over the prior year."  It quoted Pearson as stating "*Valeant once again delivered strong quarterly results and, as expected, organic growth has accelerated from the first quarter*.  As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

185.    That same day the Company hosted a conference call to discuss its 2Q14 financial results.  Pearson and Schiller attended on behalf of the Company.  During his opening remarks, Pearson stated, in part:

> *Turning to medical dermatology*…  The business has now stabilized, with a new management team.  *And the branded market share has increased across all key Medicis products since the beginning of 2014.  This includes Solodyn, Ziana, and Zyclara*.
>
> *In the US, dermatology grew approximately 7% in the quarter, including the headwinds from generics, driven by the continued growth of Acanya, Targretin, and Elidel*.
>
> * * *
>
> *Given the strong reception from both physicians and patients of our recently launched products Jublia,* Ultra, and Luzu, each of them has exceeded our expectations.  As I mentioned, *after only three weeks of being available, last week's script demand for Jublia exceeded over 1,300 scripts.  This trend is expected to accelerate,* as regulatory approval for marketing materials are received and *our dermatology sales forces is appropriately trained.*

186.    Later in the call, a Deutsche Bank analyst asked a "question on the alternative fulfillment initiatives" and whether Defendants could "just give us a sense of how much volume tends to run through that channel."  In response, Pearson stated:

> *We're not going to give specifics. It's – we think it's a competitive advantage that we have.* And it is still primarily the Medicis products, although not exclusively the Medicis products. *And – but I don't want to give specific numbers, but it is a very successful initiative.*

187.    On August 1, 2014, the Company filed its quarterly report on Form 10-Q for 2Q14 ("2Q14 10-Q"), signed by Pearson and Schiller. The 2Q14 10-Q contained the Internal Controls Statement and SOX Certifications, signed by Pearson and Schiller, which in all material respects are identical to the ones previously quoted above. The 2Q14 10-Q included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*.

188.    The 2Q14 10-Q identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control*," but concealed that Valeant controlled and had significant influence over Philidor.

189.    On August 19, 2014, the Company filed with the SEC a "[c]larification on assertions made about Valeant's business," which purported to respond to statements made by Allergan in its August 5, 2014 press release and in an August 15, 2014 *Financial Times* article. Among other things, Valeant stated that the Company's "*Promoted Pharmaceutical brands (i.e. Dermatology, Dental) are growing from a combination of price and volume" and that "[w]e have no knowledge of any exposures or issues other than those disclosed or for which reserves have been established.*"

190.    On September 11, 2014, the Company filed with the SEC a letter sent by Pearson to Valeant's employees referencing Allergan's "attack[s] [o]n our business" and "our business model and our track record of organic growth." In the letter, Pearson responded that "[h]ighlights

across Valeant's businesses include" **"*return to growth of our U.S. Prescription Dermatology business, including the Obagi Medical business, coupled with the early, but exciting launch successes of Jublia and Luzu*"** and "***continued tremendous growth in our U.S. Neuro & Other and OraPharma businesses.***"

191.   On October 20, 2014, the Company issued a press release announcing its third quarter 2014 financial results.  The release stated, in relevant part: "***Total Revenue [of] $2.1 billion… GAAP EPS [of] $0.81, [and] Cash EPS $2.11***."  The release also reported ***net income of $275.4*** million.  The release further conveyed that "***[t]otal same store sales organic growth was 19%***, including impact from generics."

192.   The same day, Pearson, Schiller, and Kellen hosted a conference call to discuss Valeant's 3Q14 financial results.  In his opening remarks, Pearson emphasized improved marketing and increased dermatology sales as the source of Valeant's earnings growth, stating, in part:

> ***Revenues for our dermatology business, including the recent Precision acquisition, grew 33% quarter over quarter.  The turnaround of our dermatology business is continuing.  New leadership has brought stability to the sales force and has led to innovative new marketing approaches that are working well.  This has resulted in market share and revenue gains across the portfolio, including launch products.***
>
> ***Elidel, Acanya, Zyclara, and Ziana have all gained market share since the beginning of 2014.  Elidel has had an exceptional year, increasing market share from 45% to 52%.***  And it has overtaken Protopic as the leader in this category.
>
> ***After years of declines Solodyn market share has stabilized.  On the new products side, both Jublia and Luzu quickly gained share, with Jublia reaching 7% script share of the total onychomycosis market, both branded and generics.  And Luzu accelerated its script share to 13% of the branded topical antifungal market.   In addition, quarter-over-quarter result growth for all of our dermatology promoted brands was over 40%.***

193.    On October 20, 2014, Allergan filed a response to Valeant's 3Q14 financial results with the SEC and Valeant responded by filing a document entitled "October 20th rebuttal items." In the document, Valeant rebutted Allergan's assertion that "price is a large drive[r] of growth for select Valeant U.S. pharmaceutical businesses" by stating, in part:

- *Overall price/volume for the Valeant business was ~50% volume and ~50% price.*

- *Like all PhRMA* [Pharmaceutical Research and Manufacturers of America] *companies, including Allergan, our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year.*

- *Gross price increases could be seen as higher but do not contribute to our reported net sales growth.*

194.    On October 24, 2014, Valeant filed its quarterly report on Form 10-Q for the third quarter ended September 30, 2014 ("3Q14 10-Q").  The 3Q14 10-Q was signed by Pearson and Schiller.  The 3Q14 10-Q reported *3Q14 revenue of $2.056 billion, net income of $275.4 million, and GAAP EPS of $0.81* and included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*  We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

195.    The 3Q14 10-Q also identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed by third parties, over which we have no or limited control*," but concealed that Valeant controlled and had significant influence over Philidor.

196.     The 3Q14 10-Q included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones previously quoted above.

197.     On January 8, 2015, Valeant hosted a guidance call to discuss its expected 2015 financial performance and strategies for the year.  Pearson, Schiller, and Kellen attended on behalf of the Company.  During the call, Pearson stated, in relevant part:

> *We demonstrated tremendous organic growth improvement in 2014 . . .*
>
> * * *
>
> In conclusion, ***all the successes from 2014*** and our [process] for 2015 and beyond ***continue to validate that Valeant's business model is both sustainable and value creating.  Our robust organic growth profile is evidenced by our ability to deliver double-digit organic growth, not only in 2014 and 2015*** but strong organic growth for the foreseeable future.

198.     The statements referenced above in Valeant's July 18, 2014 press release, July 31, 2014 press release and conference call, 2Q14 10-Q, August 19, 2014 SEC filing, September 11, 2014 letter, October 20, 2014 3Q14 financial results, October 20, 2014 rebuttal to Allergan, 3Q14 10-Q, and January 8, 2015 guidance call, were false and misleading when made for the reasons stated in ¶ 145 above.  With respect to price gouging, Valeant increased the price of Syprine and Cuprimine by 50% on July 18, 2014.  Additionally, the source of Valeant's growth of dermatology prescription products such as Solodyn, Ziana, Zyclara, Elidel, and Jublia, was not the improved marketing, business strategies, and increased sales volume of certain products as Defendants claimed, but rather the deceptive practices described in ¶ 145 above.  Furthermore, Allergan's claims were not "unjustified" because Valeant's business strategy relied upon extraordinary price increases which were not capped at 10% but were far beyond industry norms.  This strategy carried the undisclosed risks and were unsustainable as detailed in ¶ 145 above.  In addition, far from

"maintaining the highest ethical standards in the industry," Defendants were engaged in deceptive practices; and despite "ensur[ing] tight controls and rigorous compliance standards," Valeant lacked controls and compliance standards as described in ¶ 145 above. Finally, in violation of GAAP, the 2Q14 10-Q and 3Q14 10-Q failed to disclose Philidor as a VIE as set forth in Section VII.B.

### E.   Defendants' Material Misstatements From February To April 2015

199.   On February 22, 2015, Valeant issued a press release announcing its fourth quarter 2014 and full year 2014 financial results. For 4Q14, the release reported "*Revenue [of] $2.3 billion… GAAP EPS [of] $1.56, [and] Cash EPS [of] $2.58.*" For the full year 2014, the press release reported: "*Revenue [of] $8.3 billion… GAAP EPS [of] $2.67, [and] Cash EPS [of] $8.34*, (excluding Allergan gain)." The release also reported *4Q14 net income of $534.9 million and 2014 net income of $913.5* million. The press release further reported that "*Total Same Store Sales organic growth*" was 16% and 13% for the 4Q14 and FY 2014, respectively and quoted Pearson as claiming Valeant's strategy "is paying off for all of our stakeholders" and reporting "*Outstanding growth in the U.S., most notably dermatology*."

200.   On February 23, 2015, Pearson and Schiller hosted a conference call to discuss Valeant's 4Q14 and full year 2014 financial results. During the call, Schiller highlighted Valeant's sources of growth, including that "*[r]evenues for our dermatology business were very strong and increased 70% year-over-year*" and:

> *The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014.*
>
> *Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth. And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013.*

> *Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report. This yields an annualized run rate of greater than $250 million for the product.*

201.     On February 25, 2015, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K").  The 2014 10-K was signed by Defendants Pearson and Schiller.  The 2014 10-K:

a)     reported the Company's ***4Q14 revenue of $2.28 billion, net income of $534.9 million, GAAP EPS of $1.56, full year 2014 revenues of $8.264 billion, net income of $913.5 million, and GAAP EPS of $2.67***;

b)     attributed the source of Valeant's growth to "***our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense***";

c)     claimed "***[t]o successfully compete for business with managed care and pharmacy benefits management organizations, we must often demonstrate that our products offer not only medical benefits but also cost advantages as compared with other forms of care***….";

d)     stated that "***[t]he consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ('VIEs') for which the Company is the primary beneficiary***," while failing to mention Philidor;

e)     stated, under the heading "Business Combinations":

> ***During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate.  These acquisitions are included in the aggregated amounts presented below***;

f)     included "Reports of Management on Financial Statements and Internal Control over Financial Reporting" signed by Pearson and Schiller, stating:

**Financial Statements**

The Company's management is responsible for preparing the accompanying consolidated financial statements in conformity with United States generally accepted accounting principles ("U.S. GAAP").  In preparing these consolidated financial statements, *management selects appropriate accounting policies and uses its judgment and best estimates to report events and transactions as they occur.  Management has determined such amounts on a reasonable basis in order to ensure that the consolidated financial statements are presented fairly, in all material respects.  Financial information included throughout this Annual Report is prepared on a basis consistent with that of the accompanying consolidated financial statements.*

**Internal Control Over Financial Reporting**

Under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based on the framework described in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.  *Based on its evaluation under this framework, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2014*;

g)      identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed or marketed by third parties, over which we have no or limited control*," but concealed that Valeant controlled and had significant influence over Philidor; and

h)      also included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones previously quoted above.

202.    On March 16, 2015, Valeant announced a $1.45 billion public offering of 7.3 million shares of common stock at a price of $199 per share ("March 2015 Stock Offering"), the proceeds of which were used to fund the acquisition of Salix and related costs.  The March 2015 Stock Offering was conducted pursuant to the March 2015 Stock Offering Materials, including the Registration Statement and Prospectus Supplement.

69

203.    The March 2015 Stock Offering Materials represented that:

a)    A "key element" of Valeant's business strategy, which allowed it to "**improve both the growth rate and profitability of the Company**" and "**enhance shareholder value,**" was its "**low-risk research and development ('R&D') model**";

b)    Valeant's dermatology segment and other segments were "attractive markets" in which Valeant operated because they were "**high-growth businesses**" with "sustainable organic growth" where the "**healthcare professional or patient is still the primary decision maker,**" and similarly stated that Valeant's business strategy operated "**to ensure decisions are made close to the customer**" and that there was "**significant opportunity to create value through application of the Valeant business model**";

c)    Valeant's "**inventory is held at retail pharmacies and other non-wholesale locations over whose buying patterns we will have limited influence**" and identified as a risk factor "**declines in the pricing and sales volume of certain of our products (or Salix's products) that are distributed or marketed by third parties, over which we have no or limited control**"; and

d)    Valeant's financial results for the year ended December 31, 2014: **total revenues of $8.264 billion; net income of $913.5 million; and basic and diluted EPS of $2.72 and $2.67, respectively**, and stated that revenues had grown by approximately 43% year-over-year.

204.    The March 2015 Stock Offering Materials also discussed the Company's "Other Recent Acquisitions," but failed to mention Valeant paid $100 million for the option to acquire Philidor just three months prior to the March 2015 Stock Offering, and claimed that the Company was "not currently a party to any significant transactions, other than the [Salix merger]."

205.    Valeant's 2014 10-K, which was expressly incorporated into the March 2015 Stock Offering Materials, included the same Internal Controls Statement and SOX Certifications as previously set forth above.

206.    On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter 2015, as well as increased guidance for full year 2015.  The release reported: "***Same Store Sales Organic Growth was 15%, driven by***":

- ***Growth from launch brands***, including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, ***Jublia, Luzu***, and Ultra Contact Lens, and

- ***Double digit growth in U.S. businesses such as*** Contact Lens, ***Dermatology, Neurology and Other***, Obagi, and Oral Health[.]

207.    On April 29, 2015, Pearson, Schiller and Kellen hosted a conference call to discuss Valeant's 1Q15 financial results with investors and analysts.  During the call:

a)    Pearson stated, in part:

> ***Our US dermatology business had an outstanding quarter.  Dermatology revenue grew 38%*** year ***on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year;*** and

b)    An analyst asked "if you could quantify a little bit how much was price versus volume that contributed to growth in 1Q?  And what do you factor in your full-year guidance price versus volume?"  Pearson responded:

> ***In terms of price volume, actually volume was greater than price in terms of our growth.***  Outside the United States it's all volume . . . . ***And in the US it's shifting more to volume than price, and we expect that to continue*** with our launch brands.  A lot of our prices for most of our products are negotiated with managed care.  And there's only a limited amount of price that we can take.

208.    On April 30, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2015 ("1Q15 10-Q").  The 1Q15 10-Q was signed by Pearson and Schiller and: (a) reported the Company's ***1Q15 revenue of $2.191 billion***; (b) included the same

statement related to Valeant's "*Business Combinations*'' as in the Company's 2014 10-K, discussed above, which failed to mention the existence of Philidor as a VIE; and (c) included the Internal Controls Statement and SOX Certifications signed by Pearson and Schiller, which in all material respects are identical to the ones previously quoted above.

209.   The 1Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

> *The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.* We believe this strategy will allow us to maximize both the growth rate and profitability of the Company and to enhance shareholder value.

210.   The 1Q15 10-Q identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed or marketed by third parties, over which we have no or limited control*," but concealed that Valeant controlled and had significant influence over Philidor.

211.   The statements referenced above in Valeant's February 22, 2015 press release, February 23, 2015 conference call, 2014 10-K, April 29, 2015 press release and conference call, and 1Q15 10-Q were false and misleading when made for the reasons stated in ¶ 145 above. Additionally, rather than competing by demonstrating their products' "cost advantages," Defendants were engaged in the deceptive practices outlined in ¶ 145 above, raising the price of products by as much as 5,700% without justification.  Furthermore, in violation of GAAP, the 2014 10-K and 1Q15 10-Q failed to disclose Philidor as a VIE as set forth in Section VII.B.

### F.      Defendants' Material Misstatements From May to July 2015

212.    On May 19, 2015, Pearson addressed investors at Valeant's 2015 annual shareholder meeting.  Pearson made numerous statements about the business strategy, source of growth, pricing, and stock price, including:

        a)      Pearson said that "***we have a differentiated R&D model that has and will continue to deliver more innovative products to our customers at a lower cost than our competitors***" adding that "***[w]e've delivered three consecutive strong quarters of organic growth, 19% and 16% and 15% respectively***"; and

        b)      Valeant had a "***unique executive compensation system tied to generating disproportionate returns for our shareholders.***"

213.    On May 21, 2015, Pearson attended an RBC Capital Markets, LLC ("RBC") Investor Meeting on Valeant's behalf and made numerous statements about the Company's pricing, source of growth, and accounting practices, including:

        a)      when asked to discuss pricing in the United States, Pearson said that due to managed care contracts, Valeant was "***contractually not allowed to raise prices beyond***" an average of "***5%***," including in its Dermatology business;

        b)      while discussing pricing, Pearson said of the Neurology and Other business segment "***that's where we have the most ability to raise price[s] and play with price***" and raising prices "***is I believe not, at least from your [an investor's] standpoint a bad thing***."  Pearson stated that orphan products provided him with the opportunity to be flexible with pricing.  He said Valeant's base plan was around 5% price increases adding that Valeant had raised prices more in certain areas but that "***we don't plan for them, but again if we can take advantage of – during times we've had significant price increases in acquisitions***."  Rather than disclosing the deceptive

73

tactics to implement the price increases, Pearson claimed Valeant was able to raise prices by buying products from companies "***that did not price their product the right way***";

       c)    Pearson said they raised the prices of Isuprel and Nitropress because Marathon left money "on the table" and claimed the drugs were priced much lower than competitive products, stating they raised prices "***because the drugs were mispriced vs. comparative products***" and adding "***that can create lot of value[] for shareholders***'';

       d)    Pearson added that "***we've been accused of our growth being price and not volume***" but claimed that "***organic growth is more volume than price and will continue to be***";[3] and

       e)    turning to Valeant's accounting practices and financial status, Pearson reassured investors "our accounting practices are fine" and added "***[w]e get audited all the time, by the SEC. . .and we have absolutely no issue from a government standpoint***" and that "***we never had a financial irregularity***."

214.    On July 23, 2015, the Company issued a press release announcing its second quarter 2015 financial results and increasing the Company's full year 2015 guidance.  The release reported that "***Same Store Sales Organic Growth was 19%, driven by: U.S. businesses, driven by the strength of dermatology***, contact lenses, dental and Obagi."

215.    The July 23, 2015 press release also quoted Pearson as stating: "***We once again exceeded our guidance and delivered our fourth consecutive quarter of greater than 15%***

---

[3] On May 21, 2015, Schiller, in an email with the subject "price/volume," wrote to Pearson, "Last night, one of the investors asked about price versus volume for Q1.  Excluding [M]arathon, price represented about 60% of our growth.  If you include [M]arathon, price represents about 80%." In addition, on May 26, 2015, an RBC analyst reported that one of the key takeaways from the meetings with Valeant management and Pearson, was "volume not price is fueling organic growth."

*organic growth.  Our strong second quarter results were driven by outperformance in our U.S. businesses.*"

216.    On July 23, 2015, the Company also hosted a conference call to discuss its 2Q15 financial results.  Pearson, Rosiello, and Kellen attended on Valeant's behalf.  Commenting on the Company's results, Pearson stated, in relevant part:

> *We have now delivered four consecutive quarters of more than 15% same-store organic growth.  Strong performance throughout our businesses resulted in both our top and bottom line exceeding the Q2 guidance that we provided on our last call*.

> * * *

> *Turning to organic growth, our overall same-store total company organic growth was 19% for the quarter.  The exceptional growth of our US businesses driven by the strength of dermatology*, contact lenses, dental and Obagi was complimented by many of our emerging markets including China, Middle East/North Africa, Russia and South Korea.

> * * *

> *Jublia is now our second largest product with annual run-rates sales of approximately $450 million....*

> *Our US dermatology business had another excellent quarter with our launch brands leading the way.  Both launch and core brands contributed to the dermatology revenue growth of 55% year-on-year. Jublia scripts grew 37% in Q2 versus Q1....*

217.    During the question and answer session of the Company's July 23, 2015 conference call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going through specialty pharmacy channels had improved.  In response, Kellen, Valeant's Company Group Chairman, concealed Valeant's control over the Philidor network, and stated:

> *Yes, the adoption through multiple specialty pharmacies continues*.  I think last time we said Jublia was around 50%.  That trend continues.  For derm[atology] overall, it varies by product, but it's around 40%.

218.    As the call continued, Pearson was asked about the price increase on Glumetza and the "extent to which you envision more pricing power… broadly speaking, in the U.S.?" In response, Pearson stated:

> I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza – we're going to lose Glumetza within six months – often price increases are taken at the end. *So that was just consistent with what most companies do*.
>
> *Our view on pricing* – across most of our portfolio, we do not take prices. Outside the US, there's like zero price. I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. So we're opportunistic when it comes to price. *But our base strategy is, how do we grow organically through volume, which is – I think this quarter, we once again exhibited our ability to do so*.

219.    On July 28, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for its 2Q15, ended June 30, 2015 ("2Q15 10-Q"). The 2Q15 10-Q was signed by Pearson and Rosiello. The 2Q15 10-Q *reported the Company's revenues for the six months ended June 30, 2015 of $4.923 billion*. The 2Q15 10-Q also stated:

> *As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions* in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers…. *Provisions as a percentage of gross sales increased to 32% and 33% for the second quarter and first half of 2015*, respectively, compared with 27% and 26% in the second quarter and first half of 2014. *The increase was driven by (i) higher provisions for rebates, chargebacks, and returns, including managed care rebates for Jublia® and the co-pay assistance programs for launch products including Jublia®, Onexton®, and Retin-A Micro® Microsphere 0.08% ("RAM 0.08%")* . . .

220.    The 2Q15 10-Q also included a statement regarding the Company's purportedly lower risk business strategy, stating:

*The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense.*

221.     The 2Q15 10-Q identified as a risk factor "*declines in the pricing and sales volume of certain of our products that are distributed or marketed by third parties, over which we have no or limited control*," but concealed that Valeant controlled and had significant influence over Philidor.

222.     The 2Q15 10-Q also included the Internal Controls Statement and SOX Certifications, but signed by Rosiello and Pearson, which in all material respects are identical to the ones previously quoted above.

223.     The statements referenced above in Valeant's May 19, 2015 annual shareholder meeting, May 21, 2015 RBC Investor Meeting, July 23, 2015 press release and conference call, and 2Q15 10-Q, were false and misleading when made for the reasons stated in ¶ 145 above. Additionally, price increases represented 80% of Valeant's 1Q15 growth compared to only 20% attributable to volume increases; and contrary to Pearson's suggestions that price increases were not a "bad thing" for investors and that prior owners had underpriced drugs, Valeant had achieved the price increases through deceptive practices which carried undisclosed risks, as described in ¶ 145 above.  Furthermore, provisions for rebates and chargebacks, including managed care rebates for Jublia, had increased due to the Company's use of co-pay reimbursements and other methods of financial assistance to conceal its price gouging as described in ¶ 145 and were not "customary" deductions.  Finally, Valeant's "unique" compensation system was part of Valeant's improper "tone at the top" as described in ¶ 145 above, and in violation of GAAP, the 2Q15 10-Q failed to disclose Philidor as a VIE as set forth in Section VII.B.

**G.      Defendants' Material Misstatements From September to December 2015**

224.      On September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees responding to claims that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."  In his letter:

a)      Pearson referred to these concerns as a "bear thesis," claimed they were "***incorrect on both accounts***," and dismissed the dependency on price increases stating "***Valeant is well-positioned for strong organic growth, even assuming little to no price increases***";

b)      Pearson added, "[a]s we have stated many times, ***Valeant's core operating principles include a focus on volume growth*** and a concentration on private and cash pay markets that avoid government reimbursement in the U.S." and "the majority of our portfolio ***will continue to deliver strong volume-based organic growth and is not dependent on price increases***";

c)      Pearson went on to "lay out the facts" noting, in part, that: (i) growth in dermatology, ophthalmology, Rx and dentistry was based on having "***delivered over 30% script growth year to date***," and (ii) they expected "***double-digit script growth and corresponding revenue growth trends to continue***" in the "Salix business"; and

d)      Pearson added, "***we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals***…."

225.      On October 14, 2015, Valeant issued a press release noting it received subpoenas from the DOJ for documents regarding its patient assistance and distribution practices.  The release quoted Pearson as stating that "***All of us at Valeant firmly believe in maintaining strong***

*regulatory and financial controls and believe we have operated our business in a fully compliant manner*."

226.    On October 19, 2015, Valeant issued a press release announcing its third quarter 2015 financial results and hosted an earnings conference call that began before the market opened. The release stated, in part, "***Same store sales organic growth of 13%; 5th consecutive quarter of > 10% organic growth***, driven by: ***Continued outperformance of U.S. businesses, particularly dermatology*** and contact lens…."

a)    As discussed in Section VI.B, below, by this time Valeant's ties to Philidor were beginning to be uncovered by investigative journalists, which forced Valeant to publicly disclose the relationship.  To offset the negative impact on the price of Valeant securities, the Company raised revenue and EPS guidance for the fourth quarter 2015 and full year 2015, stating:

4Q15 Guidance

- ***Total Revenue increased to $3.25 - $3.45 billion [midpoint of $3.35 billion] from $3.2 - $3.4 billion [midpoint of $3.3 billion]***

- ***Cash EPS increased to $4.00 - $4.2 0 [midpoint of $4.10] from $3.98 - $4.18 [midpoint of $4.08]***

Full Year 2015 Guidance

- Total Revenue increased to $11.0 - $11.2 billion [midpoint of $11.1 billion] from $10.7 - $11.1 billion [midpoint of $10.9 billion]

* * *

- Cash EPS increased to $11.67 - $11.87 [midpoint of $11.77] from $11.50 - $11.80 [midpoint of $11.65]; and

b)    In addition, the press release quoted Pearson as stating, in part, "With our strong product portfolio and growth prospects, we feel very confident in our future outlook and we are reaffirming our $7.5 billion EBITDA floor for 2016."

227.    That same day, Pearson, Rosiello, and Kellen hosted a conference call.  In the slide presentation accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors."   One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor," to which the presentation responded:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients

* * *

*We understand that Philidor*:

- Provides services under our programs for commercially insured and cashpaying claims only.  Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

- ***Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)*** [4]

- ***Dispenses generic products as specified in patient's prescription or as requested by patient***

228.    During the call, Pearson repeated some of the same claims, saying that the relationship with Philidor had not been disclosed previously for "competitive reasons" and suggesting Valeant's use of specialty pharmacies was similar to its competitors and resulted in more affordable prices, stating, in part:

---

[4] As Defendants knew, and as Philidor admitted on November 25, 2015, Valeant was Philidor's only customer.

> *The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors.  But given all the incorrect assertions by some,* we will provide an update to this call.
>
> *Similar to many pharmaceutical companies in the US, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies.  We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients.  In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.*

229.    Pearson also claimed that "[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels."

230.    In reference to media and government scrutiny of Valeant's pricing practices, Pearson claimed that such criticism was an industry-wide problem and told investors that Valeant's forecast was appropriately discounted for such scrutiny, claiming "*it's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions.  And that's not just Valeant, but I think it's all companies*.  I do think given that environment, the pricing that pharmaceutical companies will take in the future will be more modest, and *we built that into our forecast for next year*."

231.    Regarding the lawsuit filed by R&O, Pearson reassured investors that the business practices of Valeant and Philidor were proper by claiming:

> *R&O is one of the specialty pharmacies in our network*, and Valeant has shipped approximately $69 million at wholesale prices to them.  This represents approximately $25 million at net prices.  Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables.  Any products still held by R&O are reflected in our inventory.  *R&O is currently improperly holding significant amounts it*

81

> *receives from payers*.  We will refrain from comment on active litigation,
> and *look forward to showing in court that we are owed the money*.

232.    During the conference call, Rosiello repeated the increased guidance from the press

release and added that "*[w]e expect our gross margins to approach 80% in the fourth quarter,*

*driven by continued growth in our dermatology and Salix businesses, the launch of Addyi*, and

decreased sales of Xenazine."  His statements were accompanied by the following chart in the

slide presentation:

|  | Previous Q4 2015 | New Q4 2015 | Previous full year | New full year |
|---|---|---|---|---|
| Revenues | $3.2 - $3.4B | $3.25 - $3.45B | $10.7 - $11.1B | $11.0 - $11.2B |
| Cash EPS | $3.98 - $4.18 per share | $4.00 - $4.20 per share | $11.50 - $11.80 per share | $11.67 - $11.87 per share |
| Adj. Cash Flow From Operations | NA | NA | >$3.2B | >$3.35B |

233.    To further alleviate investor concern, and buoy the price of Valeant's securities, the

slide presentation also stated that Valeant was "*reaffirming our expectations to exceed $7.5*

*[billion] in EBITDA in 2016*."  When Pearson was asked during the conference call how the lack

of price increases going forward may affect the Company's ability to meet EBITDA guidance in

2016, he responded, in part, "*today... we feel very comfortable with the $7.5 billion and we expect*

*our guidance next year will exceed that*."

234.    On October 21, 2015, Valeant issued a press release responding "to recent

accusations made regarding its financial reporting and operations" by Citron Research ("Citron")

that Valeant was inflating revenues through its secret network of pharmacies.  To refute such

allegations and confirm it was complying with GAAP, Valeant stated, in part:

- ***All shipments to Philidor and other pharmacies in the Philidor pharmacy network, including R&O, are not recorded in Valeant's consolidated net revenue. Sales are recorded only when the product is dispensed to the patient. All sales to Philidor and Philidor network pharmacies are accounted for as intercompany sales and are eliminated in consolidation. They are not included in the consolidated financial results that Valeant reports externally.***

- Any inventory at pharmacies in the Philidor pharmacy network are included in Valeant's consolidated inventory balances – ***there is no sales benefit from any inventory held at these specialty pharmacies*** and inventory held at the Philidor network pharmacies is reflected in Valeant's reported inventory levels.

* * *

- ***The timing of our revenue recognition by selling through the Philidor pharmacy network is actually delayed when compared to selling through the traditional wholesaler channel.***

235.    On October 26, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2015 ("3Q15 10-Q"). The 3Q15 10-Q was signed by Pearson and Rosiello. The 3Q15 10-Q reported the Company's ***revenue for the nine months ended September 30, 2015 of $7.71 billion***.

236.    The 3Q15 10-Q disclosed that Valeant had the "power to direct Philidor's activities" and stated that Valeant's entire Board of Directors had reviewed Valeant's accounting for Philidor and had confirmed its appropriateness.

a)    Specifically, the 3Q15 10-Q stated:

During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, ***which were not material individually or in the aggregate***. These acquisitions are included in the aggregated amounts presented below. Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC. The Company determined that based on its rights, including its option to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits. As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements. Net sales recognized through Philidor represent

83

approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated assets as of September 30, 2015.   The impact of Philidor as a consolidated entity on the Company's net revenues for 2014 was nominal.

b)      The 3Q15 10-Q further stated:

On October 26, 2015, the Company also announced that its **Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.**

**As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales.   Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers….   Gross product sales for products dispensed through Philidor Rx Services, LLC** ("Philidor") (which is consolidated as a variable interest entity within our consolidated financial statements) **are recognized when a prescription is dispensed to a patient.** Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively.

c)      The 3Q15 10-Q also described the Company's performance:

Excluding the items described above, we realized incremental product sales revenue from the remainder of the existing business of $236 million and $820 million in the third quarter and first nine months of 2015, respectively. **The growth, which incorporates sales directly to wholesalers and retailers as well as use of specialty pharmacies (primarily Philidor), reflected (1) higher sales of (i) Jublia®** (launched in mid-2014), (ii) the **Retin-A®** franchise (including the launch of RAM 0.08% in mid-2014), (iii) Xenazine®, (iv) Arestin®, (v) **Solodyn®**, and (vi) the Carac® franchise, and (2) higher sales from other recent product launches, including the launches of Biotrue® ONEday, Bausch + Lomb Ultra®, and Onexton.®

d)      The 3Q15 10-Q also included a statement regarding the Company's

purportedly lower risk business strategy, stating:

**The growth of our business is further augmented through our lower risk, output-focused research and development model, which allows us to**

84

*advance certain development programs to drive future commercial growth, while minimizing our research and development expense*; and

e)      The 3Q15 10-Q included the Internal Controls Statement and SOX Certifications (this time signed by Pearson and Rosiello), which in all material respects are identical to the ones previously quoted above.

237.    On October 26, 2015, Valeant issued a press release designed to alleviate investor concerns and re-inflate the price of Valeant stock, which:

a)      repeated that Valeant's "Audit and Risk Committee and the full Board of Directors have reviewed the company's accounting for its Philidor arrangement and have confirmed the appropriateness of the company's related revenue recognition and accounting treatment";

b)      quoted Pearson as stating that "As we have said previously, our accounting with respect to the Company's Philidor arrangements is fully compliant with the law," and "We operate our business based on the highest standard of ethics, and we are committed to transparency"; and

c)      quoted Robert Ingram as stating that the Board of Directors "has fully supported the company's specialty pharmacy strategy," adding that Pearson "operates with the highest degree of ethics.''

238.    Also on October 26, 2015, the Company hosted a conference call with investors that was accompanied by a presentation. Pearson, Schiller, Rosiello, Ingram, director Norma Provencio, director Theo Melas-Kyriazi, director Katharine Stevenson, Carro, and Kellen attended on behalf of Valeant.  The presentation disclosed that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program."  Among other things, the presentation also stated that:

85

a)        "Prescriptions through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels";

b)        "*We do not own or control Philidor* . . ." and "*Philidor employees do not report to Valeant* . . .";

c)        "*Philidor is independent* . . ."; and

d)        "Unless and until Valeant exercises the option to acquire Philidor, *Philidor remains independent* and Valeant has no rights to remove CEO or management."

239.    Pearson assured investors there was no improper accounting or other improper practices involving Philidor stating:

a)        "*we stand by our accounting treatment of Philidor completely*";

b)        "*[w]e follow the law and we comply with accounting and disclosure rules*'';

c)        "*the sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue.  His motivation is the same as someone who runs into a crowded theater to falsely yell fire.  He wanted people to run*";

d)        "*after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill to make a request that the SEC investigate Mr. Left and Citron*";[5]

---

[5] This request eventually led the SEC to investigate Valeant's accounting, which as noted below, resulted in a restatement.

e)      "*We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians.  There have been no issues with regards to the accounting or revenue recognition of the business*''; and

f)      "*We have been working with outside counsel and we have found no evidence of illegal activity whatsoever at Philidor*."

240.    Ingram, Valeant's lead independent director, speaking on behalf of the entire Board of Directors, reaffirmed these statements, saying:

> Thank you, Mike [Pearson].  *As Mike stated, the Company stands by its accounting completely.  The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment.*

241.    Rosiello reinforced the statements by Pearson and Ingram adding:

a)      "*Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate*";

b)      "*Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price*";

c)      "*There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients*"; and

d)      "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in December 2014.  *The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction.*

*The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee.*"

242.    Carro, Valeant's corporate controller, also defended Valeant's accounting and lack of prior disclosure regarding Philidor.  Specifically:

a)    Carro claimed that, as of year-end 2014, "***Philidor is not considered to be material to Valeant's business for reporting purposes***" because the "GAAP requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

b)    Carro claimed that for the first two quarters of 2015 "***Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements***," because "[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014."

243.    Schiller reassured investors that there was no evidence of wrongdoing by Pearson, stating "if I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board.  It's as simple as that.  When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing."

244.    To mitigate the impact of the negative news, Pearson reaffirmed Valeant's recently increased 2015 guidance, stating: "***Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections***, excluding the one-time expenses associated with recent events."  He added, "***we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion.***"

245.    On November 10, 2015, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."[6]  Pearson stated, in relevant part:

> *We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients.  We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us rather than the patient, to assume the risk if the commercial payer denied the claim.*

246.    An analyst noted that there were "two kind[s] of major accusations aimed at the Company," one regarding pricing and the other regarding Philidor, and noted that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor."  With regard to Philidor, Pearson responded in part:

> Well Philidor was very specific.  *First, there was the Citron report which claimed financial fraud and other things.  They quickly came out and there was no financial fraud, in terms of Valeant had to do.*  But then other allegations were made in terms of the practices of Philidor.  And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

247.    On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it issued less than two months earlier on October 19, 2015.  Attempting to offset the disappointing revised 2015 guidance and notwithstanding the financial impact of its lost sales through Philidor and increased scrutiny by PBMs and private payors, Valeant's December 16,

---

[6] As discussed herein, in late October 2015 Valeant announced that it would be terminating its relationship with Philidor and that Philidor would be shut down.

2015 press release projected robust 2016 growth with revenue of *$12.5- $12.7 billion, Cash EPS of $13.25 - $13.75, and EBITDA of $6.9 - $7.1 billion.*

248.    The same day, Valeant hosted a conference call.  Pearson, Rosiello, Jorn, and Kellen participated on behalf of the Company.  Rosiello repeated the 2016 guidance and Pearson stated the guidance was conservative, noting: "*I feel very comfortable with the guidance*.  But each little pieces [sic], I feel little less comfortable this year just given - *so we put an extra dose of conservatism in*."  Pearson added: *"Addyi*… a lot of people have said, Addyi is a disaster; *today you'll see it's not a disaster.  So we believe we'll sell between $100 million and $150 million in sales of Addyi next year."*

249.    The statements referenced above in Valeant's September 28, 2015 Form 8-K, October 14, 2015 press release, October 19, 2015 press release and conference call, October 21, 2015 press release, 3Q15 10-Q, October 26, 2015 press release and conference call, November 10, 2015 conference call, and December 16, 2015 press release were false and misleading when made for the reasons stated in ¶ 145 above.  Regarding price increases, Valeant increased the price of Cuprimine on July 31, 2015 by more than 400%.  Furthermore, Valeant's secret network of captive pharmacies was not concealed because it was a "competitive advantage" and designed to make prices more "affordable," but rather because its disclosure carried the impact described in ¶ 145 above.  Moreover, Philidor was not formed to deliver better service or transfer risks to Valeant of non-payment but was part of Valeant's strategy to implement the deceptive practices described in ¶ 145 above.

250.    Additionally, at the time of issuing increased guidance, Defendants were aware that they had doubled the price of Addyi, making it unlikely to be covered by insurance or approved by PBMs, cancelled a distribution agreement with Cardinal Health in order to rely on Philidor to

distribute Addyi, and the disclosure of Valeant's relationship with Philidor and investigations into their price gouging would result in decreased sales, sale prices, revenue, and earnings.  In addition, based on ¶ 145 above and the additional reasons stated herein, Defendants had no reasonable basis to believe and, in fact did not believe, that Valeant could achieve 4Q15 and full year 2015 revenue of $3.25-$3.45 billion and $11-$11.2 billion, respectively; 4Q15 and full year 2015 Cash EPS of $4.00- $4.20 and $11.67-$11.87, respectively; full year 2016 EBITDA of at least $7.5 billion; full year 2016 revenue of $12.5-$12.7 billion, Cash EPS of $13.25-$13.75 billion or EBITDA of $6.9-$7.1 billion.  At the time Pearson, Schiller, and Rosiello signed their respective SOX Certifications in the 10-Qs for 1Q13 through 3Q15, the 2013 10-K, and the 2014 10-K, they knew or recklessly disregarded that the certifications were false and misleading for the reasons stated in ¶ 145 above.

## VI.  THE TRUTH ABOUT DEFENDANTS' FALSE AND MISLEADING STATEMENTS EMERGES

251.  Through a series of partial disclosures, the truth emerged regarding Valeant's pricing practices, business operations and prospects.  Valeant itself began to provide partial corrective disclosures on October 19, 2015.  The full disclosure of the facts, and the risks associated with Defendants' misstatements, did not occur until August 10, 2016, when *The Wall Street Journal* reported that the U.S. Attorney was considering bringing criminal charges against Defendants.

### A.  Valeant's Extraordinary Price Gouging Is Revealed

252.  Beginning in September 2015, public attention began to focus on the practice of certain pharmaceutical firms, such as little-known Turing Pharmaceuticals ("Turing"), of acquiring drugs and then massively increasing prices.  On September 28, 2015, *Bloomberg* reported that all Democratic members of the U.S. House of Representatives Committee on Oversight and Government Reform ("House Oversight Committee") were calling for an

investigation of price gouging by Valeant, and had sent a letter to Chairman Jason Chaffetz urging

him to subpoena Valeant.  In the letter, these Congressmembers wrote that:

> [I]n February, Valeant purchased the rights to sell Nitropress, which is used
> to treat congestive heart failure and hypertensive episodes, and Isuprel,
> which is used to treat heart block and abnormal heart rhythm.  The same
> day, Valeant increased the prices of these drugs to $805.61 and $1,346.62,
> respectively (increases of 212% and 525%).  When asked about its price
> increases, a Valeant spokeswoman responded: 'Our duty is to our
> shareholders and to maximize the value' of the drugs.

253.    The September 28, 2015 letter also revealed that on July 31, 2015, staff members

from the House Oversight Committee participated in a call in which Valeant representatives "failed

to adequately answer our questions about the basis for their skyrocketing prices."  It also revealed

that on August 12, 2015, "Ranking Member [Elijah] Cummings sent [a] document request to

Valeant" and on September 3, 2015, "Valeant rejected Ranking Member Cummings' request in a

dismissive two page letter that refused to provide any of the requested documents."

254.    Also on September 28, 2015, *The Washington Post* disclosed that Senator Claire

McCaskill ("McCaskill") "sent a detailed list of 22 questions to [Valeant], probing its simple

explanation that it increased two heart drug prices because they were 'significantly underpriced.'"

Media outlets reported that Valeant was "in [the] crosshairs of [the] U.S. Congress" for its practice

of "engag[ing] in a business strategy of buying old neglected drugs and turning them into high-

price specialty drugs," noting that Valeant was using the same business model as Turing.  (Turing's

CEO, former hedge fund manager Martin Shkreli, resigned three months later following his

indictment by federal authorities on securities fraud charges.)

255.    On September 28, 2015, Citron published a report revealing that Valeant had more

than doubled the price of 30 other drugs during the Relevant Period.  The report stated: "Martin

Shkreli was created by the system.  Shkreli is merely a rogue trying to play the gambit that Valeant

has perfected."  The report also highlighted that "Valeant has made little to no effort to improve these products."

256.     In response to these developments, Valeant issued a press release on September 28, 2015, announcing that it had distributed a letter to its employees in which Pearson attempted to address concerns that Valeant's "business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business" and "[c]oncern around our exposure to U.S. government drug price reimbursement."

257.     On October 4, 2015, *The New York Times* questioned Pearson's September 28, 2015 letter to employees.  *The New York Times* article called into doubt, among other things, Pearson's claim that Valeant was well-positioned for growth even without price increases.  The article provided insight into Valeant's dependency on price gouging compared to the rest of the pharmaceutical industry, citing a Deutsche Bank analysis finding that in 2015, "Valeant raised prices on its brand-name drugs an average of 66 percent… about five times as much as its closet industry peers."  The article cited Mephyton, a drug that helps blood clot, as an example of price gouging, noting that the drug has seen eight price increases since July 2014, costing $58.76 a tablet, up from $9.37.  The article cited additional examples, such as Glumetza, a diabetes pill acquired from Salix, whose price was increased over 800% during the year, with a month's supply rising from approximately $500 to $4,600.

258.     On October 14, 2015, Valeant issued a press release disclosing that the Company had recently received subpoenas from prosecutors in the U.S. Attorneys' Offices for the District of Massachusetts and the Southern District of New York.  Significantly, the subpoenas did not only relate to the Company's drug pricing practices, but also sought information about the Company's patient assistance programs and distribution practices.  Following disclosure of the

subpoenas, Pearson assured investors that the Company believes in "maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner." The Company further stated that Valeant "responded to a letter from Senator Claire McCaskill" regarding the pricing of Nitropress and Isuprel and the "reimbursement process for hospital procedures involving Nitropress and Isuprel, the analysis and reasons underlying Valeant's pricing decisions." The Company noted it was "beginning outreach to hospitals where the impact of a price change was significantly greater than average."

259. On October 15, 2015, news outlets reported that Senator McCaskill condemned Valeant's response to her letter, stating: "It appears obvious to me that Valeant has been anything but responsive or transparent – it refused to take any action until served with federal subpoenas, and is still refusing to provide answers to many of the questions I've asked."

**B.    Valeant's Secret Relationship With Philidor**

260. On October 19, 2015, Valeant's control over a secret network of pharmacies began to come to light. Early that morning, Ackman sent an email to Laurie Little, Valeant's Senior Vice President, Investor Relations, and Pearson regarding a SIRF report on Valeant, which described the connection between Valeant and Philidor. Little responded, "We knew it was coming and will address on today's call."

261. The same day, Valeant issued a press release announcing its 3Q15 financial results and hosted a conference call. Pearson, Rosiello, and Kellen hosted the call using a prepared slide presentation. Pearson said he wanted to address "the turmoil over the past few weeks from both governmental and media scrutiny." The Company made limited disclosures, such as confirming its relationship with Philidor, the option to acquire Philidor, and that it had been consolidating Philidor's financial results with its own. Valeant also effectively conceded its business strategy

was neither sustainable nor less risky by disclosing it would rely less on acquisitions and more on R&D. Pearson added that Valeant would be "making pricing a smaller part of our growth looking forward" and "will pursue fewer, if any, transactions that are focused on mispriced products."

262.   During the call, Valeant disclosed that it nearly doubled its R&D spending of $56 million in 1Q15 to $102 million in 3Q15 and that "internal R&D will become more of a focus" signaling the unsustainable nature of their business strategy and its illusory lower costs and higher profits. Pearson also disclosed that price accounted for approximately 60% of growth in 2014 (the component portion of the 20% growth was 12% price and 8% volume) as well as in 2015 (the 41% growth was 24% price and 17% volume). The slide presentation stated that 85 of Valeant's 156 U.S.-branded Pharma products had an average price increase of 36%. With respect to the "Neuro and Other" portfolio, the presentation further provided that the year to date volume had declined by 7% but the net realized price had increased by 30%. Pearson repeated during the call that the Company was "seriously considering spinning off or selling" the "Neuro and Other portfolio, which is dependent on price," and that "internal R&D will become more of a focus."

263.   Pearson refused to discuss the subpoenas from federal prosecutors, stating "[w]e will not be answering questions." Regarding the government inquiries on price gouging, Pearson stated:

> As you all know, Valeant has responded to Senator McCaskill, and addressed her questions regarding Nitropress and Isuprel. In a letter to her last Wednesday, we discuss…, the analysis and reasons underlying Valeant's pricing decision, and Valeant's programs designed to improve patient access, among other topics. We also noted that we are beginning an outreach to hospitals where the impact of a price change was significantly greater than average.

264.   When asked what percentage of U.S.-branded prescription business flowed through "alternative fulfillment" and "how much of that is Philidor" Pearson stated:

> Sure. It's really primarily our dermatology brands and then some of our specialty products like Ruconest, Arestin, and some of the other orphan drugs. For certain products it's quite large. For Jublia it's probably 15%. For a lot of other dermatologies it's much less. I'm sorry, I can't – it's significant but it's – I don't know the precise number but it's certainly, of our US portfolio, 10%, 20%, maybe. Tanya's nodding probably closer to 10%.

265. After the market closed on October 19, 2015, *The New York Times* published an article entitled "Drug Makers Sidestep Barriers on Pricing." The article discussed how Philidor's application for a license in California had been rejected because it had concealed its owners. The article reported that Valeant used Philidor to "keep the health system paying for high-priced drugs" and to keep prices high for its dermatology products, quoting a Florida dermatologist as stating that Valeant's program was designed to buffer physicians and insurers from complaints about high prices. Discussing Philidor, the article stated, in part:

> Valeant had said little about Philidor until Monday, when J. Michael Pearson, Valeant's chief executive, revealed on his company's quarterly earnings call that Valeant had purchased an option to acquire Philidor late last year. He said that Valeant consolidated Philidor's results in its own financial reports.
>
> *  *  *
>
> Specialty pharmacies are most known for providing patients with assistance with complex drugs, many of them requiring refrigeration and injections, for diseases like cancer, multiple sclerosis and rare genetic disorders. But the drugs dispensed through the specialty pharmacies used by… Valeant are for common ailments like arthritis pain, acne, and toenail fungus. What was started as administering complex, costly drugs has been co-opted as a sales/marketing tool to drive the growth of minor differentiation standard retail drugs.

266. On October 21, 2015, the news took another turn for the worse as Citron published a report entitled "Valeant: Could this be the Pharmaceutical Enron?" questioning the propriety of Valeant's accounting and prior disclosures. The report asked "**Why** would Valeant, a major **big cap pharma**, a **darling** of the hedge fund crowd… be secretly maneuvering to buy a little known

pharmacy [Philidor] with a dubious ownership structure" and inquired as to why this entity was "NEVER disclosed in any prior company disclosure?"  The Citron report asserted that Valeant was using a network of mail-order pharmacies under its control to prop up sales and keep patients and their insurance companies from switching to less costly generics.  Citron also questioned whether Valeant's revenues were inflated through Philidor.

267.    The Citron report linked Philidor to other pharmacies through shared phone numbers, identical privacy notices, a shared facsimile number, and shared websites.  Citron claimed "it appears to Citron that Valeant/Philidor have created an entire network of phantom captive pharmacies," which included West Wilshire, SafeRx and Orbit Pharmacy.  The report also provided investors with details of the R&O lawsuit, noting that Valeant resembled a "house of cards" and could be "Enron part Deux."

268.    When the Citron report was issued, Valeant's stock price suffered a rapid decline and trading was halted.  When trading resumed, Valeant shares plummeted nearly 40%, resulting in another trading suspension.

269.    In response, Philidor issued a press release on October 21, 2015, disclosing that it had a contractual relationship with "affiliated pharmacies," including R&O, and that Philidor "does not currently have a direct equity ownership in R&O Pharmacy or the affiliated pharmacies, but does have a contractual right to acquire the pharmacies now or in the future subject to regulatory approval."

270.    The following day, October 22, 2015, BMO Capital Markets Corp. ("BMO") stated that it "cannot defend the specialty Pharmacy structure" Valeant was using and downgraded the shares to "market perform."  The BMO report further stated: "We've been strong, vocal Valeant

bulls," but "we find Valeant's arrangements with specialty pharmacy Philidor as not just aggressive, but questionable."

271.    The same day, a *Bloomberg* article titled "Valeant Still Has Explaining to Do, Citron Research's Left Says," reported on Valeant's option to buy Philidor and noted it was "a relationship other [drug] companies don't appear to have" with pharmacies.  The article noted that when manufacturers previously owned PBMs in the 1990s they were all spun off because it was "perceived" as a conflict of interest.

272.    Revelations of Valeant's improper practices continued as Philidor employees came forward disclosing the improper business practices employed by Philidor.  On October 25, 2015, *The Wall Street Journal* reported that it had interviewed former Philidor employees who revealed that Valeant employees worked directly at Philidor and were using fictitious names to "conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products…."  A former employee interviewed by *The Wall Street Journal* noted that the Valeant employees' "real identities were well known to the other Philidor employees."

273.    That night, Ackman forwarded a media article to Pearson, Schiller, Rosiello, Ingram, and Little which reported that Pearson's explanation that Valeant did not disclose Philidor because it was a competitive advantage "comes up short."  The article noted that "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise.  And since materiality is a qualitative, not a quantitative, concept the company shouldn't try to stonewall…."  Ackman suggested the Company admit that "some mistakes were made."  As an example, Ackman wrote "a mistake not to disclose Philador [sic]?  In retrospect, it certainly appears to have been a mistake as the lack of disclosure made the company a potential target for a short attack which implied the company was hiding something."

Ackman observed that "the lack of disclosure on Philidor was a big surprise and raised concerns among shareholders."  Ackman suggested that they "explain whether or not the board, audit committee, auditors understood and agreed with the accounting, strategy, and disclosure of this business," adding that "Investors fear fraud."

274.    On October 26, 2015, the Company filed its 3Q15 10-Q which included disclosures related to Philidor, including that the Company now had the "power to direct Philidor's activities." The 3Q15 10-Q also revealed that Valeant established a special "ad hoc" committee of the Board of Directors to investigate Valeant's relationship with Philidor to be led by Ingram, the Company's lead outside director, and to include Provencio, chairman of the Audit and Risk Committee, Goggins, and Mason Morfit ("Morfit"), the President of ValueAct (Valeant's fourth largest shareholder) who had been added to the Valeant Board that morning and immediately placed on the ad hoc committee.

275.    As discussed above, on October 26, 2015, the Company hosted a conference call which included a presentation that stated, among other things:

- That "44% of Jublia revenue flowed through Philidor in Q3 2015";

- That "we maintain regular communication, have a joint steering committee, have rights (and have utilized them) to approve key positions (*e.g.,* in-house lawyer, chief compliance officer), included Philidor in Valeant's SOX 404 Internal Control Testing and Internal Audit program for 2015";

- That "Valeant [has] contractual rights [to Philidor] including: Joint Steering Committee, Right to require hires for certain positions, Substantial information rights, Covenants respecting Philidor's compliance with all applicable laws"; and

- In a section addressing Valeant's "Management Rights" over Philidor, that "Valeant has the right (but not the obligation) to appoint or cause Philidor to hire: Advisor to the CEO, Head Compliance Officer, In-House lawyer, Head IT officer, Other employees as reasonably requested."

276.     On the conference call, Rosiello disclosed Philidor's status as a VIE, and stated: "Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.  A purchase option agreement for Philidor was executed in December 2014."  Moreover, Carro admitted that "Valeant reviews the financials of the Philidor network pharmacies on a regular basis." Shortly after the call, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor, according to analysts."

### C.     Valeant's Closure Of Philidor

277.     On October 27, 2015, Ackman emailed Pearson and Schiller stating "I don't think you are handling this correctly and the company is at risk of getting into a death spiral as a result."

278.     In another email that day, Ackman wrote to Ingram, Pearson, Schiller, Morfit, and Little regarding *The New York Times* article by Joe Nocera on whether Valeant was the "Next Enron?" in which the reporter wrote that "Valeant… is a sleazy company."  Ackman said, "when one of the most credible journalists in the world accuses you of being the next Enron, time is short."  He warned that "[y]our reputation and that of the rest of the board along with the company is at grave risk of being destroyed on a permanent basis."  Ackman criticized Pearson for ending the last conference call abruptly, and said: "When Mike said that you were running out of time on the call, he was right in that the company is running out of time to save itself.  When shareholders hear that management doesn't have time to address their concerns, they assume the worst.  There is no amount of time that should [be] spared addressing shareholders [sic] concerns."  Ackman noted that it took a "short seller to bring Philador [sic] to light and that has destroyed managements [sic] compact with shareholders."  Ackman advised, "I strongly recommend you immediately hold a conference call to address every remaining question from shareholders" of "unlimited duration."

Ackman pleaded with the executives to "answer the questions honestly no matter how embarrassing the answers are and no matter what the legal implications are." Ackman noted the business risks, including, "Valeant has become toxic. Doctors will stop prescribing your products" and "Regulators around the world will start investigating and competing to find problems with every element of your business." Ackman said, "The only people that need scripts and limited questions are crooks. Joe Nocera is right. You look like Enron." Ackman added, "You should assume that the truth will come out eventually so there is zero downside to having it out now" and "If mistakes have been made, admit them immediately and apologize." Ackman closed the email by stating: "You have previously made the mistake of waiting while Rome was burning. There is now a conflagration. It takes no time to prepare for a conference call to tell the truth. The time to do it is today. We are on the brink of tragedy. Please do the right thing."

279. Pearson did not follow Ackman's advice, but the truth continued to emerge. After the market closed on October 28, 2015, *Bloomberg* reported that an internal Philidor training manual showed that Philidor relied on "back door" tactics to boost payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim – to essentially shop around for one that would be accepted."

280. In light of the revelation of Philidor and the secret pharmacy network, on October 29, 2015, Valeant announced it would cut all ties with Philidor. That same day, *Bloomberg Businessweek* reported additional accounts by former Philidor employees of the improper tactics by Philidor, some of which were formally documented, reporting that, in order "to fill more prescriptions with Valeant products instead of generics":

- "[w]orkers at… Philidor… were given written instructions to change codes on prescriptions in some cases so it would appear that physicians required or patients desired Valeant's brand-name drugs – not less expensive generic versions – be dispensed, the former employees said";

- that "[a]n undated Philidor document obtained by *Bloomberg* provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological creams and gels… is rejected"; and

- that an October 2014 employee manual noted that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."

281.    Later that day, while the market was still open, reports disclosed that CVS Caremark (one of the three largest PBMs in the United States) terminated its relationship with Philidor, citing "noncompliance" with its provider agreement after an audit of Philidor's practices.

282.    On October 29, 2015, Express Scripts and UnitedHealth's OptumRx, the other two largest PBMs, similarly announced that they had terminated their relationships with Philidor.  In the same day, the three largest PBMs in the country announced they would no longer pay for medication dispensed by Philidor.  The following day, just after underscoring the purported benefits and independence of Philidor, Valeant announced that Philidor would be shutting down as soon as possible.

283.    On November 4, 2015, it was reported that the U.S. Senate formally launched a probe into Valeant's price increases for three drugs.  On the same day, *Bloomberg* reported further information regarding the financial impact of closing Philidor, disclosing that, just weeks earlier, Valeant was planning to expand its use of the specialty pharmacy.  Also on November 4, 2015, *The Wall Street Journal* reported that Ackman told Valeant's lead director, Ingram, that Pearson might need to leave Valeant and that Ackman was considering liquidating his hedge fund's entire $3.8 billion investment in the Company. *The Wall Street Journal* article further noted that Ackman had pushed Valeant to hold a conference call to "come clean" and disclose the full extent of executives' knowledge regarding Philidor, and that he was disappointed the Company did not comply.

284.    On November 10, 2015, the Company hosted a conference call with investors to "update [the market] on our strategy with respect to specialty pharmacies, to explain our transition plans for Philidor, to discuss our business performance for the first half of the quarter, and perhaps most importantly to take questions from all of you."   Pearson, Rosiello, Carro, and Kellen participated on Valeant's behalf.   Pearson stated that, "As of last week, Philidor has stopped adjudicating claims....   Philidor has committed to cease operations by January 30, 2016 at the latest."

285.    Pearson also began to disclose the negative financial impact the closing of Philidor and the government inquiries into its practices were having, stating, in relevant part:

> In the very short term, disruption in our dermatology business will be significant.  Last week, we asked Philidor to stop adjudicating claims and to fill all prescriptions at no cost for the week.
>
> Turning to Neuro, we are also seeing some short-term pressure in our Neuro business, in particular with respect to Nitropress and Isuprel, given all the publicity around those two drugs.  We're working with our large customers and providing direct discounts to protect volume.

286.    Despite having just raised guidance less than a month before, on October 19, 2015, Pearson suggested it would be withdrawn and lowered, stating:

> Turning to guidance.  In terms of guidance, we are working to quantify the potential short-term impact of recent events, including the termination of our relationship with Philidor.  Specifically, the downsides in Q4 will be primarily in dermatology and to a lesser extent, neurology RX.  Obviously, what has happened will impact Q4.  We are working to quantify the impact on Q4 and 2016 and we will provide you with updated guidance at our investor day in December.

287.    During the call, Pearson was asked about the impact the Company would see in 4Q15 in the dermatology division and responded:

> So, again, based on the data we have, we've not seen volume declines.  It's largely the value of the average selling price for a script.  Now, I would not be shocked to see some volume declines over the next few weeks.

103

In fact, I would expect that. But I don't think they're going to be hugely material. The onus is on us to get some sort of a Plan B in place, and we are quite confident that we'll be able to get that done quite quickly.

288. In response to an analyst question regarding pricing scrutiny, Pearson stated, "if we're viewed as aggressive, we're going to have to listen to that." Pearson acknowledged "the past few weeks have been a painful learning experience for me personally" and that "[t]he other things I'm dedicated to doing going forward is listening more to our patients, our partners, and our critics."

289. On November 11, 2015, *Bloomberg* reported that Valeant creditors were "spooked by possibility of revenue squeeze" and that concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." According to one creditor, "The Big question is: What is the true cash-flow generation nature of the company? Will it be materially different?" The report noted that Valeant's dermatology and neurology business accounted for 24 percent of company revenue, which Pearson stated would be "significantly" disrupted. The next day, November 12, 2015, *Bloomberg* released another article regarding Valeant's relationship with Philidor and media reports recounted how numerous analysts had lowered their price targets for the Company.

290. On November 16, 2015, *Bloomberg* reported that U.S. Representative Elijah Cummings ("Cummings") wrote Pearson requesting that Pearson make Tanner, Bijal Patel, and Alison Pritchett available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations." Representative Cummings also asked for contact information for Kornwasser, who recently left the Company. Later that day, *The Washington Post* published an article entitled "House Committee to hold hearing on prescription drug pricing." The article reported that the House

Oversight Committee would hold a formal hearing in early 2016 focusing on prescription drug pricing, and that the Committee had reached out to Valeant to gather information. The article also stated that members of the House Oversight Committee were calling for Valeant's executives to testify at the hearing.

### D.     The Financial Impact Of The Fraud

291.    On December 15, 2015, Valeant issued a press release announcing that it had entered into a deal with Walgreens to distribute its products which included 10% price reductions for its branded prescription-based dermatological and ophthalmological products.

292.    On December 16, 2015, Valeant issued a press release formally withdrawing the inflated guidance it issued on October 19, 2015.  Valeant issued new fourth quarter revenue guidance of $2.7 - $2.8 billion (a reduction of approximately $600 million and 17% from $3.25 - $3.45 billion) and new fourth quarter Cash EPS guidance of $2.55 - $2.65 (a reduction of approximately $1.50 and 37% from $4.00 - $4.20).  Valeant also issued new 2015 full year revenue guidance of $10.4 - $10.5 billion (a reduction of approximately $700 million and 16% from $11.0 - $11.2 billion) and new 2015 Cash EPS guidance of $10.23 - $10.33 (an approximately $1.50, or 13% decline from $11.67 - $11.87).  Finally, Defendants issued new 2016 EBITDA guidance of $6.9 - $7.1 billion (a reduction of approximately $500 million and 7% from $7.5 billion).

293.    On December 16, 2015, an analyst for Piper Jaffray reported that Valeant was not "well positioned for significant [price/earnings] recovery anytime soon given the credibility gap associated with senior management."  The next day, Mizuho Securities USA ("Mizuho") cut its rating on Valeant stock to "neutral" from "buy" pointing to a lack of clarity regarding Valeant's agreement with Walgreens and stating that Valeant management had "not done a good job in

articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist."

294.    On December 28, 2015, Valeant announced that Pearson had left the Company, effective immediately, on a medical leave of absence.  To fill the gap, Valeant created an "Office of the CEO," which included Chai-Onn, Kellen, and Rosiello to serve in an interim capacity.  The Board also formed a committee to "oversee and support" the Office of the CEO, which included Ingram, Morfit, and Schiller.

295.    On January 6, 2016, Valeant announced that Schiller would serve as the Company's interim CEO while Pearson remained on medical leave and that Ingram would serve as the interim Chairman of the Board of Directors.

296.    On January 22, 2016, but undisclosed to investors, Valeant entered into a termination agreement with Philidor that was effective as of November 1, 2015.  Schiller signed on behalf of Valeant and Rosiello signed on behalf of KGA.  The agreement included a retroactive mutual release dated November 1, 2015.

297.    On February 19, 2016, a Wells Fargo report by analyst David Maris ("Maris") providing a detailed analysis of Valeant drew significant media attention.  The media noted that Maris had identified inconsistencies with regard to Defendants' disclosures concerning Philidor's impact on the business.  Specifically, Maris found that Valeant initially claimed that Philidor accounted for 7% of sales, yet lowered 4Q15 revenue guidance by 17%-19% (from $3.25-$3.45 to $2.7-$2.8 billion) and EPS guidance by nearly 37% (from $4.00-$4.20 to $2.55-$2.65).  The analyst commented that "Valeant has not explained how the unwinding of a business that represents only approximately 7% of total revenue, and is, according to Valeant, less profitable than traditional prescriptions, results in a 36.6% reduction in EPS."  Maris added that at

approximately 7% of revenue, Philidor would have represented approximately $227.8 million in revenue for 4Q15, yet guidance was lowered by $526.5 million.  The analyst concluded that "the new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact, as described by Valeant."

298.    Second, according to media reports, Maris commented on the Company's management, stating "we believe investors are likely questioning the judgment and decision making of [the] management team and board," adding that "corporate cultures… are difficult to change without management and board changes."  Maris noted that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor, which later caused a significant decline in shareholder value and corporate reputation."

299.    Third, according to media reports, Maris discussed the reduced financial outlook for Valeant. Maris noted that "management has said that it is not planning to complete any acquisitions in 2016, nor is it planning to raise prices excessively" and concluded that "this will pose significant risk for a company that was dependent on both."  The Wells Fargo analyst commented that "the model of cutting R&D and spending, and dramatically raising prices, in pursuit of higher and higher EPS to fuel a roll-up strategy built on earnings accretion for deals is shortsighted, as often the cuts undermine the longer- term prospects of the business."

300.    Fourth, according to media reports, Maris identified how Valeant's accounting was misaligned with Valeant's purported performance.  The analyst said "receivables growth has outstripped sales growth over the past several years."  Maris noted that a screening tool it uses "to predict the likelihood of accounting misstatements, puts Valeant in the 'substantial risk' category," adding that when "receivables are increasing faster than revenue, it can often indicate that

customers are hesitant to pay for products" and "[a]n alternative explanation for a dramatic rise in receivables is a company's improperly timed recognition of revenue." Maris stated that "gross-to-net revenue adjustments" in 2012 were 19.1% of gross revenues but had steadily increased to 41.1% of gross revenues by 3Q15, and that "Valeant suggests the reason for the increasing provision is growing returns, rebates, and co-pay assistance programs related to select dermatology products…."

### E. Valeant's Fraudulent Accounting

301. On February 22, 2016, *Market Watch* reported that Valeant "likely needs to restate some of its previous financial results based on the findings of an internal investigation into its business, according to people familiar with the matter." *Market Watch* noted that the "potential revisions concern revenue that Valeant booked when its drugs were shipped to a distributor" and involved "late 2014 and early 2015."

302. That evening, Valeant issued a release confirming the financial restatement. In the release, Valeant admitted that "the Company has preliminarily identified certain sales to Philidor during 2014, prior to Valeant's entry into an option to acquire Philidor, that should have been recognized when product was dispensed to patients rather than on delivery to Philidor." The release stated that the "Company currently believes that approximately $58 million of net revenues previously recognized in the second half of 2014 should not have been recognized upon delivery of product to Philidor," and "[c]orrecting the misstatements is expected to reduce reported 2014 GAAP EPS by approximately $0.10."

303. Valeant also revealed internal control problems, stating that the Company would "delay filing its 2015 10-K pending completion of the review of related accounting matters by the Ad Hoc Committee… and the Company's ongoing assessment of the impact on financial reporting

and internal controls." Schiller assured investors that the Company was "committed to improving reporting procedures, internal controls and transparency for our investors" and "[w]e have made mistakes in the past and our focus today is on executing our business plan and rebuilding trust."

304.    On February 28, 2016, Valeant issued a press release announcing that Pearson was returning from his medical leave but that the Company was separating the role of CEO and Chairman of the Board, naming Ingram as Chairman. The release further disclosed that "[i]n the interim, the Company is withdrawing its prior financial guidance," adding that "[a]s previously announced, the Company will delay filing its 2015 10-K pending completion of the review of certain accounting matters by the Ad Hoc Committee" and "the Company's ongoing assessment of the impact on financial reporting and internal controls." Pearson was quoted as admitting that "I realize that recent events are disappointing to everyone" and that among his priorities would be "improving Valeant's reporting procedures, internal controls and transparency."

305.    In the early afternoon on February 29, 2016, *Bloomberg* reported that although the scheduled call was canceled, Valeant "will hold a call for sell-side analysts later Monday that will include Pearson," noting the call was not publicly announced. According to a *Bloomberg* article, on March 2, 2016, Pearson held a meeting with certain Valeant employees in the second-floor conference room at Valeant's headquarters in Bridgewater, New Jersey. Pearson claimed, "We're under a barrage of external government and media and everything else," adding that "Everyone is nervous. The board is nervous." That same day, *Moody's* reported that it had placed Valeant's corporate credit ratings "under review for downgrade," which it stated "reflect[ed] concerns that Valeant's underlying operating performance is weaker than Moody's previous expectations," potentially impeding the Company's deleveraging plans. Then, within hours of release of the *Bloomberg* article regarding Valeant's non-public conference call, it was reported that the call was

109

canceled as a result of "media interest."  Moreover, Valeant announced later in the day that it was under investigation by the SEC since 4Q15.

306.    On March 15, 2016, Valeant reduced its financial guidance for 2016 and provided unaudited financial information regarding its 4Q15 performance.  With regard to 2016 guidance, Valeant lowered revenue guidance to $11-$11.2 billion (a reduction of approximately $1.5 billion and 12% from the full year 2016 $12.5-$12.7 billion guidance given on December 16, 2015), Cash EPS guidance to $9.50 - $10.50 (a reduction of approximately $3.50 and 26% from the prior $13.25 - $13.75 guidance), and full year 2016 EBITDA guidance to $5.6-$5.8 billion (an approximately $1.3 billion and 19% reduction from the prior $6.9-$7.1 billion guidance).  The Company blamed "reduced revenue assumptions for certain businesses, new managed care contracts, and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."

307.    The Company hosted a conference call that same day, which Pearson, Rosiello and Kellen attended.  During the call, Rosiello stated that Valeant's first quarter results were below guidance in part due to "realizing a slower-than-expected rebound in dermatology," and Pearson added that "increases in rebates are due to more competitive pressure in response to our store price increases for our late life cycle products."  In a press release that was also issued on March 15, 2016, Valeant disclosed $51.3 million in "wind down costs" for Philidor which included write-downs of fixed assets and bad debt expenses during the "wind down period November 1, 2015 through December 31, 2015."  Furthermore, the Company disclosed a "$79.0 million impairment charge related to Philidor Rx Services."

308.    During the conference call, Pearson explained why the guidance was being lowered.  In particular, Pearson cited "higher-than-expected inventory reductions that transition

from Philidor to Walgreens and the cancellation of almost all price increases."  Pearson added that "any future price increases will be more modest and in line with industry practices and managed-care contracts.  We have experienced increased competitive pressure at the payer level, resulting in increased rebates for access for our key growth products, like Jublia…."  Pearson revealed that the Company had already committed to reducing pricing on certain dermatology products "within the Walgreens' portfolio, on average, 10%" and that the "price reduction is on WAC and will impact and will be taken across all channels, not just Walgreens."

309.    During the March 15, 2016 conference call, an analyst noted "the fact that management needs to rebuild credibility with investors" and that the guidance was "lowered far more than any investor anticipated."  The analyst asked "how can we be confident in what you're saying today about the business, given that you were positive in December and January?"  Pearson responded, in part "we have to earn back the credibility."   In a publicly disclosed message to Valeant employees the next day, Pearson reiterated that "Restoring the public's confidence will take time."

310.    On March 21, 2016, Valeant filed a Form 8-K announcing the restatement of its prior financial statements.  The Company disclosed that in light of the Ad Hoc Committee's review of recent allegations and related matters it was determined that "approximately $58 million in net revenues relating to sales of Philidor during the second half of 2014 should not have been recognized upon delivery of product to Philidor."  Valeant therefore disclosed that the Company's last four financial statements, the 2014 10-K and the 10-Qs for the first, second, and third quarters of 2015, along with PricewaterhouseCooper's audit report on the 2014 10-K, should no longer be relied upon.

111

311.    Specifically, the Ad Hoc Committee determined that the Company's revenue recognition "on a sell-in basis (*i.e.,* recorded when the Company delivered the product to Philidor)" prior to the Company's purchase option agreement with Philidor was improper.  Instead, "revenue for certain transactions should have been recognized on a sell-through basis (*i.e.,* record[ed] revenue when Philidor dispensed the products to patients) prior to entry into the option agreement." As a result, the Company was no longer able to record revenues for shipments to Philidor and could only record revenues on shipment to the patient.  The March 21, 2016 press release further disclosed that:

> Management, in consultation with the [Ad Hoc] committee, has concluded that one or more material weaknesses exist in the Company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and the subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

312.    Significantly, the Company admitted that its "improper revenue recognition" related to Philidor was not innocently made, but rather was the result of the ***"improper conduct"*** of the Company's former CFO and former Corporate Controller.  Additionally, the Company specifically attributed as a ***"contributing factor"*** to its ineffective controls over financial reporting the unethical ***"tone at the top"*** by senior management.  Specifically, Valeant's March 21, 2016 press release stated that:

> The ***improper conduct*** of the company's former chief financial officer and former corporate controller, which resulted in the provision of incorrect information to the committee and the company's auditors, contributed to the misstatement of results.  In addition, as part of this assessment of internal control over financial reporting, the company has determined that the ***tone at the top of the organization*** and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition.

The Company further stated it would begin searching for a new CEO to replace Pearson, who would continue to serve as CEO and a Director until his replacement was appointed.

### F.  Additional Revelations Regarding The Fraud And Its Impact

313.  On March 22, 2016, the *Business Insider,* in an article entitled "Bill Ackman's Plan to Fix Valeant Is Doomed," attempted to quantify the impact of the change in business strategy from Valeant's non-traditional approach to that of a traditional pharmaceutical company.  The article noted that without price hikes, "Valeant would lose 10% of its revenue."  The analysis showed that operating margins would decrease from 24% to 7% and with an increase in R&D spending to 13% instead of 3% that "Valeant would be losing money.  *A lot of money."*  (Emphasis in original.)  The article noted that, according to an analysis conducted by *Bloomberg*, "[i]f Valeant was operating more like a traditional specialty pharma company, it could have had a trailing 12month (4Q15) loss of $2.44 rather than an adjusted EPS of $1.53.  Ebit could have dropped to $606 million from $2.5 billion… Valeant could have had an adjusted net loss of $842 million instead of net income of $527 million."

314.  On April 9, 2016, *The New York Times* published an article titled "The Female Viagra, Undone by a Drug Maker's Dysfunction" which noted that "Valeant dismissed the entire sales force behind [Addyi]" and "doctors had prescribed the drug fewer than 4,000 times as of February."  Citing interviews with former employees, analysts, investors and doctors, the article attributed Addyi's failure to Valeant's pricing actions and reliance on Philidor.  The article explained that Sprout (the maker of Addyi) had determined that Addyi should be sold at $400 and "Anthem, one of the nation's largest insurers, said it would cover the drug at the $400 price."  However, once Valeant acquired the drug, it doubled the price to $800 causing payors to reconsider

their coverage.  Valeant also terminated Sprout's distribution agreement with Cardinal Health, deciding instead to rely on Philidor.

315.    On April 29, 2016, Valeant released its annual report on Form 10-K for the year ended December 31, 2015 ("2015 10-K") which confirmed the financial restatement and the Company's material weaknesses.  Additions to the 2015 10-K demonstrated the inadequacy of the disclosures in the Company's prior annual and quarterly reports.  For example, the 2015 10-K revealed that while the Company historically depended on acquisitions, that the volume and size of acquisitions in 2016 and beyond was expected to be minimal and this "could have a material adverse effect on our business, financial condition, cash flows and results of operations and could cause the market value of our common shares and/or debt securities to decline."

316.    On May 3, 2016, Valeant announced the appointment of Joseph C. Papa ("Papa") as its CEO and Chairman of the Board, reuniting the roles it recently separated.  Three weeks later, on May 23, 2016, Papa spoke publicly at the UBS Global Healthcare Conference.  While answering questions from investors and analysts, Papa described Valeant as "a great turnaround opportunity" and discussed a number of the challenges he inherited.  Papa acknowledged that with Philidor "clearly we had some question marks" and that "there were some pricing mistakes that were made" and "some transparency things that [could be] improve[d] on at Valeant."  Regarding internal controls, Papa recognized "there are some functions that we need to put some additional [] controls" and "there is some investment that needs to happen in areas," such as finance, "where [Valeant] just need[s] to bring some additional financial capabilities."  To that end, Papa disclosed that the Company "just recently hired a new Controller."

317.    On June 7, 2016, Valeant made additional disclosures regarding the financial impact of shutting down its captive pharmacy network, restricting the Company's ability to price

114

gouge and engage in deceptive practices.  That day, Valeant filed its first quarter 2016 10-Q ("1Q16 10Q"), issued a press release, and hosted a conference call regarding the Company's long-awaited first quarter 2016 ("1Q16") financial results, which had been delayed by several months. Valeant disclosed a GAAP loss per share of ($1.08) for 1Q16 and significantly lowered its 2016 guidance again to total revenue of $9.9-$10.1 billion (down from $11-$11.2 billion), adjusted EPS (non-GAAP) of $6.60-$7.00 (down from $8.50-$9.50), and adjusted EBITDA (non-GAAP) of $4.80$4.95 billion (down from $5.6-$5.8 billion).  During the conference call that day, Rosiello stated that "[t]he base business in Q1 declined by $289 million, driven by dermatology… and the transition to Walgreens…."

318.    Further revealing the detrimental effect that the loss of Philidor was having on Valeant's pricing, volume, and drug refills, Rosiello added that:

> Following the launch of the Walgreens program in January, we saw volume flattening and ASPs [average selling price] declining post launch.  Overall volume challenges were exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy [Philidor] relationship, as well as the negative external narrative and some internal disruptions….

319.    Papa added that the "vast majority" of Valeant's "revenue shortfall in dermatology in our revised guidance relates to this average selling price shortfall."  During the question and answer portion of the call, Papa further revealed how much the Company's drug pricing and profitability were suffering as a result its cessation of price gouging and deceptive practices and the termination of its relationship with Philidor:

> The issue is that there is a percentage of the business where the average selling price is significantly below what we had previously expected as we put the program together.  And in fact, in some places that average selling price is negative and by that [it] means, every time a prescription goes out the door we're taping dollar bills to that prescription as it goes out the door. That's something that we have to get fixed.

115

320.    On July 31, 2016, *The New York Times* published an article titled, "How Valeant Cashed In Twice on Higher Drug Prices," which detailed Valeant's use of "price appreciation credits" to inflate the Company's revenues.  The article explained that the credits – which come about when a drug company increases the cost that its wholesalers must pay for a product they have contracted to distribute – were "an obscure but vital source of cash to Valeant that is directly linked to its pricing practices."  As reported by *The New York Times*, "[n]ow that those practices are under scrutiny, the money Valeant receives from these credits is likely to decline substantially or disappear outright," noting the "unique" and "outsize contributions" of the credits to Valeant's cash flows.  "In recent periods, they have equaled one-fifth or more of Valeant's operating cash flow," the article emphasized, based on the Company's reported financials.

321.    On August 9, 2016, Valeant issued a release and hosted a conference call regarding the Company's second quarter 2016 ("2Q16") financial results.  In the release, Valeant disclosed a GAAP loss per share of ($0.88) for 2Q16 and a drop in revenue of 11.4%, with the Company blaming the slow recovery in its dermatology division, which suffered greatly from Philidor's closing.  The release disclosed that Valeant's dermatology revenue dropped 55% compared to 2Q15, with Solodyn and Jublia sales down 74% and 69%, respectively, year-over-year.  The two Valeant drugs singled out by Congress at the start of its probes, the heart drugs Nitropress and Isuprel, experienced year-over-year revenue declines of 46% and 19%, respectively.  In the conference call that day, Papa stated: "I don't want to suggest for an instant that there [aren't] challenges" and that it "will take time to implement and execute our turnaround plan."  Additionally, the Company cited lower price appreciation credits as one of the reasons revenues declined 14% in Developed Markets.

322.     Also on August 9, 2016, in an article titled "Valeant Begins to Look Like A Normal Drug Company, But With Way Too Much Debt," *Forbes* reported on analysis by Wells Fargo's Maris.  Further demonstrating the challenges facing the Company following the closure of its secret pharmacy network and the cessation of its deceptive practices, *Forbes* noted that by Maris' calculations, "Papa will have to deliver a 55% sequential increase in adjusted EPS and a 30% increase in adjusted EBITDA in the second half of 2016 to meet guidance" and that "Xifaxan remains off pace to hit $1 billion in 2016 sales, a previous Valeant target."  Quoting Maris, *Forbes* added that:  "If Papa falls short in coming quarters, it is likely many will see the company's new reign as 'just new paint on the same old shed'…."

323.     On August 10, 2016, *The Wall Street Journal* reported that federal prosecutors at the U.S. Attorney's office in Manhattan were considering bringing **criminal mail and wire fraud charges** against Valeant and former Philidor executives.  According to sources with knowledge cited by *The Wall Street Journal*, federal prosecutors were investigating whether Valeant and Philidor "defrauded insurers by hiding their close relationship."  The sources added that prosecutors were also examining "some of Philidor's business practices, including rebates and other compensation provided by the pharmacy to customers who used Valeant products, as well as Philidor's efforts to seek reimbursement from insurers."  *The Wall Street Journal* reported that, based on its sources, "**the probe is expected to be the most serious Valeant faces.**"

## VII.     VALEANT'S FINANCIAL STATEMENTS VIOLATED GAAP AND SEC RULES

324.     As discussed above, throughout the Relevant Period, Valeant's periodic financial statements with the SEC represented that Valeant's financials were prepared in accordance with GAAP.  Financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP.  *See* Regulation S-X, 17 C.F.R.

§ 210.401(a)(1).  This presumption also exists for interim financial statements filed with the SEC. *See* 17 C.F.R. § 210.10-01.

325.    Valeant has admitted that its reported revenues for the financial periods below were overstated by the following amounts during the Relevant Period:

| Financial Period: | Reported revenue overstated by: |
| --- | --- |
| 3 months ended Sept. 30, 2014 | $12.9 million |
| 3 months ended Dec. 31, 2014 | $44.6 million |
| 12 months ended Dec. 31, 2014 | $57.5 million |
| 3 months ended Mar. 31, 2015 | $20.8 million |
| 6 months ended June 30, 2015 | $20.8 million |
| 9 months ended Sept. 30, 2015 | $20.8 million |

326.    Valeant's financial statements during the Relevant Period were materially misstated and violated GAAP (and certain of the Company's critical accounting policies) in numerous ways, including (i) by improperly recognizing Philidor revenue, in violation of GAAP; (ii) by concealing Philidor as a VIE, in violation of GAAP as well as Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 810, *Consolidation*; (iii) by falsely certifying that the Company's internal controls over financial reporting and its disclosure controls were effective, in violation of the Sarbanes-Oxley Act of 2002 ("SOX") and SEC rules, as well as the Committee of Sponsoring Organizations, Internal Control – Integrated Framework; (iv) by concealing information regarding the impact of Philidor and price increases on its reported revenue and earnings, in violation of SEC disclosure rules; and (v) because Defendants' false and misleading statements were quantitatively and qualitatively material, including pursuant to SEC Codification of Staff Accounting Bulletins Topic 1-M, *Materiality*.

A.        **Valeant Improperly Recognized Philidor Revenue**

327.    On March 21, 2016, Valeant confirmed that it had materially overstated Philidor revenue in violation of GAAP and would be restating its financial statements for fiscal year 2014 and the first nine months of fiscal year 2015, and that, as a result, the Company's 2014 10-K and 10-Qs for the first, second, and third quarters of 2015 could no longer be relied upon.  Valeant concluded that, prior to the Company's Purchase Option Agreement with Philidor in 4Q14, certain sales transactions involving Philidor were not executed in the normal course of business and collectability was not reasonably assured at the time the revenue was recognized.  *See* FASB Accounting Standards Codification Topic 605, Revenue Recognition; SEC Staff Accounting Bulletin No. 104 ("SAB 104").

328.    As detailed above, Valeant entered into the Purchase Option Agreement with Philidor on December 15, 2014.  Before the option agreement, Valeant recognized revenue on sales to Philidor when Valeant delivered products to Philidor, *i.e.*, on a sell-in basis.  After the option agreement, Valeant was required to recognize revenue when Philidor distributed the products to the end customers (patients), *i.e.*, on a sell-through basis.

329.    Further, in 4Q14, leading up to the option agreement's execution, Valeant improperly recognized revenue on sales transactions with Philidor that were not executed in Valeant's normal course of business, but rather to inflate revenues.  The Defendants knew that after the formal consolidation of Philidor was completed, Valeant would be prohibited from recording revenue for shipping products to Philidor, because that was akin to shipping products to itself.  Instead, to recognize revenue, Valeant would have to wait until Philidor shipped the products to patients.  Therefore, before the agreement was signed in December 2014, Valeant shipped millions of dollars of products to Philidor to inflate revenue.  This manipulative practice

clearly violated GAAP.  Nevertheless, Schiller, Carro, Ingram, the Audit Committee, the Finance and Transactions Committee, and the entire Board of Directors approved the accounting relating to Philidor.

330.    As admitted in Valeant's 2015 10-K, these purported sales transactions included: "fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product."  As a result of these improper sales transactions, Valeant recorded revenue.  After recording revenue on those fictitious sales, and after execution of the option agreement, Valeant recognized revenue a second time as Philidor sold the same products to end customers.

331.    With respect to the 4Q14 Philidor transactions, collectability was not reasonably assured at the time the revenue was originally recognized, and thus should not have been recognized.  Valeant acknowledged in its March 21, 2016 press release that, as a result, the Company's financial statements for the year ended December 31, 2014 were materially misleading and required restatement.

332.    The Philidor-related misstatements and disclosure violations were each quantitatively and qualitatively material to Valeant's financial statements during the Relevant Period.  For example, Valeant emphasized its U.S. organic sales growth and dermatology sales growth throughout the Relevant Period, of which Philidor constituted a material portion.  Further, the improperly recognized revenue from Philidor transactions enabled Valeant to meet its "Cash EPS" of $2.58 for 4Q14 and exceed its 4Q14 Cash EPS guidance of $2.55.  Had such revenues not been included, Valeant would have missed its guidance and reported Cash EPS of $2.51.

### B.     Valeant Concealed Philidor As A VIE

333.    Valeant also failed to disclose Philidor as a VIE.  Pursuant to ASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810"), a company must disclose in its financial statements both unconsolidated and consolidated VIEs.  In its October 26, 2015 investor presentation, Valeant stated that it considered Philidor a VIE prior to the purchase agreement.  Under ASC 810, Valeant was required to determine if Philidor needed to be consolidated in its financial statements.  The relevant test for determining if a VIE should be consolidated is whether or not the company is the "primary beneficiary" of the VIE.

334.    On October 26, 2015, Valeant claimed that it was not the primary beneficiary of Philidor until after the purchase option agreement was executed in December 2014.  However, ASC 810's guidance still requires disclosure of material unconsolidated VIEs.  Thus, before the December 15, 2014 option agreement, Valeant was required to disclose its unconsolidated VIE relationship with Philidor because it was material.  In particular, Valeant was required to disclose in its pre-December 2014 financial statements: (i) quantitative and qualitative information about Valeant's involvement with Philidor, including Philidor's nature, size, purpose, activities, and how it is financed; and (ii) methodology for concluding that Valeant is not the primary beneficiary of Philidor, including disclosure of key factors, assumptions, and significant judgments used in making the determination.  *See* ASC 810-10-50-5A. In violation of GAAP, Valeant stated in its 2013 10-K that: "There were no material arrangements determined to be variable interest entities."

335.    Moreover, following the execution of the purchase option agreement (as a result of which Valeant concluded it was the primary beneficiary of the Philidor VIE and consolidated Philidor's results), Valeant was also required under ASC 810 to disclose which factors resulted in a change of the reporting with respect to the VIE, including the impact of the change on the

Company's consolidated financial statements.  *See* ASC 810-10-50-5A.  Valeant failed to disclose this information in its 2014 10-K.  Valeant also failed to make additional VIE disclosures necessary to comply with the principle disclosure objective of ASC 810, *i.e.*, to provide users of its financial statements with information concerning:  (i) significant judgments and assumptions made in determining whether it needs to consolidate the VIE and/or disclose information about its involvement with the VIE; (ii) the nature of and changes in the risks associated with its involvement with the VIE; and (iii) how its involvement with the VIE affects its financial position, financial performance, and cash flows.  *See* ASC 810-10-50-8.  However, Valeant did not make any required disclosures related to its VIE relationship with Philidor until the Company's 3Q15 10-Q.

### C.    Defendants' False Statements Regarding Internal Controls

336.    As discussed above, Valeant has admitted that Defendants' representations during the Relevant Period concerning the effectiveness of the Company's internal and disclosure controls were false.

337.    Valeant management was responsible for establishing and maintaining effective internal controls over financial reporting and disclosure controls pursuant to the SOX.  This requirement included annual assessments of Valeant's financial and disclosure controls and the issuance of a report on whether such controls were effective and free from material weaknesses. SOX required the use of an appropriate framework in making such assessments, such as the "COSO Framework."  *See* Committee of Sponsoring Organizations, Internal Control – Integrated Framework.  During the Relevant Period, Valeant's financial statements represented that management's evaluations were based on the COSO Framework.

122

338.    According to the COSO Framework, the control environment sets the tone for the entire structure of internal control and has a pervasive influence on all business activity.  As a result, deficiencies affecting the control environment are strong indicators of a material weakness. Circumstances that may indicate that a company's control environment is ineffective include, but are not limited to, "[i]dentification of fraud of any magnitude on the part of senior management" and "[i]neffective oversight of the company's external financial reporting and [internal controls over financial reporting] by the company's audit committee."  *See* Exchange Act Release No. 54976 (Dec. 20, 2006).  The concept of "tone at the top" has become widely accepted within the accounting profession to describe the attitude and actions of a company's senior management toward internal financial controls and the control environment.  Indeed, SEC Staff has referred to the tone set by top management – *i.e.*, "the corporate environment or culture within which financial reporting occurs" – as "the most important factor contributing to the integrity of the financial reporting process."  *See* SEC Staff Accounting Bulletin No. 99.

339.    Control deficiencies that are determined to be a material weakness[7] must be disclosed in management's annual report on its assessment of the effectiveness of the company's internal controls over financial reporting.  Management may not disclose that it has assessed its internal financial controls as effective if there is one or more control deficiencies determined to be a material weakness.  *See* Exchange Act Release No. 54976.  Indicators of material weaknesses in a company's internal controls over financial reporting include:  (i) identification of fraud, whether or not material, on the part of senior management; (ii) restatement of previously issued financial

---

[7] Pursuant to Public Company Accounting Oversight Board Auditing Standard No. 5 ("AS 5"), a "material deficiency" is a "deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

statements to reflect the correction of a material misstatement; (iii) identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and (iv) ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee. *See* AS 5.

340.     As detailed above, Defendants repeatedly represented during the Relevant Period that Valeant's internal controls functioned properly to prevent or detect material misstatements. This included SOX Certifications contained in each of the Company's quarterly reports and annual reports. However, in connection with the restatement, Valeant admitted that material weaknesses in its internal financial controls existed during the Relevant Period, and that its disclosure controls and procedures were not effective. Specifically, on March 21, 2016, the Company disclosed:

> As a result of the restatement, management is continuing to assess the Company's disclosure controls and procedures and internal control over financial reporting. Management, in consultation with the committee, has concluded that one or more material weaknesses exist in the company's internal control over financial reporting and that, as a result, internal control over financial reporting and disclosure controls and procedures were not effective as of December 31, 2014 and disclosure controls and procedures were not effective as of March 31, 2015 and subsequent interim periods in 2015 and that internal control over financial reporting and disclosure controls and procedures will not be effective at December 31, 2015.

> * * *

> [A]s part of this assessment of internal control over financial reporting, the company has determined that the tone at the top of the organization and the performance-based environment at the company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the company's improper revenue recognition and the conduct described above.

341.     Valeant's 2015 10-K, filed with the SEC on April 29, 2016, confirms the Company's ineffective financial controls, including the existence of two separate material

weaknesses as of December 31, 2014 (*i.e.*, the improper "tone at the top" and the failure to detect the Philidor accounting fraud).

### D.    Defendants Concealed Valeant's Reliance on Philidor and Price Gouging

342.    Valeant also failed to disclose the Philidor relationship, and the Company's dependence on price increases to drive its revenue and profit growth, in the Management's Discussion and Analysis ("MD&A") section of each of quarterly and annual report filed during the Relevant Period.

343.    With regard to Philidor, Valeant was required to disclose, among other things: (i) the impact of price increases and Philidor on Valeant's revenue growth; (ii) Philidor's existence as a distinct sales channel; and (iii) that Philidor sales were unsustainable.  During the Relevant Period, Valeant repeatedly emphasized U.S. organic sales growth and sales growth in its dermatology segment, as well as the role of volume increases, as opposed to price increases, on its revenue growth.

344.    As detailed above, Valeant's price gouging was a major driver of Valeant's revenue and profitability growth trends requiring disclosure in the Company's annual and quarterly reports. Indeed, at the April 27, 2016 Senate Hearing, Pearson testified that 1Q13 to 3Q15 revenue growth and profitability were driven primarily by price, not volume.  When asked if he could name a single drug that Valeant acquired where it did not raise the price, Pearson responded "[n]ot in the United States."  Valeant was required to disclose its dependency on and the impact of price increases on its reported revenues and earnings, as Item 303 explicitly requires reporting issuers to report details in MD&A disclosures describing changes in volume or price that impact reported revenues. Moreover, in SAB 104, the SEC Staff makes it clear that an analysis of volume and price changes affecting changes in revenue are required MD&A disclosures.  As detailed above, Valeant's

dependency on price increases and their impact on Valeant's reported revenues was concealed from investors during the Relevant Period.

345.    In addition, Valeant's secret pharmacy network was key to Valeant's ability to raise prices, and was thus a major driver of the Company's purported revenue and profitability growth trends during the Relevant Period, including U.S. organic sales growth, dermatology and neurology sales growth, and overall prescription volume growth.  As a result, Valeant was required to disclose the impact of Philidor and price increases on its revenue growth trends.  *See* SAB 104. However, Valeant failed to disclose Philidor in its MD&A until 3Q15.

346.    Valeant was also required to disclose the trend of increasing sales through Philidor because Philidor was a separate sales channel with different characteristics than Valeant's traditional sales channels.   The SEC Staff provides specific examples of required MD&A disclosures regarding sales channels, including "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."  *See* SAB 104, Topic 13.B.  During the Relevant Period, Valeant disclosed "Provisions to reduce gross product sales to net product sales" in its financial statements.  The sales provisions as a percentage of gross sales increased dramatically throughout the Relevant Period, including increases of 47%, 7%, and 28% in 2013, 2014, and 3Q15, respectively.  However, Defendants concealed the fact that these significant increases in provisions were tied to deceptive practices, such as routing patients into Valeant's secret pharmacy network and the improper use of PAPs.  Valeant failed to disclose Philidor as a distinct sales channel and, as a result, its reported growth was not indicative of future performance.

347.    As described above, Philidor also employed practices to deceive TPPs.  As a result, Valeant's sales, through its concealed relationship with Philidor, were unsustainable.  When

private insurers and PBMs became more aware of Philidor and its practices in late 2015, they immediately stopped reimbursing Philidor. Consequently, Valeant closed Philidor. The significant financial impact that the Philidor closing ultimately had on Valeant's future financial results, including its revenues and earnings, is precisely what Valeant was required to disclose under the SEC's MD&A rules.[8]

348. The SEC MD&A rules require disclosure of material events that would cause reported financial information to not necessarily be indicative of future operating performance. Because of the unsustainable nature of Valeant's deceptive practices, Valeant was required to disclose the practices and associated risks and that its financial performance was not indicative of future results. In October 2015, Valeant provided certain price and volume disclosures as part of its 3Q15 earnings presentation. These disclosures of how price and volume impacted Valeant's sales growth were not provided throughout the Relevant Period. The October 19, 2015 investor presentation showed that through the first nine months of 2015, volume had declined 7% while net realized price had increased 30% for Valeant's neurology business. This showed that without price increases, revenues for neurology would have declined. As another example, Valeant doubled its revenues from Wellbutrin XL from 2013 to 2015, despite declining volume, by repeatedly increasing the drug's price. Valeant provided similar disclosures about price and volume in its 1Q16 10-Q filed on June 7, 2016. However, during the Relevant Period, in violation of SEC rules, Valeant failed to provide adequate disclosures showing how increases or decreases in price and volume impacted its revenue growth.

---

[8] Valeant was required to warn investors that its results were not indicative of future results due to the significant financial impact Valeant would suffer upon Philidor closing.

### E.     Defendants' False And Misleading Statements Were Quantitatively And Qualitatively Material

349.    In evaluating the materiality of financial statement items, SEC rules require that both "quantitative" and "qualitative" factors be considered. *See* SEC Topic 1-M.[9]  SEC Topic 1M notes that assessing materiality solely on a quantitative basis "has no basis in the accounting literature or the law" and that the FASB "has long emphasized that materiality cannot be reduced to a numerical formula."  As alleged herein, each of Defendants' Relevant Period misstatements and disclosure violations were quantitatively and/or qualitatively material to investors as they related to central aspects of Valeant's business, operations, and prospects.

350.    Valeant has restated its financial statements for the quarter and year ending December 31, 2014 and the first nine months of 2015 disclosing that, as originally reported, its financial statements should no longer be relied upon.  Valeant's financial restatement is an admission that the financial statements it issued to investors during the Relevant Period were materially false and misleading, as only materially misstated financial statements and measures need be corrected and reissued on a retroactive basis.  As discussed above, the material impact of Philidor on Valeant's revenue growth is further evident from Valeant's closing of Philidor.  For example, Valeant disclosed that the "Philidor separation" would negatively impact 4Q15 financial results by approximately $250 million in revenue, $0.65 in EPS, and its dermatology prescriptions would decline by 20%.

351.    Each of the Philidor-related misstatements and disclosure violations were also material from a qualitative perspective.  First, SEC Topic 1-M provides that quantitatively small

---

[9] SEC Topic 1-M provides: "there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material."

misstatements may be material if management has intentionally violated GAAP.  Here, Valeant has acknowledged that an improper "tone at the top" and "improper conduct" of its Controller and CFO contributed to the misstatements.  Second, Philidor masked Valeant's sales trends throughout the Relevant Period.   Philidor was a key driver of Valeant's publicly reported, and highly touted, dermatology segment revenue growth rate.  As detailed above, Valeant emphasized U.S. organic sales growth and dermatology sales growth – each of which Philidor represented a material portion. Third, SEC Topic 1-M states that "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  Here, when Valeant disclosed the existence of Philidor on October 19, 2015, the price of Valeant stock plummeted over 17% in just two trading days.  As reported by *The Wall Street Journal* on October 25, 2015, "[w]hile Valeant may argue it didn't think the consolidation of Philidor was material, the market's reaction shows investors think otherwise.  And since materiality is a qualitative, not a quantitative concept, the company shouldn't try to stonewall with answers that try to purport that it wasn't enough of assets to talk about it."

352.    Finally, in addition to the foregoing quantitative and qualitative considerations, the MD&A disclosure violations and omissions were also material under SEC disclosure rules, which place an emphasis on materiality in regards to MD&A disclosure.

> Companies must provide specified material information in their MD&A, and they also must provide other material information that is necessary to make the required statements, in light of the circumstances in which they are made, not misleading.

*See* SEC Release Nos. 33-8350, 34-48960; FR-72.

353.    Each of the MD&A disclosure violations and omissions discussed above were either required MD&A disclosures on their own, or at a minimum, were required in light of the

existing MD&A disclosures that Valeant made regarding revenue trends.  Valeant has conceded the materiality of Philidor and the Company's price increases by belatedly making additional MD&A disclosures.

354.    The Company's Forms 10-K and 10-Q were also materially false and misleading because they failed to, as required by Item 303 of Regulation S-K, disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

## VIII.  ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

355.    As discussed above, Defendants participated in an intricate scheme that operated for years to defraud investors by issuing false and misleading statements about Valeant and its operating performance.  They also defrauded PBMs, physicians, and payors by using secretive improper practices to boost sales and sale prices of Valeant products.  The Executive Defendants were personally aware of, designed, and implemented the deceptive practices detailed herein.  The Executive Defendants were also personally aware of, or were severely reckless in disregarding, the improper and deceptive tactics employed by Philidor by virtue of their frequent meetings, effective control over, and contractual right to review and approve Philidor's records and policies.  Additionally, the Executive Defendants had significant motives to engage in the fraudulent conduct.  Other facts demonstrating the Executive Defendants' scienter are detailed below.

### A.    The Executive Defendants' Role In Valeant's Business Strategy

356.    Pearson was the architect of the Company's business strategy and orchestrated the dramatic price increases and deceptive business practices along with the other Executive Defendants.  Pearson implemented the strategies discussed herein when he became Valeant's

CEO, *i.e.*, acquiring existing drugs, cutting R&D, and engaging in price gouging while hiding such practices by intentionally concealing that Valeant's network of captive pharmacies formed the core of Valeant's operations.  It was a strategy well known to the Executive Defendants who designed, implemented and/or approved of the strategy that allowed Defendants to claim profit margins as high as 99%.

357.   A former Valeant executive told *Forbes* that Pearson "wanted to win at all costs and surrounded himself with people who would basically do whatever he told them to do." According to *Forbes,* Pearson "liked to hire cronies like his former McKinsey partner Robert Rosiello, (now Valeant's CFO)," his "brother-in-law [Robert Brabandt], who was paid $299,000 a year," and "Ryan Weldon, head of Valeant's U.S. dermatology operation," who was the son of Pearson's former client, Johnson & Johnson CEO Bill Weldon.  Other members of the Board of directors and executives also had prior ties to Pearson.

358.   Former employees interviewed by *Bloomberg Businessweek* confirmed that Pearson had a hands-on management style and "had his fingers in everything, from operations to making decisions about the salaries of individual employees."  *Forbes* also confirmed that Pearson "micromanaged things he deemed important."  In fact, Pearson held weekly calls with the leaders of Valeant's business groups on Tuesdays at 11:00 a.m., during which Valeant's senior management would assess the business, address developing issues, and ensure that there were no surprises facing the Company at each quarter end.

359.   During the April 29, 2015 conference call, Schiller commented on his resignation as CFO and confirmed the role that he and Pearson played in implementing the non-traditional practices, stating that, "Mike [Pearson] sets the tone at Valeant" and adding, in part:

> I've completely bought into our unique strategy and culture, the transparency and fact-based approach to running our business, and our

131

relentless focus on building a great Company and on creating shareholder value.

…Valeant's business has never been stronger and its prospects have never been brighter….

360.     In addition, Valeant documents, former Valeant/Philidor employees, and sworn testimony confirm that the Executive Defendants were directly involved in the business and pricing strategies implemented by Valeant.  In particular, they had extensive discussions about the role of price increases in the Company's growth.  For example, in a meeting in July 2015, Pearson met with Rosiello, Carro, Brian Stolz (Senior Vice President of Neurology/Dentistry/Generics), Craig Olson (Vice President of Finance), and Lalilt, and decided to raise the price of Cuprimine by 400% from approximately $6,500 for 100 capsules to over $26,000.

361.     As another example, when Isuprel and Nitropress were acquired, Pearson, Schiller, Kornwasser, Andrew Davis, Steve Sembler (former Senior Vice President of Neurology and Other), and Sandeep Lalilt (Senior Director of Marketing) held a meeting to discuss pricing.  *The Wall Street Journal* reported that Pearson wanted to dramatically increase prices to reach profit targets, while the rest of the group recommended smaller price increases implemented over time.  At the Senate hearing, Schiller confirmed that, despite the recommendation of the business unit, "Mr. Pearson made a decision to go with the higher price."  In a written statement to the Senate Committee, Pearson admitted that he, "as [Valeant's] leader, was too aggressive [i]n pursuing price increases on certain drugs."  At the Senate hearing, Pearson confirmed his hands-on style, testifying in response to questions about patient complaints that "we do track every patient that calls and make sure that it's run to the ground" and "I read the reports."

362.     In a May 28, 2014 conference call with investors, Schiller stated that he and Pearson "religiously track each deal on a quarterly basis.  Our Board of Directors receives a report every

quarter on each deal.  We review every quarter and ask ourselves how are we doing, we are our own biggest critics."  Later the same day, at a Sanford C. Bernstein Strategic Decisions Conference, Pearson stated, "we're tracking every product around the world."

363.  Moreover, throughout the Relevant Period, the Executive Defendants held themselves out to investors as the persons most knowledgeable about Valeant's business, operating model, and strategies (including pricing, the AF initiative, and specialty pharmacies), acquisitions, organic growth, internal controls, ethical standards, compliance programs, and the volume, pricing, and performance of Valeant's products.  The Executive Defendants voluntarily and repeatedly chose to discuss these issues throughout the Relevant Period and in doing so either knew or recklessly disregarded that their statements were contrary to the underlying facts alleged herein, while making the specific and detailed statements alleged herein.

364.  For example, during a May 21, 2016 RBC Investor Meeting, Pearson discussed Valeant's stock price, stating "[w]e expect our stock to go up 50%, 70% a year, that's our expectation, that's what I get paid to do and our long-term investors appreciate it."  He also said, "I believe that our company is fundamentally undervalued" and that "last year when we were trading at 105 it was so obvious to me that we were so undervalued why wouldn't all you guys rush in?  Not just you guys but I mean investors clearly we weren't worth [only] 105."

365.  The Executive Defendants were active and culpable participants in the fraudulent scheme and course of business alleged herein by virtue of their receipt of information reflecting the true facts regarding Valeant, their control over and/or receipt of Valeant's materially misleading misstatements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Valeant's unsustainable business model and its reliance on deceptive practices.  The ongoing fraud as described herein was pervasive, multi-

faceted, and carefully designed.  Such a sophisticated fraudulent scheme could not have been perpetrated for so many years without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Executive Defendants.

366.    During the Relevant Period, the Executive Defendants, as senior executive officers and/or directors of Valeant, were privy to confidential and proprietary, non-public information concerning Valeant's operations, finances, financial condition, and present and future business prospects, including in connection with due diligence undertaken as part of Valeant's acquisitions, via internal documents and conversations with other officers and employees, and/or attendance at management and/or board of directors meetings and committees thereof.  Because of their possession of such information, the Executive Defendants had the ability and opportunity to prevent the issuance of the Company's reports and releases alleged herein to be false or misleading and/or to cause them to be corrected.  The Executive Defendants' materially false and misleading statements during the Relevant Period violated their duty to promptly disseminate accurate, full, and truthful information with respect to Valeant's operations, business, financial statements, and financial metrics, so that the market price of Valeant securities would be based upon truthful and accurate information.

367.    The level of involvement in the day to day operations of the Company goes beyond general awareness of corporate executives of the workings of their companies.  As explained above, Pearson, Schiller, Rosiello and Carro held meetings to determine by how much to raise prices.  They also held meetings with Pearson's former employer, McKinsey, to strategize about pricing.  As his former employees stated, Pearson had his "fingers in everything."  Given these facts, and that the key Valeant executive who was on the ground at Philidor reported directly to

Pearson, it is reasonable to infer that he was aware of the fraudulent practices that allowed for the price increases.

368.     Moreover, Pearson, Schiller, and Rosiello assumed the responsibility of obtaining the requisite knowledge to ensure the Company's disclosures to the market were true by executing SOX Certifications.  Pearson, Schiller and Rosiello participated in the drafting, preparation, and/or approval of the various SEC filings, releases, and other public statements complained of herein and because of their managerial positions had control over the information that was disclosed and the true facts relating to those disclosures.

**B.     The Executive Defendants Closely Monitored and Ultimately Closed, Philidor**

369.     The Executive Defendants were personally aware that Valeant used Philidor and its secret network of pharmacies to engage in deceptive practices from Philidor's inception until its closure.  They also knew that the relationship was being concealed.

370.     The Executive Defendants were intimately involved in the acquisition of Medicis, which employed an AF strategy and led to the formation of Philidor on January 2, 2013.  Gary Tanner had been at the helm of Medicis' AF strategy.  The Executive Defendants decided to retain Tanner, and to promote him several times, so that he might implement the AF strategy within Valeant/Philidor.  The AF strategy was simply a euphemism for the deceptive practices that underlay Valeant's price gouging.

371.     On January 3, 2013, Valeant announced the hiring of Kornwasser.  Kornwasser and Tanner were Valeant's main contacts for Philidor.  Tanner reported to Kornwasser, who reported to Pearson.  Kornwasser's position and compensation within the Company make clear that Philidor was of critical importance to Valeant.   Kornwasser received over $8.8 million in total compensation (cash and stock awards) in his first year of employment.

372.    Pearson, Schiller, and senior management signed the Philidor agreements, and Pearson and other executive officers often touted Valeant's new "alternative fulfillment program." The Executive Defendants knew that several Valeant employees were assisting in the formation of Philidor, working at Philidor, and eventually transferred employment to Philidor, where these employees (both while still employed at Valeant and after transferring to Philidor) would oversee the deceptive business practices designed to artificially boost the sales and sale prices of Valeant drugs.

373.    Prior to obtaining the option to acquire Philidor, Pearson, Schiller, and Valeant's Board of Directors performed due diligence, including multiple site visits.  Notably, before Valeant's $100 million payment to Philidor, Valeant's senior management and members of the Board, including the entire Audit Committee, went on site visits to Philidor.  On these visits, Valeant was provided further access and exposure to Philidor's business practices and operations. After the payment, Valeant intentionally avoided disclosing its relationship with Philidor in its financial statements.  Defendants concealed from investors, as well as physicians, patients, private payors, and PBMs the $100 million payment, Valeant's controlling relationship and that Philidor's financials were being consolidated into Valeant's.  Additionally, Valeant's entire Board of Directors, including the Finance and Transactions Committee and the Audit and Risk Committee, reviewed and approved the Philidor transaction and accounting treatment that violated GAAP.

374.    Valeant effectively controlled Philidor from the day it was created.  Philidor was formed to orchestrate Defendants' fraudulent scheme to inflate revenues.  Valeant had a contractual right to inspect Philidor's books, records, and facilities and to audit its practices for compliance and either did so, and knowingly approved of the deceptive practices, or was severely reckless in failing to do so.  As Philidor employees have confirmed, the deceptive practices were

136

widely known, discussed, and even documented in Philidor's training manuals.  Philidor was included in Valeant's internal control testing and internal audit program for 2015.  Valeant and Philidor formed a joint steering committee which held regular meetings to discuss, among other things, Philidor's "Strategic Plan," contractual obligations with TTPs, and "internal policies, manuals and processes."

375.    As a further example that Pearson was personally monitoring Philidor's practices, on March 9, 2015, Kellen sent an email to Pearson updating him on their earlier conversation stating "Met with Deb [Jorn]….  Suggested we get all the DMs [District Managers] in for a day… goal to go over the practices in each district where Philidor is working well and identify next [approximately] 10 practices where we should push harder to build it out.  That [sic] will help fuel growth."  Pearson responded, "Good stuff."  Philidor managers were invited to meet with Valeant's Board in July 2015.

376.    Defendants also monitored the network of pharmacies through which Philidor operated.  For example, Valeant made approximately 75 shipments to R&O between January and August 2015 and received millions of dollars in payment directly from R&O in return.   On September 4, 2015, after R&O began withholding invoices upon suspicion of fraudulent conduct, Valeant's general counsel sent a letter to R&O's owner seeking "immediate payment."   In the October 19, 2015 conference call, Pearson told investors that R&O was a part of the Company's specialty pharmacy network and discussed the lawsuit.

377.    On October 19, 2015, as questions about Philidor arose, Pearson, at a conference attended by Rosiello and Kellen, defended Philidor and the decision to conceal the relationship as "a competitive advantage that we did not want to disclose to our competitors."  Pearson repeated this at the October 26th conference attended by Schiller, Rosiello, Ingram, Provencio, Melas-

Kyriazi, Stevenson, Carro, and Kellen and added that Philidor was purportedly "independent" and sales through it were "less profitable."  But just days later, on October 30, 2015, Valeant announced Philidor would cease operations as Philidor's improper practices were publicly revealed. Defendants' decision to shut down Philidor so quickly, rather than investigating to confirm the devastating allegations, demonstrates they were aware of Philidor's deceptive practices.

378.     Pearson repeatedly spoke of the purported benefits of the AF strategy during the Relevant Period but refused to provide details of the particular practices when asked.  In addition, when Valeant's relationship with Philidor was uncovered, Pearson admitted that it was a conscious decision to conceal Philidor for purported "competitive" reasons, and Ingram made clear that the Board "has fully supported the company's specialty pharmacy strategy."

379.     The Executive Defendants also had knowledge of the accounting violations associated with Philidor.  When Citron issued its report questioning whether Valeant was inflating revenue through Philidor, Pearson, Ingram, and Carro all publicly defended Valeant's accounting. On October 26, 2015, Ingram noted that the entire Board and Audit Committee had reviewed and confirmed the appropriateness of the accounting relating to Philidor.  The 3Q15 10-Q, which Valeant filed that same day and which was signed by Pearson and Rosiello, repeated this fact.  In a conference call with investors, Ingram forcefully defended Pearson, saying, "I also want to reiterate the Board's complete and total faith in Mike Pearson" because "[h]e operates with the highest degree of ethics and he has the Board's unanimous support."  However, once the SEC investigation was underway, Carro and Schiller were asked to leave for engaging in "improper conduct" related to the accounting.  Valeant admitted it had improperly inflated revenues through Philidor and would need to restate its previously issued financial statements.

380.    Finally, the efforts by Philidor to cover up its wrongdoing further support an inference of scienter considering Valeant's effective control over Philidor.  *See* Section VI.B.

### C.    Evidence Of Scienter From the U.S. Attorney's Complaint Against Tanner

381.    As explained above, Tanner had been employed at Medicis and was retained at a high level within Valeant to foster its AF program and its relationship with Philidor.  The U.S. Attorney's criminal action against Tanner, currently pending in the United States District Court for the Southern District of New York, sheds further light on the Executive Defendants' knowledge of the misconduct that was occurring at Philidor, under Tanner's direct oversight.

382.    According to the U.S. Attorney's complaint against Tanner and Davenport, Tanner "had direct access to senior management of Valeant."  "In documents that were later prepared for Valeant's Board of Directors, Valeant recognized Tanner as a 'key organization talent' that Valeant retained after acquiring Medicis."  The U.S. Attorney's complaint further states:

> By April 2013, Valeant had appointed TANNER to be the Senior Director for the "Access Solutions Team," which was responsible for Valeant's AF initiatives and patient access programs, among other things.  TANNER was later promoted to the position of Vice President responsible for Access Solutions.
>
> During TANNER's employment by Valeant, TANNER occupied a managerial position of trust at the company.  In particular, TANNER supervised programs that were responsible for generating hundreds of millions of dollars in sales for Valeant; he reported to and had access to Valeant's top executives, including the company's CEO, on various issues; and he interacted directly with Valeant's customers, suppliers, and auditors as an executive of Valeant.
>
> Over the course of TANNER's work for Valeant, TANNER proposed and assumed responsibility for supporting and supervising the operation of Philidor, a new mail-order pharmacy that, as described in greater detail below, assumed an increasingly large role in Valeant's AF program and its financial performance.
>
> As part of TANNER's work at Valeant on supporting and growing Philidor TANNER interacted directly with Philidor's executives, including ADNREW DAVENPORT, the defendant.  TANNER also supervised

employees who worked partially or wholly out of Philidor's out of Philidor's offices in Pennsylvania, including sales and managerial staff employed by Valeant and certain staff employed by Philidor.  Even while TANNER served in this capacity at Philidor, however, TANNER was still considered and treated as a Valeant employee, receiving compensation, performance ratings, and compliance training from Valeant.

*** 

During TANNER's time as a Valeant employee, Valeant paid TANNER millions of dollars in salary, bonuses, stock options, and restricted stock options to represent its interests.

383.    The U.S. Attorney's complaint explains that "From in or about 2013 until 2015, Valeant Executive-1 oversaw numerous business units within and affiliated with Valeant, including Philidor.  Valeant Executive-1 reported directly to Valeant's former CEO.  During the relevant time period, GARY TANNER, the defendant, reported to Valeant Executive-1, first indirectly and then directly for a period of time."

384.    Furthermore, during a Philidor site-visit, "Valeant Executive-1 noticed that TANNER appeared to have an office inside Philidor, had access to Philidor's entire office facility, and acted as if he had a managerial role at Philidor."  This executive "understood [TANNER] was providing advice to Philidor's sales team."  These observations purportedly caused the anonymous executive to be concerned, and he "shared his concerns about TANNER with other senior executives at Valeant."

385.    In addition to "Valeant Executive-1," Valeant's Chief Compliance Officer "also had concerns that TANNER may have a financial interest in Philidor," and he "raised these concerns to other Valeant executives."

386.    Moreover, Valeant Executive-1 repeatedly urged Tanner to diversify the pharmacies that would be used to dispense Valeant products, in large part to lessen the risks associated with becoming "overly dependent on Philidor."  These concerns were also raised by

two other senior executives in emails to Tanner.  However, Tanner told the executives that "he was too busy building Philidor to enter into arrangements with other pharmacies, or that alternative arrangements would compare unfavorably to Philidor."  The U.S. Attorney's complaint concluded that "[a]s a result of TANNER's failure and/or refusal to diversify the AF program, Valeant did not mitigate payer risk… and it became increasingly dependent on Philidor to achieve its sales and growth targets."

387.   According to the U.S. Attorney's complaint, Tanner also provided updates regarding Philidor to Pearson and Schiller.  For example, on September 5, 2014, Tanner sent an email to Valeant's CEO, Chief Financial Officer, and other senior executives in which Tanner touted Philidor's performance and stated, "Given the performance through the first half of the year and specifically the significant update of the program yielding results far greater than expectation, I temporarily ceased publishing this summary knowing the performance was exceeding expectation."  In addition, "On September 17, 2014, TANNER met with Valeant's CEO and emailed the CEO a 20-page presentation which described Philidor's growth over time and touted its future prospects."

388.   It is inconceivable that the Executive Defendants did not know of Tanner's misconduct given their constant interactions with Philidor, Tanner's direct reporting to them, and Tanner's responsibility for such a large portion of Valeant's business.  Further, Tanner sent the Executive Defendants updates regarding Philidor, including that its growth was far ahead of expectations.  Finally, the Executive Defendants never disclosed their concerns regarding Tanner and his affiliation with Philidor, including the Company's reliance on Philidor, to investors.  At a minimum, they recklessly disregarded the risks that Valeant prescriptions filled by Philidor were tainted by deceptive and improper practices.

## D.     Valeant's Refusal To Pursue Remedies Against Wrongdoers

389.    Valeant's failure to pursue remedies against Pearson, Schiller, Philidor, and Philidor executives supports an inference that the deceptive business practices alleged herein were fully approved.  Valeant, therefore, could not pursue such remedies for the very wrongdoing it condoned, and thus was limited to terminating the employment of the wrongdoers and shutting down Philidor.

390.    In 2014, Valeant instituted a clawback policy, allowing the Company to recover incentive compensation from management if a restatement is required within three years of the relevant period and an executive is found to have participated in fraudulent or illegal conduct. However, as Ingram noted, the Board approved the accounting for Philidor and thus, notwithstanding this clawback right, Valeant's Board has taken no public action to recover payments to Pearson, Schiller, or the other executives.

391.    To the contrary, the Company retroactively modified Pearson's employment contract to provide him with a $2 million salary for 2016, along with other financial benefits, although Pearson was only supposed to receive a performance bonus but no salary for 2016, a month after announcing that Pearson would be replaced as the CEO.  Valeant has since provided him a $9 million severance.

392.    Similarly, Valeant's purchase option agreement with Philidor provides broad indemnification rights to the Company, including that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against any and all Losses" to Valeant "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties."  However, the purchase option agreement further provides that such liability "shall be reduced by the extent… that such Losses are caused by or arise out of (a) the negligence or intentional misconduct of Manufacturer."  Rather

than pursue its claims against Philidor, Valeant entered into a mutual release with Philidor, effective as of November 1, 2015.

### E.    Valeant's Admissions Of Wrongdoing

393.    As detailed above, Valeant has admitted that several statements made by Defendants during the Relevant Period were false and misleading, that Carro and Schiller engaged in improper conduct, and that Valeant had an unethical "tone at the top."

394.    In February 2016, Valeant admitted that Pearson's April 29, 2015 statement that "volume was greater than price in terms of our growth" was false.  On February 22, 2016, Valeant issued a press release in which the Company stated it had improperly recognized revenues.  Earlier, *The Wall Street Journal* reported in a February 2, 2016 article, "Valeant's Sales Growth: Driven by Price Increases or Volume Growth?" that Pearson knew his statement at the April 29, 2015 conference call was false.  According to the article, on May 21, 2015, Defendant Schiller (who was CFO at the time) sent an email to Pearson, stating that for the first quarter of 2015, price represented about 60% to 80% of Valeant's growth.  On March 21, 2016, the Company issued a press release and Form 8-K disclosing that it had material weaknesses in internal controls and the 2014 10-K and three 10-Qs during 2015 could no longer be relied upon.

395.    Further, Schiller was accused of "improper conduct" and the Company "determined that the tone at the top of the organization and the performance-based environment… may have been contributing factors resulting in improper revenue recognition."[10]  Valeant asked Schiller to resign from the Board and forced Pearson and Carro out, quickly replacing them.

---

[10] Valeant regularly reported non-GAAP financial disclosures in an effort to make Valeant appear more profitable.  On December 4, 2015, the SEC raised concerns regarding the "overall format and presentation of the non-GAAP measures" and regarding the prominence given to such numbers.  In a March 18, 2016 letter to the Company, the SEC noted that "over the past four years, you have reported approximately $9.8 billion of non-GAAP net income" compared to having "reported [a] GAAP net loss of approximately $330

396.     Finally, during a conference call on October 26, 2015 in which the three members of the Audit Committee (Norma Provencio, Theo Melas-Kyriazi and Katherine Stevenson), Schiller, Pearson, Carro, Rosiello, and Kellen participated, Lead Independent Director Ingram admitted that the Audit Committee of the Board and the full Board had approved the Company's (improper) accounting for Philidor. Slides accompanying the call stated that the "Finance and Transactions Committee, Audit and Risk Committee and [the] Full Board reviewed the transaction" and "[t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

### F.     The Congressional Hearings

397.     Congressional committees began investigating Valeant's business practices in 2015.  Numerous admissions during the course of these investigations further support an inference of scienter.  In particular, Pearson repeatedly acknowledged that Valeant's business model was price gouging, which he stated was unsustainable.  It is reasonable to infer that, with such detailed knowledge of Valeant's pricing, Pearson and the other Executive Defendants were aware of the deceptive and fraudulent practices that allowed Valeant to charge such exorbitant prices.

### 1.     February 4, 2016 House Oversight Committee Hearing

398.     Valeant produced 75,000 pages of documents to the House Oversight Committee. A summary of those documents corroborates the allegations herein, confirming:  (i) "that Mr. Pearson purchased Isuprel and Nitropress in order to dramatically increase their prices" and "Valeant identified goals for revenues first, and then set drug prices to reach those goals"; (ii) "that Valeant used its patient assistance programs to justify raising prices and to generate increased

---

million."  The Executive Defendants' insistence on providing opaque and misleading disclosures and resistance to the SEC's repeated requests for reform further supports an inference of scienter.  On April 8, 2016, the Company informed the SEC it would change its approach to non-GAAP financial measures.

revenues by driving patients into closed distribution systems"; (iii) that Valeant "sought to exploit this temporary monopoly by increasing prices dramatically to extremely high levels very quickly"; and (iv) that "Mr. Pearson utilized this strategy with many more drugs than Isuprel and Nitropress" as Valeant had increased the prices of 20 prescription drugs by more than 200% from 2014 to 2015.

399.    During the February 4, 2016 hearing, Schiller demonstrated his intimate familiarity with and knowledge of Valeant's drug pricing practices and spoke as an authority on the subject. In his prepared testimony, Schiller acknowledged that Valeant had acquired Nitropress and Isuprel in February 2015 and that even though they were only two of 1,800 total Valeant products (0.1%), they accounted for 4% of full year 2015 revenues (and even more of Valeant's profits given their 99% margins).  Schiller further acknowledged that federal anti-kickback laws prohibited the "patient assistance" programs Valeant provided.

400.    At the hearing, Schiller admitted that the previously concealed risks of the Company's price gouging practices included: "increased pressure for rebates from the payers, decreased sales volumes from hospitals, increased substitution of alternative products, and heightened competition from new generic or branded drugs."

401.    In addition, Schiller effectively admitted that Valeant's business strategy was neither sustainable nor more profitable than a traditional R&D strategy, a notion which Defendants previously denied repeatedly during the Relevant Period.  Schiller did so by acknowledging "we made a lot of mistakes" and would no longer pursue such "aggressive" price increases and would be lowering prices.  Schiller also admitted they were "too aggressive" in raising the prices of Nitropress and Isuprel, and said "[w]e are not going to be looking for those kinds of acquisitions

145

going forward." Schiller also acknowledged that Valeant would spend more heavily on R&D in the future.

402.   When Representative Carolyn Maloney asked if "price increases represented 80 percent of your company's growth for the first quarter of 2015," Schiller admitted they did. Schiller was also asked if Pearson's statement, "do not bet on science, bet on management," was Valeant's operating philosophy. Schiller responded that the Company was "chang[ing] quite a bit."

403.   Representative Cummings confronted Schiller with Valeant's price increases, and even though Schiller would not confirm each specific price increase, he confirmed their general thrust. Representative Cummings said Valeant's documents showed "[t]heir basic strategy has been to buy drugs that are already on the market and then raise the prices astronomically [for a] temporary period of time before other competitors enter the market" and noted reports that "in 2014, Valeant led the industry in price hikes, raising prices on 62 [drugs]" by "an average of 50 percent" with Glumetza, a diabetes drug, increasing "by a whopping 800 percent over a mere six-week period." Schiller said he was "not familiar with all those numbers" but "directionally, that is true."

404.   At the hearing, Representative Cummings also complained that Valeant had "refused my previous request and obstructed our abilities to investigate their actions." On April 12, 2016, Representative Cummings sent a letter to Pearson stating "[y]our refusal to cooperate fully with Congress is extremely troubling and reflects a pattern of obstruction…." Cummings said he had asked on November 16, 2015 that Valeant make Tanner, Pritchett, and Patel available for interviews but that Valeant had "failed" to do so.

### 2.      Senate Aging Committee Hearing

405.     On April 27, 2016, the U.S. Senate Committee on Aging ("Senate Aging Committee") held hearings relating to Valeant.  Pearson (who had been terminated as CEO after returning from a leave of absence) along with Schiller and Ackman testified.

406.     Pearson submitted a written statement admitting "the company was too aggressive – and I, as its leader, was too aggressive – In pursuing price increases on certain drugs."  He said he "regret[ted] pursuing transactions where a central premise was a planned increase in the prices of the medicines, such as our acquisitions of Nitropress and Isuprel."   Pearson further acknowledged in his written statement:

> In retrospect, we relied too heavily on the industry practice of increasing the price of brand name drugs in the months before generic entry.  Instead, in my view, we should have abandoned the transaction with Marathon when it became clear the expected arrival of generic competition made the economics of the deal dependent on significant price increases.

407.     During the hearing, Pearson and Schiller displayed their intimate familiarity with and knowledge of the Company's drug pricing practices and spoke as authorities on the subject. Pearson admitted: "Yes. Our pricing has driven more growth than volume, although that is changing over time."  He also stated "we have also made mistakes, including those that bring me here today."

408.     Senator Tim Kaine noted that Pearson previously claimed Valeant's business model was not fully understood by all investors and the Company had "nothing to be ashamed of." Senator Kaine asked if Pearson still felt that way and Pearson testified "No," adding, "we have been too aggressive on pricing."  Pearson also admitted he had raised prices higher than Valeant's consultants recommended.

409.     Senator McCaskill noted that, since 2013, price had been more responsible for growth than volume in all quarters except one, and Pearson confirmed that was correct.  This admission contradicted Pearson's April 29, 2015 statement and his October 14, 2015 letter to Senator McCaskill, wherein Pearson claimed "[t]here is a misperception in the media that Valeant's revenue growth for existing products has been driven primarily by price."

410.     The Congressional committee hearings exposed other false and misleading statements that Defendants had made to investors during the Relevant Period.  For example, Pearson claimed in his October 30, 2015 letter to Senator McCaskill that "for those institutions where the impact was significantly greater, we are beginning to reach out to hospitals to determine an appropriate pricing strategy."  Soon thereafter, Valeant announced a 30% discount program.  But, at the hearing, Senator McCaskill noted that she had not found a single hospital that had received the discounts.  Hospital affiliated witnesses at the hearing also denied receiving the discounts and several more sent letters to the Senate Aging Committee stating they had not received any such discounts.

411.     For example, Cleveland Clinic noted that it called Stolz of Valeant to ask about the discounts, and Stolz promised to get back to them but never did.  Similarly, University of Utah Health Care wrote to the Senate Aging Committee that "Valeant noted in a letter to Ranking Member McCaskill that their company would be reaching out to hospitals that were impacted by the new pricing" but when they called "Valeant refused to talk to me about better contracted prices."  Valeant essentially conceded that Pearson's claim was inaccurate, when, on April 23, 2016, Stolz submitted a written response admitting that "[a]s of this date, Valeant has not entered into contracts with individual hospitals to provide volume-based discounts for Nitropress and Isuprel" but had entered into contracts with only three hospital groups.  Valeant issued a public

statement that they formed a committee which was working to "develop solutions so any hospital that is eligible for discounts on Nitropress and Isuprel receives them," and Stolz left the Company.

412.    During the hearing, Senator Susan Collins commented that Valeant's "price-gouging strategy appears to be based on careful study of the FDA approval process.  The Company knows it often takes years before generic competitors can clear the hurdles imposed by that process to enter the market and to compete.  During that period, Valeant exploits its de facto monopoly."  Senator Collins further stated "[i]t is also apparent that these medications make an out-sized contribution to the company's net income, we can find nothing to explain these dramatic price increases beyond Valeant's desire to take advantage of monopoly drugs."  Senator McCaskill commented that "[e]ven Valeant's patient assistance program appears to be set up solely to increase Valeant's bottom line," with Senator Collins adding that Valeant's PAP was used "so that you can still get the payments primarily from commercial insurers, which dwarf the amount that you're giving in customer assistance."

413.    Senator Warren asked Pearson "[w]hy don't you use these co-pay reduction programs for federal government insurance programs, like Medicare Part D or Medicaid," to which Pearson acknowledged "we're not allowed to."  Warren responded, "Yeah, because it's illegal."  She additionally stated "These programs are illegal because Medicare and Medicaid understand that the programs are scams to hide the true cost of the products from the consumer and drive up the cost of all the taxpayers."

414.    Finally, in connection with the Congressional probes, Philidor was asked why Valeant did not simply purchase Philidor outright rather than acquire the option to purchase it for $0.  Philidor's counsel, in a written response, stated that "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant

had purchased Philidor."  Thus, Philidor confirmed that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship.

### G.  Executive Departures

415.    An inference of scienter can also be drawn from the timing of widespread executive and director departures, including many of the Executive Defendants, just shortly before the initial public revelations regarding the deceptive practices by Valeant and Philidor.  In total, 12 senior executives and Board members were forced out of Valeant, including its CEO, CFO, Controller, Audit Committee, Head of Dermatology and most members of its Board of Directors.

416.    On April 29, 2015, just after the false 2014 financial statements were issued, Valeant announced that Schiller would be leaving his position as CFO once a successor was appointed.

417.    In July 2015, Kornwasser left the Company.  CNBC subsequently attempted to contact Kornwasser, but received a call from Valeant's crisis management department who said Kornwasser was not interested in discussing Valeant or Philidor.  Representative Cummings noted Kornwasser was never made available when the House Oversight Committee asked Valeant to produce him for an interview.

418.    On August 25, 2015, the Company issued a release announcing that Jeffery W. Ubben, a Valeant Board member and founder of activist investor ValueAct (Valeant's fourth largest shareholder), had resigned from the Board.  Before he resigned, Ubben, through ValueAct, sold 4.2 million shares of Valeant stock on June 10, 2015 for near $1 billion, at close to peak prices.  He had previously held these shares for many years.

419.    On or about March 2, 2016, it was reported that Defendant Jorn, head of the U.S. Gastrointestinal and Dermatology divisions was "leaving the company effective immediately."

Jorn was responsible for some of Valeant's top selling drugs, including Jublia, a dermatology drug which was sold in massive quantities through Philidor.

420.    On March 21, 2016, Valeant issued a press release regarding the restatement and material weaknesses of its internal controls.  It also confirmed Pearson would be leaving the Company.  Moreover, the Company admitted that Schiller and Carro engaged in "improper conduct" and provided inaccurate information to the Ad Hoc Committee investigating the false revenues. Schiller was asked to resign from the Board.  Carro was replaced as Controller.

421.    After joining the Board, Ackman was asked by media and Congress about the corrective actions Valeant was taking and he responded by stating that Pearson was replaced as CEO.  Ackman responded that "[w]e have a new CEO starting" and a "lot of the board is going to turn over, so we're going to have a new board for the most part."

422.    On April 29, 2016, Valeant announced that seven of its Board members would not be standing for re-election.  This included Pearson and Schiller, as well as Morfit (of ValueAct), Provencio (chair of the Audit Committee), Colleen Goggins, Ronald Farmer, and Melas-Kyriazi (member of the Audit Committee).  Notably, Provencio, Goggins, and Morfit were also members of the Ad Hoc Committee.

423.    On May 20, 2016, Valeant stated in a filing with the SEC that Stolz had resigned as Senior Vice President of Neurology, Dentistry and Generics.  Stolz had been involved in both the price increases and the purported pricing discounts Pearson promised Congress but failed to deliver.

### H.    Pearson's Misrepresentations To Ackman

424.    The fact that Pearson concealed his deceptive practices from Ackman, a large investor with whom Pearson had a cooperative business relationship, is another strong inference

151

of Pearson's scienter.  Although Ackman met with Pearson on many occasions to discuss Valeant's business, Pearson kept Ackman in the dark regarding the deceptive practices herein, while using Ackman to refute Allergan's claims and defend Valeant's business model.

425.   In 2014, Ackman, who controlled one of the Company's largest stakeholders (Pershing Square), met with Pearson to form a partnership between Valeant and Pershing Square in an effort to take over Allergan.  According to the plan, Pershing Square would acquire stock in Allergan both to assist in providing shareholder support and to validate the value of Valeant's stock.

426.   Pershing Square is, as Ackman has described, an investment company whose business is to thoroughly investigate companies before taking large investment positions.  In an October 2014 deposition, Ackman testified that because Valeant was attempting to acquire Allergan with Valeant stock, Pershing Square "had the benefit really for the first time of doing due diligence on a company with full access to management and access to inside information, so we could vet Valeant as a company, we could assess its value and we could have helped, you know, vet the credibility of the currency [Valeant's stock]."

427.   When Allergan resisted Valeant's takeover attempt and challenged the sustainability of Valeant's business and its pricing practices (which claims Valeant denied), Pershing Square engaged in further due diligence before investing $4 billion in Valeant in early 2015.  Ackman and Pearson had frequent contact, through calls, emails, and dinners.  Ackman also introduced other investors to Pearson, offered to help Pearson prepare for earnings calls, and gave advice after those calls.  In short, during 2014 and 2015, Ackman had numerous conversations with Pearson about Valeant's business.

428.   Despite these extensive contacts and Ackman's "full access to management," Pearson concealed the extent of Valeant's price gouging and other deceptive practices from Ackman, in order to have Ackman publicly endorse Valeant's "currency," *i.e.*, stock value, during the attempted Allergan acquisition, and defend Pearson and Valeant's business practices.  For example, on April 22, 2014, Pearson emailed Ackman, asking him to "emphasize [the] quality of our company" to the media.

429.   On April 9, 2015, Ackman emailed Warren Buffett ("Buffett") in response to criticism of Valeant and Pearson by Buffett's partner, Charlie Munger ("Munger"), vice-chairman of Berkshire Hathaway.  Ackman wrote that Munger "has gotten this one wrong," that "[w]e have gotten to know Valeant and Pearson well over the last year," and that others also "hold Mike Pearson in extremely high regard."  Ironically, Ackman claimed that Pearson was "an extremely direct person," and offered to set up a meeting to "meet Mike Pearson and ask him anything you would like."  Ackman continued stating "Mike would like the opportunity to clear his reputation in response to Charlie's recent comments."  Buffett suggested that Ackman contact Munger directly.

430.   On April 11, 2015, Ackman sent an email to Munger.  He claimed there "was a lot of misinformation disseminated by Allergan about Valeant," and "[p]erhaps that is the source of your misinformation."  Ackman asked him to meet with Pearson, stating, "I think you have the facts wrong," and "it seems fair that you would give Mike an opportunity to respond to your concerns…."  Further demonstrating Ackman's belief that Allergan's claims were false and revealing the extent of his ignorance about the true state of affairs at Valeant, Ackman even claimed that Pearson followed a "rational approach to operations," and that "Valeant stock has

been and continues to remain perennially undervalued," even though it was trading at over $200 per share.

431.    Even as late as October 6, 2015, Ackman had not been told of the extent of Valeant's price gouging.  In a media interview that day, Ackman claimed a "[v]ery small part of Valeant's business is repricing drugs" and said it was price increases by other companies that were resulting in Valeant getting "dragged into the story."  Ackman went on to claim that Valeant was "the most undervalued" stock Pershing Square owned at the time.

432.    After the truth regarding Valeant's deceptive practices came to light and Ackman joined the Board, Ackman dramatically reversed course in his defense of Pearson and Valeant's business practices.  Ackman testified to the Senate under oath that he was unaware of what he called the "horrible" and "wrong" price increases that were later publicly disclosed with regard to Cuprimine, Isuprel, and Nitropress, and testified that Pershing Square did not approve of the "rapid and large increases in the prices of certain drugs."  Ackman testified, "[c]learly [there] were things I did not understand about the business."  Ackman also told the Senate Aging Committee, and repeated on CNBC and in other media interviews, that replacing Pearson as CEO was "appropriate."

433.    After the disclosures, Munger's criticism was even sharper, stating "Valeant of course is a sewer, and those who created it deserve all the opprobrium that they got."  Buffett added, "I don't think you'd want your son to grow up and run a company in the manner that Valeant was run."  This time, rather than defend Pearson, as he had to Munger and Buffet in the past, Ackman essentially conceded Pearson's misconduct by stating only that "it is not fair to indict an[] entire company based on the actions of a few."

154

## I.    Valeant's Executive Compensation Structure Provided A Motive To Engage In Fraud

434.    Valeant's unusual compensation structure, which was heavily dependent on increasing the value of its stock, provided a motive to commit fraud.  Valeant's compensation structure granted incredibly rich compensation packages based on achieving increasingly challenging performance goals, backed by the threat of termination.  As Pearson described it, "[i]f a business does not make money, we either exit the business or we fire the person running that business.  Usually we fire the person running the business."  This emphasis on results over ethics led to a culture of fraudulent practices.

435.    For example, at a May 28, 2014 conference, Pearson stated "there's been a lot of turnover at the senior ranks; but that has been, by and large, our decision, not their decisions, as we continue to upgrade talent."  Pearson bluntly acknowledged "[t]here's no tenure at Valeant.  It's up and out….   It's more like a professional services firm than a sort of traditional pharmaceutical company."  Pearson also admitted that the compensation system at Valeant was entirely dependent on increasing the stock price, stating:

> So, our Company senior management and the Board – we – there's only one metric that really counts, and it's total return to shareholders.  That's how we're paid.  We have a unique pay model, that at least we – at least – if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing.

A December 12, 2013 Board of Directors presentation regarding Valeant's 2014 budget reflected these aggressive targets.  The presentation noted that the "[b]udget reflects stretched targets for all business units," and there would be "[n]o bonuses to be paid for performance <90% of base budget."

155

436.    While missing budgets was punished with forfeiture of bonuses or worse, Valeant's highest ranking executives were rewarded with millions of dollars for achieving the increasingly aggressive financial targets.  For example, in 2014, Pearson's base compensation was $2 million and Schiller's was $1 million.  However, under the bonus program they could earn multiples of their base salary.  For example, Pearson received an $8 million bonus, an amount equal to 4 times Pearson's base compensation, and Schiller received a $2.4 million bonus, nearly 2.5 times Schiller's base compensation.

437.    The lavish salaries and bonuses paled in comparison to the rewards for bringing Valeant's stock price as high as possible until 2017.  Industry observers noted that Valeant's compensation scheme paid Pearson "like a hedge fund manager."  For example, on April 22, 2014, the Company filed a proxy statement with the SEC disclosing that the value of Pearson's shares on March 31, 2014 was approximately $1.3 billion.  During an April 22, 2014 presentation in New York, Ackman appeared with Pearson and referred to the $1.3 billion, stating that "this is one of the more unusual and leveraged shareholder aligned compensation packages we've ever seen." Ackman also highlighted that a large portion of Pearson's compensation was tied to the grant of performance share units that vest only if he delivered incredibly aggressive annual returns over three years of between 15% and 60%, which compounded each successive year.

438.    The compensation program provided Pearson the opportunity to become a billionaire and obtain wealth far beyond even a typical highly paid CEO.  It also incentivized Pearson and other Valeant executives to use any means necessary to increase the stock price through 2017 at the expense of the long-term health of the Company and shareholder interests. Moreover, Pearson was allowed to effectively cash out a portion of his stock, pledging it as collateral for $100 million loaned to him by Goldman Sachs in 2014.

439.    With such powerful incentives, Pearson made statements to drive up the stock price, including in an October 27, 2014 letter that Pearson wrote to Allergan's Board of Directors, which was publicly disclosed by the Company.  In it, Pearson stated: "We believe our stock is trading at artificially low levels."  Valeant's compensation structure also gave Pearson the incentive to omit aspects of Valeant's business model that could negatively affect the Company's stock price, such as how its business model was based on unsustainable price gouging.

440.    On January 13, 2015, the Company filed a Form 8-K with the SEC announcing it had entered into an amended and restated employment agreement with Pearson.  Pearson stopped earning an annual base salary, but his "target bonus opportunity" was increased from $6 million to $10 million.  Again, as large as it was, the cash bonus paled in comparison to the hundreds of millions of dollars in compensation Pearson would receive if he successfully drove Valeant's share price higher.[11]

441.    During the Relevant Period, Schiller also had millions of dollars of his executive compensation connected with meeting challenging share price increases.

---

[11] Pearson's amended employment agreement stated, in relevant part:

> The Employment Agreement provides for the grant of 450,000 PSUs with a base price of $140.63 (with the potential to earn between zero and 2,250,000 PSUs depending on performance).  The PSUs vest based on achievement of the following performance metrics (applying linear interpolation for performance between the applicable thresholds): if the total shareholder return ("TSR") over the five year measurement period is less than 10% over the base price, none of the PSUs will vest; if the TSR over the five year measurement period is 10% over the base price, 450,000 of the PSUs will vest; if the TSR over the five year measurement period is 20% over the base price, 900,000 of the PSUs will vest; if the TSR over the five year measurement period is 30% over the base price, 1,350,000 of the PSUs will vest; if the TSR over the five year measurement period is 40% over the base price, 1,800,000 of the PSUs will vest and if the TSR over the five year measurement period is 50% or more over the base price, 2,250,000 of the PSUs will vest.

442.    On March 21, 2016, the Company admitted that its aggressive compensation and performance goal practices contributed to the wrongdoing stating: "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition" and other misconduct detailed in the press release.

443.    The "tone at the top" further supports an inference of scienter.  As accounting and internal control guidance makes clear, "top management" has an important task in setting an appropriate tone.  SEC Staff Accounting Bulletin No. 99 at 16.  As CEO during the Relevant Period, Pearson had ultimate responsibility for Valeant's internal control system and setting the "tone at the top" to prioritize ethical business and accounting practices and compliance over personal financial compensation, which he failed to do.

**J.      Defendants Were Motivated To Inflate Valeant's Stock Price To Facilitate Acquisitions**

444.    In addition to personal compensation, the Executive Defendants had motive to conceal their fraudulent business practices described herein in order to artificially inflate Valeant's stock price, more cheaply acquire other companies, and further its acquisition strategy.

445.    For example, in 2014, Valeant offered cash and shares of Valeant stock in exchange for Allergan shares of stock.  Thus, Defendants had an incentive to increase the price of Valeant shares to hit or exceed their $46 billion offer to Allergan, which was to be substantially funded with Valeant shares.  On May 28 and 29, 2014, Valeant held meetings with some of Allergan's largest shareholders to gather their support for Valeant's bid.  Ackman reported that Allergan's shareholders would support the transaction if Valeant could "deliver $180 a share in Valeant in

the value of the bid." The higher Valeant's stock price, the lower the cash required to deliver $180 per Allergan share.

446.    Valeant also took advantage of the artificially inflated price of its securities to conduct numerous debt and equity offerings during the Relevant Period, including one of the largest high-yield debt offerings in history, which generated in the aggregate nearly $15 billion of cash for the Company from the investing public at artificially inflated prices. For example, Valeant used proceeds from a $9.5 billion offering of senior notes in March 2015 to acquire Salix, and proceeds from a $3.2 billion offering of senior notes in July 2013 to acquire Bausch & Lomb.

447.    These acquisitions added to Valeant's drug portfolio and, thus, provided more opportunities for price increases and revenue growth. This implicitly led to continual increases in Valeant's stock prices, which, in turn, increased the value of the Executive Defendants' stock options. This gave the Executive Defendants a powerful motive to continue with their fraudulent scheme and to conceal anything that would threaten Valeant's ability to fund additional acquisitions.

## IX.    LOSS CAUSATION

448.    Defendants' wrongful conduct, as detailed herein, directly and proximately caused Plaintiffs' economic loss. Defendants' statements and material omissions caused, or were a substantial contributing factor, in causing Valeant stock to trade at artificially inflated prices during the Relevant Period, with the price of Valeant stock reaching over $260 per share on August 5, 2015. As Defendants' false and misleading statements and omissions were revealed to the market beginning in the third quarter of 2015 and continuing through the second quarter of 2016, the price of Valeant stock declined precipitously, ultimately closing as low as $24 per share on June 7, 2016. As the artificial inflation was removed from Valeant's stock price, tens of billions of dollars in

shareholder market capitalization was destroyed, causing substantial damage to investors, including Plaintiffs.

449.   **September 28, 2015**.  The relevant truth began to emerge on September 28, 2015, when *Bloomberg* reported that members of Congress were calling for an investigation of price gouging by Valeant.  *Bloomberg* reported that all Democratic members of the House Committee had directed Chairman Chaffetz to subpoena Valeant for documents related to massive price increases for two heart rate medications, and that, according to the House Committee members, Valeant had failed to "adequately answer" questions and provide documents requested by House Committee staff members regarding the Company's basis for such "skyrocketing prices."  Also on September 29, 2015, numerous additional news reports were released detailing that Valeant was being targeted by Congress for the Company's practice of purchasing older drugs and then dramatically raising their prices.

450.   In response to this partial disclosure regarding the Company's reliance on, and the associated risks of, price gouging, the price of Valeant stock dropped more than 16%, from a close of $199 per share on Friday, September 25, 2015, to a closing price of $166 per share on Monday, September 28, 2015, on unusually high trading volume.  The price of Valeant stock continued falling the following day, dropping an additional 5% to close at $158 per share on September 29, 2015, also on unusually high trading volume.  The total stock price decline over this two-day period was over 20%, or $41 per share.

451.   **October 4, 2015.**  On Sunday, October 4, 2015, additional details regarding Valeant's reliance on price gouging were revealed when *The New York Times* published a highly critical article concerning Pearson's September 28, 2015 letter to employees, specifically, his claim that Valeant was well-positioned for growth even without any price increases.  The article noted

160

that extraordinary price increases on eight Valeant drugs accounted for approximately 7% of the Company's revenue and 13% of its earnings before taxes and interest in the second quarter, and that Valeant raised the prices on its branded drugs nearly five times as much as its closest competitor.  On this news, the price of Valeant stock declined by more than 10%, falling from a close of $182 per share on Friday, October 2, 2015 to a close of $163 per share on Monday, October 5, 2015, on unusually high trading volume.

452.   **October 14-15, 2015**.  After the market closed on October 14, concerns about the legality of the Company's financial assistance programs were revealed when Valeant issued a press release disclosing that it had received subpoenas from the U.S. Attorney's Offices for the District of Massachusetts and the Southern District of New York requesting documents related to, among other things, Valeant's PAPs, financial support provided by Valeant for patients, distribution of Valeant's products, and pricing decisions.  The press release also noted that the Company was beginning to reach out to hospitals impacted by above average price increases in response to Congressional inquiries.  On October 15, 2015, additional information was revealed to the market as news reports detailed Valeant's failure to be responsive or transparent with Congress's investigation, and that despite being served with a federal subpoena, Valeant was still refusing to provide adequate answers regarding its price gouging and improper practices.  On this news, the price of Valeant stock dropped by 4.75%, from a close of $177 per share on October 14, 2015, to a close of $168 per share on October 15, 2015, on elevated trading volume.

453.   **October 19-20, 2015.**  On October 19, 2015, the market learned additional information related to Valeant's dependence on price increases and its controlling interest in Philidor and a related secret network of specialty pharmacies, when the Company reported its third quarter 2015 financial results and hosted an earnings conference call (which started before the

market opened).  During the conference call, the Company revealed its direct relationship with and reliance on certain specialty pharmacies to increase the price of Valeant's drugs and volume of Valeant's sales, including Philidor, and Valeant's option to purchase Philidor.  In addition, the Company disclosed that pricing accounted for approximately 60% of its growth in 2014 and 2015, that it would be making drug pricing a smaller part of growth going forward, and that R&D would become an increased area of focus.  After the market closed on October 19, 2015, *The New York Times* published an article that described Philidor as not a "typical" specialty pharmacy, noted that Philidor's application for a license in California had been rejected for submitting false statements, and stated that Valeant was using Philidor as a tool to keep its drug prices high.

454.    On this news, the price of Valeant stock declined by nearly 8%, falling from a close of $177 per share on Friday, October 16, 2015 to a close of $163 per share on Monday, October 19, 2015, on elevated trading volume.  The following day, Valeant shares fell an additional 10% to close at $146 per share on October 20, 2015, also on unusually high trading volume.  The total stock price decline over this two-day period was over 17%, or $30 per share.

455.    **October 21-22, 2015.**  On October 21 and 22, 2015, the market learned of additional problems regarding Valeant's secret relationships with specialty and "affiliate" pharmacies, including Philidor and R&O, and related issues regarding Valeant's accounting practices.  On that day, Citron published a research report questioning the relationship between Valeant and Philidor and Valeant's associated accounting practices.  Citron suggested that Valeant had created a network of "phantom" specialty pharmacies for the purpose of inflating the Company's revenues.  The Citron report also provided further details of the lawsuit between R&O and Valeant, where R&O accused Valeant of "conspiring . . . to perpetuate a massive fraud."  After Citron's report was published, trading in Valeant shares was temporarily halted because of the

rapid decline in the price of Valeant shares.  Specifically, as a result of the information provided to the market on October 21, the price of Valeant stock dropped more than 19%, from a close of $146 per share on October 20, 2015, to a close of $118 per share on October 21, 2015, on extraordinary trading volume.

456.    Moreover, after the market closed, Philidor issued a press release disclosing its contractual relationship with "affiliated pharmacies," including R&O, and that it had a right to acquire such pharmacies now or in the future subject to regulatory approval.  The following day, analysts reacted to the troubling disclosures regarding Philidor.  For example, before the market opened on October 22, 2015, BMO issued a report downgrading its rating of Valeant and concluding that Valeant's arrangements with Philidor were "not just aggressive, but questionable." As analysts reacted to the disclosures and the market continued to digest the negative news, the price of Valeant stock continued to decline on October 22, falling an additional 7%, to close at $109 per share on unusually high trading volume.  The total stock price decline over this two-day period was over 25%, or $36 per share.

457.    **October 25-26, 2015**.  On October 25 and October 26, 2015, the market learned of additional issues concerning Valeant's improper relationship with and reliance on specialty pharmacies to increase the prices of Valeant products and to boost the volume of Valeant sales, and that the Company might be forced to terminate these clandestine relationships.  On Sunday, October 25, 2015, *The Wall Street Journal* reported that former Philidor employees had revealed that Valeant employees worked directly at Philidor and were using fictitious names in order to conceal the companies' relationship "so it didn't appear Valeant was using the pharmacy to steer patients" to Valeant products.  Before the market opened on October 26, 2015, Valeant filed its 3Q15 10-Q and hosted a conference call, which acknowledged that the Company had the "power

to direct" Philidor's activities, and that the Company was conducting an investigation, through an ad hoc Board committee, into its relationship with Philidor.  Later that day, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor."  As a result of this news, the price of Valeant stock dropped more than 5%, from a close of $116 per share on Friday, October 23, 2015, to a close of $110 per share on Monday, October 26, 2015, on unusually high trading volume.

458.     **October 28-30, 2015.**  On October 28 and 29, 2015, further information was revealed to the market regarding Valeant's secret relationship with and reliance on specialty pharmacies, including Philidor, to increase the prices of Valeant products and boost the volume of Valeant's sales.  On that day, *Bloomberg* reported that Philidor used "back door" tactics to increase payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim - to essentially shop around for one that would be accepted."  Then, on October 29, 2015, *Bloomberg Businessweek* reported on additional improper business practices at Philidor, including that Philidor was falsifying prescriptions to boost Valeant sales, based on the accounts of former Philidor employees and internal company documents. Additionally, during market hours on October 29, 2015, reports surfaced that CVS Caremark – one of the nation's three largest PBMs – had terminated its relationship with Philidor following an audit of Philidor's practices.  As a result of this news, the price of Valeant stock dropped nearly 5%, from a close of $117 per share on October 28, 2015, to a close of $111 per share on October 29, 2015, on unusually high trading volume.

459.     After the market closed on October 29, 2015, the nation's other largest PBMs, Express Scripts and OptumRx, announced that they too had terminated their relationships with Philidor.  Before the market opened on October 30, 2015, Valeant issued a press release stating

that it would be terminating its relationship with Philidor and that Philidor would be ceasing operations as soon as possible.  On this news, Valeant shares fell by nearly 16%, from a close of $111 per share on October 29, 2015, to a close of $93 per share on October 30, 2015, on unusually high trading volume.

460.   **November 4-5, 2015.**  On November 4, 2015, before the market opened, the Senate Aging Committee announced that it had formally launched a probe and requested documents and information from Valeant regarding its skyrocketing drug prices.  That same day, also before the market opened, *Bloomberg* reported that just weeks prior to the Company's announcement that it was cutting ties with Philidor, Valeant had planned to expand its use of Philidor, which further called into question the viability of the Company's recently issued financial guidance.  After the market closed on November 4, 2015, *The Wall Street Journal* reported that Valeant's largest shareholder, Ackman, was considering liquidating his entire $3.8 billion stake in the Company and had demanded that Valeant management "come clean" about Philidor.

461.   On this news, the price of Valeant stock dropped by approximately 6%, from a close of $97 per share on November 3, 2015, to a close of $91 per share on November 4, 2015, on elevated trading volume.  Valeant shares continued to decline the following day, falling by more than 14%, to close at $78 per share on November 5, 2015, on extraordinary trading volume.  The total stock price decline over this two day period was 19.5%, or $19 per share.

462.   **November 10-12, 2015.**  On November 10, 2015, before the market opened, Valeant hosted a business update call and disclosed the "significant" negative financial impact that Philidor's closure and the Government's spiraling probes into its pricing practices were having on the Company, including with respect to its financial guidance.  In particular, Valeant disclosed that there would be a significant short-term disruption to the Company's dermatology division, that the

Company was seeing short-term pressure in its neurology business, and that the Company was "working to quantify the potential short-term impact" on 4Q15 of the termination of its relationship with Philidor.   The Company also acknowledged that filling prescriptions for free would "obviously" have an impact on the rest of the quarter and that if Valeant's pricing is "viewed as aggressive we're going to have to listen to that."  On this news, Valeant stock dropped 2%, from a close of $85 per share on November 9, 2015, to a close of $83 per share on November 10, 2015, on unusually high trading volume.

463.   After the market closed on November 10, 2015, it was reported that the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay Philidor employees in order to obtain information regarding Valeant's practices.  The next day, before the market opened, *Bloomberg* reported that Valeant's creditors were "[s]pooked" by a possible "[r]evenue [s]queeze" and concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden."  During market hours on November 11, 2015, analysts at Nomura cut their Valeant price target.  On this news, the price of Valeant stock continued to decline, falling by over 5%, to close at $78 per share on November 11, 2015.

464.   On November 12, 2015, before the market opened, *Bloomberg* published another article regarding Valeant's relationship with Philidor, and multiple media outlets reported that analysts at several firms had lowered their price targets for Valeant.  On this news, Valeant's stock price dropped an additional 6.5%, to close at $73 per share.  The total stock price decline from November 10 through November 12, 2015 was over 13%, or $11 per share.

465.   **November 16, 2015**.  On November 16, 2015, during market hours, *Bloomberg* reported that Congressman Cummings wrote to Pearson requesting that Pearson make certain Valeant employees available for interviews.  After the market closed that day, *The Washington*

166

*Post* reported that the House Oversight Committee announced it would hold a hearing in early 2016 on prescription drug pricing, and that it had contacted Valeant to gather information. The article also disclosed that members of the House Oversight Committee were urging Valeant's executives to testify at the hearing and for Valeant to be subpoenaed. On this news, the price of Valeant stock dropped by nearly 3%, from a close of $75 per share on November 13, 2015, to a close of $73 per share on November 16, 2015, on unusually high volume. The price of Valeant stock continued to decline on November 17, 2015, dropping an additional 4% to close at $70 on high trading volume.

466. **December 17, 2015.** On December 17, 2015, before the market opened, Mizuho cut its rating on Valeant stock to "neutral" from "buy." The Mizuho analyst cited a lack of clarity regarding Valeant's agreement with Walgreens, and stated that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist." During market hours that day, *Bloomberg* published an article reporting on the Mizuho downgrade. On this news, the price of Valeant stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015.

467. **February 19, 2016**. On February 19, 2016, media outlets reported on a Wells Fargo analyst report issued the prior day that included an in-depth analysis on Valeant and questioned whether the Company had been truthful about Philidor. In particular, the report questioned whether the Company had been truthful regarding Philidor and Valeant's relationship, including the adverse consequences to Valeant of terminating that relationship, management's credibility, and irregularities with the Company's accounting. The analysis noted that Valeant's "new guidance is not compatible with the data presented by Valeant" and "the reduction in

guidance does not match the impact [of Philidor], as described by Valeant."  The report stressed that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor."  The report further noted that Valeant's accounting was misaligned with its purported performance, and suggested that the dramatic rise in Valeant's accounts receivables could be an indication of Valeant's "improperly timed recognition of revenue."  On this news, the price of Valeant stock dropped by nearly 10%, falling from a close of $94 per share on February 18, 2016 to a close of $84 per share on February 19, 2016, on elevated trading volume.

468.   **February 22, 2016.**  On February 22, 2016, a Wells Fargo analyst released an updated note regarding Valeant that included two additional valuation models and a $62 price target.  Also on February 22, 2016, CVS announced it would restrict the use of Jublia, one of Philidor's most heavily distributed drugs, by requiring patients to first try a less expensive generic drug.  After the market closed on February 22, 2016, *The Wall Street Journal* reported that Valeant was likely to restate its 2014 and 2015 earnings following an internal review of its financials.  Later that evening, the Company confirmed in a release that it would be restating its 2014 earnings by at least $58 million, which would reduce 2014 GAAP EPS by approximately $0.10.  The Company disclosed that it had been improperly recognizing revenue upon the delivery of products to Philidor, instead of when the products were dispensed to patients.  The Company also announced it would delay filing its 2015 10-K pending completion of related accounting matters.  Schiller commented that the Company would be "improving reporting procedures, internal controls and transparency for our investors."  On this news, the price of Valeant stock dropped by over 10%, from a close of $84 per share on February 19, 2016 to a close of $75 per share on February 22, 2016, the next trading day, on unusually high trading volume.  Valeant shares continued falling in

after-hours trading on February 22, 2016 as news of the impending restatement hit the market, dropping as low as $68 per share.

469.   **February 28-29, 2016.**   On Sunday, February 28, 2016, Valeant issued a press release announcing Pearson's immediate return from medical leave as CEO, Ingram's appointment as Chairman of the Board, and the cancellation of a conference call set for February 29, 2016 concerning preliminary 4Q15 financial results and updated guidance for 2016.   The press release also disclosed that the Company was withdrawing its prior financial guidance, and confirmed that it would delay filing its 2015 10-K pending completion of the review of accounting matters by the ad hoc committee "and the Company's ongoing assessment of the impact on financial reporting and internal controls."   Numerous media outlets reported on these disclosures prior to the market's opening on February 29, 2016.   Also during market hours, Moody's placed Valeant ratings on review for potential downgrade on concerns that the Company's operating performance was weaker than expectations, potentially impeding deleveraging plans.   As the day progressed, additional reports surfaced, and the Company ultimately confirmed that Valeant was under investigation by the SEC and had received a subpoena during 4Q15.

470.   On this news, the price of Valeant stock dropped by more than 18%, from a close of $80 per share on February 26, 2016 to a close of $65 per share on February 29, 2016, the next trading day, on unusually high trading volume.

471.   **March 15, 2016**.   On March 15, 2016, before the market opened, Valeant issued its preliminary unaudited 4Q15 financial results and held a much anticipated conference call.   The Company revealed that it was reducing its financial guidance for 2016, and provided certain unaudited financial information concerning its 4Q15 performance.   In particular, the Company slashed its 2016 revenue guidance from $12.5-12.7 billion to $11-11.2 billion; reduced its Cash

EPS guidance from $13.25-13.75 to $9.50-10.50; and cut its EBITDA guidance from $6.7-$7.1 billion to $5.6-$5.8 billion.  The Company cited as reasons for these substantial downward revisions "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016."  The Company also reported $51.3 million in "wind down costs" for Philidor, including "write-downs of fixed assets and bad debt expenses," and a $79 million impairment charge related to Philidor.  As to price increases, Pearson stated that all increases going forward "will be more modest and in line with industry practices and managed-care contracts."  During the conference call, Defendants disclosed that even the Company's press release earlier that morning was inaccurate, because it had forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the figure should have been only $6.0 billion.  That same day, Moody's downgraded Valeant's credit ratings, as well as those of its subsidiaries, by several levels.

472.     On this news, the price of Valeant stock plummeted by more than 50%, from a close of $69 per share on March 14, 2016 to a close of $33 per share on March 15, 2016, on extremely high trading volume.

473.     **June 7, 2016**.  On June 7, 2016, Valeant issued a press release and hosted a conference call regarding the Company's long-delayed 1Q16 financial results.  The Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 guidance, and revealed that the poor financial results and outlook were caused, in large part, by the loss of Philidor.  For example, Rosiello stated that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship." Papa, the Company's new CEO, added that with respect to dermatology, "a significant portion of

our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreens prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price."

474.    In response to this news, which further revealed the extent to which Valeant relied on Philidor to boost prescription drug sales, refills, and prices during much of the Relevant Period, the price of Valeant stock dropped by nearly 15% to close at $24 on June 7, 2016, on unusually high trading volume.

475.    **August 10-11, 2016**.  On August 10, 2016, after the market closed, *The Wall Street Journal* reported that Valeant was under criminal investigation by the DOJ for whether it defrauded insurers by concealing its relationship to Philidor and for a variety of other deceptive business practices.  According to *The Wall Street Journal* article, which was quickly picked up by a variety of media outlets, federal prosecutors in the U.S. attorney's office in Manhattan were investigating possible mail and wire fraud violations based on whether Valeant "defrauded insurers by shrouding its ties to a mail-order pharmacy [Philidor] that boosted sales of its drugs," and for deceptive business practices used to sell Valeant drugs, such as rebates and other compensation provided to patients.  According to sources interviewed by *The Wall Street Journal* familiar with the matter, "[p]rosecutors are investigating not only the level of control Valeant exerted over Philidor's business, but the extent of the ties, including Valeant's role in Philidor's growth."  *The Wall Street Journal* cited these sources as stating that, "the probe is expected to be the most serious Valeant currently faces, and could lead to criminal charges against former Philidor executives and Valeant as a company."  The article quoted a statement by Valeant that it "has been cooperating and continues to cooperate with the ongoing Southern District of New York investigation."

476.    In response to this news, which further revealed the enormous risks presented by Valeant's secret pharmacy network and other undisclosed business practices, the price of Valeant stock declined by over 10% to close at $24.49 on August 11, 2016, on unusually high trading volume.

477.    The above declines in Valeant stock were the direct and proximate result of the nature and extent of Defendants' prior materially false and misleading statements and omissions being revealed to the market.  The partial removal of artificial inflation from the price of Valeant securities following each of these disclosures would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Valeant securities remained artificially inflated.

478.    The timing and magnitude of the price declines negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

## X.    PLAINTIFFS' RELIANCE

479.    During the Relevant Period, Plaintiffs relied on the materially false and misleading statements alleged herein when purchasing Valeant securities.

480.    There is a presumption of reliance established by the fraud-on-the-market doctrine in this case because, among other things:

a)    The Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

b)    The misrepresentations and omissions were material;

c)    The Company's stock traded in efficient markets;

        d)      The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's stock; and

        e)      Plaintiffs purchased common stock and other securities of Valeant between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were fully disclosed, without knowledge of the misrepresented or omitted facts.

        481.    At all relevant times, the markets for Valeant stock were efficient for the following reasons, among others:  (a) Valeant's stock was listed, and actively traded, on the NYSE, a highly efficient and automated market; (b) Valeant filed periodic reports with the SEC; (c) Valeant regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (d) Valeant was followed by numerous analysts who wrote reports that were published, distributed and entered the public market.  As a result of the foregoing, the market for Valeant's publicly traded common stock promptly digested current information with respect to the Company and reflected such information in the price of Valeant's common stock.  Plaintiffs relied on the price of Valeant's common stock, which reflected all the information in the market, including the misstatements by Defendants.

        482.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material fact which Defendants were under a duty to disclose.

        483.    In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding whether to purchase Valeant stock.

484.     Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about Plaintiffs' decisions with respect to Valeant stock. Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of Defendants' false and misleading statements alleged herein when deciding that the Plaintiffs should purchase, sell, or hold Valeant stock during the Relevant Period.

## XI.     NO SAFE HARBOR

485.     The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint.  The statements complained of herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

486.     Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading, or the statement was authorized or approved by an executive officer of Valeant who knew that the statement was materially false or misleading when made.

## XII.   COUNTS

### COUNT I
### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5
(Against All Defendants)

487.   Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

488.   This claim is brought by Plaintiffs against all Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

489.   During the Relevant Period, Defendants disseminated or approved the materially false and misleading statements and omissions alleged above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

490.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of Valeant stock.

491.   In addition to the duties of full disclosure imposed on the Defendants attendant to their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. § 210.01, *et seq.*) and S-K (17 C.F.R. § 229.10, *et seq.*) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC,

including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

492.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of Valeant stock during the Relevant Period.  In reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for Valeant stock and experienced losses when the artificial inflation was removed from the stock as a result of the revelations and price declines detailed herein.  Plaintiffs would not have purchased or acquired Valeant stock at the prices they paid, or at all, if they had been aware that those prices had been inflated by Defendants' misleading statements and omissions.

493.    By virtue of the conduct alleged herein, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiffs.

### COUNT II
### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### (Against Defendants Valeant, Pearson, Schiller, and Rosiello)

494.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth herein.

495.    This claim is brought by Plaintiffs against Defendants Valeant, Pearson, Schiller, and Rosiello for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

496.    During their tenures as officers and/or directors of Valeant, Pearson, Schiller, and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Valeant, these Defendants had the power and authority to cause Valeant to engage in the conduct complained of herein.  These Defendants were able to, and did, control, directly and indirectly, the decision-making of Valeant, including the content and dissemination of Valeant's public

statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.  Valeant exercised control over and directed the actions of its senior managers, directors and agents, including the individual Defendants. Valeant controlled Pearson, Schiller, Rosiello and all of its employees and subsidiaries.

497.    In their capacities as senior corporate officers and/or directors of Valeant, and as more fully described herein, Pearson, Schiller, and Rosiello participated in the misstatements and omissions set forth above.  These Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Valeant's deceptive and risky business practices.  Valeant, Pearson, Schiller and Rosiello had the ability to influence and direct and did so influence and direct the activities of each of the Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5 as alleged in Count I.

498.    As a result, Valeant, Pearson, Schiller, and Rosiello, individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

499.    As set forth above, Valeant violated Section 10(b) of the Exchange Act.  By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson, Schiller, and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Valeant is liable to Plaintiffs.  Valeant exercised control over the individual Defendants and all of its employees and subsidiaries and, as a result of its aforesaid conduct and culpable participation, is liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as the individual Defendants are liable to Plaintiffs.

500.    By reason of the foregoing, Valeant, Pearson, Schiller, and Rosiello violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and are liable to Plaintiffs.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, as allowed by law;

B.      Awarding Plaintiffs extraordinary, injunctive and/or equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiffs hereby demands a trial by jury for all issues so triable.

Dated: January 19, 2018                    Respectfully submitted,

                                           HUNG G. TA, ESQ. PLLC


                                           /s/ JooYun Kim
                                           JooYun Kim
                                           Hung G. Ta (*pro hac vice* forthcoming)
                                           Natalia D. Williams (*pro hac vice* forthcoming)
                                           250 Park Avenue, Seventh Floor
                                           New York, NY 10177
                                           Tel:  (646) 453-7288
                                           jooyun@hgtlaw.com
                                           hta@hgtlaw.com
                                           natalia@hgtlaw.com

SAFIRSTEIN METCALF LLP
Peter Safirstein
Elizabeth Metcalf (*pro hac vice* forthcoming)
1250 Broadway, 27th Floor
New York, NY 10001
Tel:  (212) 201-2845
psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

KYROS LAW, PC
Konstantine Kyros
17 Miles Road
Hingham, MA 02043
Tel:  (800) 934-2921
kon@kyroslaw.com

*Counsel for Plaintiffs*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil actions:

- *Potter v. Valeant Pharmaceuticals International, Inc., et al.*, 15-cv-7658-MAS

- *T. Rowe Price Growth Stock Fund, Inc., et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-5034-MAS

- *Equity Trustees Limited, et al. v. Valeant v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-6127-MAS

- *Principal Funds, Inc. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-6128-MAS

- *Bloombergsen Partners Fund LP, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7212-MAS

- *Bluemountain Foinaven, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7328-MAS

- *Discovery Global Citizens Master Fund, Ltd., et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7321-MAS

- *MSD Torchlight Partners, L.P., et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7324-MAS

- *Incline Global Master LP, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7494-MAS

- *Janus Aspen Series, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7497-MAS

- *Valic Company I, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 16-cv-7496-MAS

- *Lord Abbett Investment Trust-Lord Abbett Short Duration Income Fund, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-6365-MAS

- *Okumus Opportunist Value Fund, Ltd. v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-6513-MAS

- *Pentwater Equity Opportunities Master Fund Ltd. v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-7522-MAS

1

- *Public Employees Retirement System of Mississippi v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-7625-MAS

- *The Boeing Company Employee Retirement Plans Master Trust, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-7636-MAS

- *Forsta AP-Fonden, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-12088-MAS

- *State Board of Administration of Florida v. Valeant Pharmaceuticals International, Inc., et al.*, 17-cv-12808-MAS

- *New York City Employees' Retirement System, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 18-cv-00032-MAS

- *GMO Trust, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 18-cv-00089-MAS

- *BlackRock Global Allocation Fund, Inc., et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 18-cv-00343-MAS

- *Colonial First State Investments Limited, et al. v. Valeant Pharmaceuticals International, Inc., et al.*, 18-cv-00383-MAS

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  January 19, 2018

/s/ JooYun Kim
JooYun Kim
HUNG G. TA, ESQ. PLLC
Hung G. Ta (*pro hac vice* forthcoming)
Natalia D. Williams (*pro hac vice* forthcoming)
250 Park Avenue, Seventh Floor
New York, NY 10177
Tel:  (646) 453-7288
jooyun@hgtlaw.com
hta@hgtlaw.com
natalia@hgtlaw.com

*Counsel for Plaintiffs*